1

2
STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

3
SARA WINSLOW (DCBN 457643)
Chief, Civil Division

4

5
JULIE BIBB DAVIS  (CABN 184957)
Assistant United States Attorney

6
1301 Clay Street, Suite 340S
Oakland, California 94612

7
Telephone: (510) 788-3508
FAX: (510) 637-3724

8
Julie.davis@usdoj.gov

9
Attorneys for Federal Defendants

10
UNITED STATES DISTRICT COURT

11
NORTHERN DISTRICT OF CALIFORNIA

12
SAN FRANCISCO DIVISION

13

14
EASTON STOKES,

    Plaintiff,

15

16
    v.

17
UNITED STATES DEPARTMENT OF
JUSTICE, et al.

18
    Defendants.

19

20

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**No. 3:19-cv-04613-WHA**

**FEDERAL DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT; [PROPOSED]
ORDER**

Judge: Hon, William Alsup
Date:  June 3, 2021
Time: 2:00 p.m.
Location: Remote

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NOTICE OF CROSS-MOTION AND CROSS-MOTION ...................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

I.    INTRODUCTION ...........................................................................................................................1

II.   PROCEDURAL BACKGROUND.................................................................................................2

III.  STATUTORY AND REGULATORY BACKGROUND.............................................................3

    A.    The Federal Gun Control Act ....................................................................................3

    B.    California's Lanterman-Petris-Short Act .................................................................5

IV.   FACTUAL BACKGROUND .........................................................................................................6

    A.    Plaintiff's Commitment Was Not Voluntary ..........................................................6

    B.    Plaintiff Was Notified Of, And Declined To Utilize, The Judicial Proceedings
       Available To Him ........................................................................................................7

    C.    The Record Contains Significant Evidence Of Plaintiff's Danger To Himself
       And Others At The Time Of His Commitment .........................................................8

V.    LEGAL STANDARD......................................................................................................................9

VI.   ARGUMENT ...................................................................................................................................9

    A.    Plaintiff's Second Amendment Argument Is Foreclosed By The Ninth
       Circuit's Decision in Mai .............................................................................................9

    B.    The California Statutory Scheme For Involuntary Commitments Contains
       Robust Judicial Proceedings That Plaintiff Chose Not To Utilize .....................9

    C.    Plaintiff Cannot State A Legally Cognizable Second Amendment Claim ........10

    D.    Section 922(g)(4) Is Consistent With Plaintiff's Constitutional Rights Because
       It Satisfies The Applicable Level Of Scrutiny ......................................................11

          1.    Section 922(g)(4) Substantially Relates To The Important
              Governmental Interest Of Preventing Firearm Violence, Including
              Suicide, and Protecting Public Safety ........................................................12

              (a)    Section 922(g)(4) Serves Important And Compelling
                   Government Interests ........................................................................12

              (b)    Section 922(g)(4) Substantially Relates To Protecting Public
                   Safety ....................................................................................................13

          2.    Section 922(g)(4) Is Constitutional As Applied To Plaintiff..................18

    E.    Plaintiff's Equal Protection And Due Process Claims Are Without Merit.......19

1        1.    Plaintiff's Equal Protection Claim Based On The Classification Of
Individuals Who Have Been Involuntarily Committed Is WIthout
2        Merit...................................................................................................................19

3        2.    Plaintiff's Equal Protection Claim Based On His Current Lack Of A
Forum To Demonstrate Fitness To Possess Firearms Is Without Merit...............21

3.    Any Substantive Due Process Challenge Is Redundant In The Face Of
Plaintiff's Second Amendment Challenge............................................................22

4.    Plaintiff Cannot Show A Deprivation Of Any Procedural Due Process
Right...................................................................................................................24

VII.    CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Kwong v. Bloomberg,*
   723 F.3d 160 (2d Cir. 2013)...................................................................................... 20, 22

*Albright v. Oliver,*
   510 U.S. 266 (1994).......................................................................................................... 23

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................................................................ 9

*Barrett v. United States,*
   423 U.S. 212 (1976).......................................................................................................... 14

*Bell v. United States,*
   2013 WL 5763219 (E.D. Pa. Oct. 24, 2013), *aff'd,* 574 F. App'x 59 (3d Cir. 2014)........................... 24

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................................................................ 9

*Clark v. Jeter,*
   486 U.S. 456 (1988).......................................................................................................... 12

*Cleburne v. Cleburne Living Center, Inc.,*
   473 U.S. 432 (1985).......................................................................................................... 21

*Culp v. Madigan,*
   270 F. Supp. 3d 1038 (C.D. Ill. 2017) ............................................................................. 25

*Currier v. Potter,*
   379 F.3d 716 (9th Cir. 2004) ........................................................................................... 21

*Davis v. United States,*
   854 F.3d 594 (9th Cir. 2017) ............................................................................................. 9

*Dickerson v. New Banner Inst., Inc.,*
   460 U.S. 103 (1983).................................................................................................... 14, 17

*District of Columbia v. Heller,*
   554 U.S. 570 (2008).................................................................................................. 1, 10, 11

*Heller v. Doe by Doe,*
   509 U.S. 312 (1993).......................................................................................................... 21

*Drake v. Filko*,
    724 F.3d 426 (3d Cir. 2013)...................................................................................... 14, 15

*Estelle v. Smith*,
    451 U.S. 454 (1981) ...................................................................................................... 15

*Fla. Bar. v. Went For It, Inc.*,
    515 U.S. 618 (1995) ...................................................................................................... 16

*Galbraith v. County of Santa Clara*,
    307 F.3d 1119 (9th Cir. 2002) ...................................................................................... 24

*Giannani v. Real*,
    911 F.2d 354 (9th Cir. 1990) ........................................................................................ 22

*Golinski v. United States Office of Pers. Mgmt.*,
    824 F. Supp. 2d 968 (N.D. Cal. 2012) .......................................................................... 20

*Graham v. Connor*,
    490 U.S. 386 (1989)......................................................................................... 22, 23, 24

*Hawthorne v. Kernan*,
    2020 WL 6891819 (N.D. Cal. Nov. 24, 2020) .............................................................. 24

*Heller v. Bedford Cent. Sch. Dist.*,
    665 F. App'x 49 (2d Cir. 2016) ............................................................................... 8, 18

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012) .......................................................................................... 21

*Huddleston v. United States.*,
    415 U.S. 814 (1974) ...................................................................................................... 14

*Jackson v. City & Cty. Of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ........................................................................................ 11

*Jefferies v. Sessions*,
    278 F. Supp. 3d 831 (E.D. Pa. 2017) ...................................................................... 20, 25

*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012)............................................................................................ 14

*Levys v. Shamlin*,
    2017 WL 5714027. (W.D. Pa. Nov. 28, 2017) ...................................................... 23, 24

*Mai v. United States*,
    952 F.3d 1106 (9th Cir.2020) ................................................................................ passim

*Matsuo v. United States*,
   532 F. Supp. 2d 1238, 1248 (D. Hawaii 2008), *aff'd* 586 F.3d 1180 (9th Cir. 2009) ........................ 22

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ........................................................................................ 11

*National Rifle Association v. McGraw*,
   719 F.3d 338 (5th Cir. 2013) ................................................................. 21, 22, 25

*Nordyke v. King*,
   644 F.3d 776 (9th Cir. 2011) ........................................................................ 2, 24

*Nordyke v. King*,
   681 F.3d 1041 (9th Cir. 2012) ..................................................................... 20, 24

*Phelps v. Bosco*,
   711 Fed. Appx. 63 (2d Cir. 2018) ...................................................................... 10

*Schall v. Martin*,
   467 U.S. 253 (1984) ............................................................................... 2, 12, 13

*Schweiker v. Wilson*,
   450 U.S. 221 (1981) ........................................................................................ 21

*Second Amendment Arms v. City of Chicago*,
   135 F. Supp. 3d 743 (N.D. Ill. 2015) .................................................................. 23

*Silveira v. Lockyer*,
   312 F. 3d 1052 (9th Cir. 2002) ........................................................................ 22

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2013) ........................................................................... 12

*SKF USA Inc. v. U.S. Customs & Border Protection*,
   556 F.3d 1337 (Fed. Cir. 2009) ........................................................................ 21

*United States v. Torres*,
   911 F.3d 1253 (9th Cir. 2019) ......................................................................... 12

*Turner Broad Sys., Inc. v. FCC*,
   520 U.S. 180 (1997) ....................................................................................... 14

*United States v. Bean*,
   537 U.S. 71 (2002) ....................................................................................... 5, 6

*United States v. Chapman*,
   666 F.3d 220 (4th Cir. 2012) ........................................................................... 18

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ................................................................ 11

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ........................................................ 11, 18

*United States v. Marzzeralla,*
    614 F.3d 85 (3d Cir. 2010) .................................................................... 11

*United States v. McIlwain,*
    772 F.3d 688 (11th Cir. 2014) .............................................................. 25

*United States v. McRobie,*
    2009 WL 82715 (4th Cir. Jan. 14, 2009) ........................................... 8, 18

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010) .............................................................. 11

*United States v. Rehlander,*
    666 F.3d 45 (1st Cir. 2012) .................................................................. 10

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................................. 12

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) ...................................................... 12, 14, 16

*United States v. Staten,*
    666 F.3d 154 (4th Cir. 2011) ................................................................ 16

*United States v. Waters,*
    23 F.3d 29 (2d Cir. 1994) ..................................................................... 15

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) .............................................................. 18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................................... 2, 13

*Weinberger v. Salfi,*
    422 U.S. 749 (1975) ............................................................................. 15

*White v. City of New York,*
    2018 WL 1545676 (E.D.N.Y. Mar. 29, 2018) ...................................... 23

Statutes

10 U.S.C. § 850a ...................................................................................... 4

18 U.S.C. § 922(d)(4) ................................................................................................ 5

18 U.S.C. § 922(g) ............................................................................................ passim

18 U.S.C. § 922(g)(4) ........................................................................................... 1, 3

18 U.S.C. § 925(c) ..................................................................................................... 5

34 U.S.C. § 40915 ..................................................................................................... 3

Cal. Welf. & Inst. Code § 5150(l)(1) ................................................................... 6, 10

Cal. Welf. & Inst. Code § 5250 ................................................................................ 6

Cal. Welf. & Inst. Code § 5250(a) ................................................................ 8, 13, 17

Cal. Welf. & Inst. Code § 5275 ........................................................................... 6, 10

Cal. Welf. & Inst. Code §§ 5000, et seq. ............................................................... 5, 6

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................. 9, 26

**Regulations**

17 C.F.R. § 478.11 .................................................................................................... 4

**Other Authorities**

Pub. L. No. 90-618 .................................................................................................... 3

Pub. L. No. 90-618, § 102, 82 .................................................................................. 5

Pub. L. No. 99-308 .................................................................................................... 5

Pub. L. No. 102-393 .................................................................................................. 5

Pub. L. No. 110-180 .................................................................................................. 5

1

2 **NOTICE OF CROSS-MOTION AND CROSS-MOTION**

3        PLEASE TAKE NOTICE that on June 3, 2021, at 2:00 p.m., before the Honorable William

4 Alsup, Federal Defendants will cross-move this Court for an order granting judgment on all claims in

5 favor of Federal Defendants pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Federal

6 Defendants' Cross-Motion is based on this notice; the following memorandum of points and authorities;

7 the record and previous pleadings in this matter; and such oral argument as the Court may permit.

8 **MEMORANDUM OF POINTS AND AUTHORITIES**

9 **I.    INTRODUCTION**

10        Plaintiff Easton Stokes ("Plaintiff") is prohibited from possessing a firearm under 18 U.S.C.

11 § 922(g)(4) because it is undisputed that he was involuntarily committed for mental health treatment

12 pursuant to California law, which explicitly provides for judicial review upon request. Cal. Welf. & Inst.

13 Code §§ 5000 et seq. The Ninth Circuit has held both that section 922(g)(4) is constitutional under the

14 Second Amendment, and that the *continued* prohibition on the possession of firearms by a plaintiff who,

15 like Plaintiff Stokes, was committed some years ago, survives an as-applied challenge to section

16 922(g)(4). *Mai v. United States*, 952 F.3d 1106, 1120-1121 (9th Cir.2020), *cert. denied* ___ S.Ct. ___,

17 2021 WL 1602649 (April 26,  2021). Moreover, section 922(g)(4)'s prohibition is constitutional where,

18 as here, a plaintiff has no potential avenues for relief from the section 922(g)(4) prohibition under

19 federal law. *Id.*  Based on the controlling authority of *Mai* and other applicable caselaw, Plaintiff's

20 Second Amendment claim must be denied, and summary judgment granted to Federal Defendants.

21        History and common sense confirm that restricting the firearm possession of persons with a

22 history of mental disturbance is consistent with "the right of law-abiding, responsible citizens to" keep

23 and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The Second Amendment is

24 thus not violated by the application to Plaintiff of section 922(g)(4)'s "longstanding prohibition[] on the

25 possession of firearms by . . . the mentally ill." *Id.* at 626.

26        Even assuming that history did not foreclose Plaintiff's claims, section 922(g)(4)'s restriction on

27 Plaintiff's firearm possession readily withstands the means-end scrutiny the Ninth Circuit has applied to

28 determine whether the prohibitions contained in section 922(g) run afoul of the Second Amendment.

1   Congress enacted section 922(g)(4) to address the problem of "firearms deaths caused by persons who

2   are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental

3   disturbances." 114 Cong. Rec. 21,829 (statement of Rep. Bingham). The Supreme Court has long

4   recognized the government's "legitimate and compelling" interest "in protecting the community from

5   crime," *Schall v. Martin*, 467 U.S. 253, 264 (1984) (quotation marks omitted), and its "unquestionably

6   important and legitimate" interest in suicide prevention, *Washington v. Glucksberg,* 521 U.S. 702, 735

7   (1997). And there is plainly a substantial fit between the compelling interests animating section

8   922(g)(4) and Congress's choice to address the problem of gun violence through a prohibition on

9   firearm possession by individuals who have suffered from such severe mental illness that they were

10  committed to a mental institution. *Mai*, 952 F.3d at 1118-19 (holding that even where a plaintiff asserts

11  that he personally no longer suffers from mental illness, "the Second Amendment does not demand 'an

12  individualized hearing' to assess Plaintiff's own personal level of risk").

13      Plaintiff's due process and equal protection claims likewise fail as a matter of law. When, as

14  here, a specific right is delineated pursuant to Amendment, the right is more appropriately analyzed

15  under that Amendment, and not under a due process or equal protection framework. *See Nordyke v.

16  King*, 644 F.3d 776, 794 (9th Cir. 2011). Accordingly, Federal Defendants are entitled to summary

17  judgment on all of Plaintiff's claims.

18  **II.   PROCEDURAL BACKGROUND**

19      Plaintiff filed his Complaint on August 12, 2019. Dkt. No. 1. Federal Defendants subsequently

20  moved for summary judgment. Dkt. No. 60. State Defendants moved for judgment on the pleadings

21  (Dkt. No. 61), and Plaintiff opposed both motions. After oral argument, the Court issued an order for

22  further discovery and development of the record. Dkt. No. 68. The Court stated that while "[t]his action

23  is probably foreclosed by *Mai v. United States*," additional evidence was needed before ruling on the

24  pending motions by Federal and State Defendants. *Id.*

25      Specifically, the Court ordered Plaintiff to file a petition requesting relief from his involuntary

26  commitment status in a California state court. Plaintiff was also ordered to submit a declaration

27  regarding various issues, which he did on November 5, 2020. Dkt. No. 73. Plaintiff also filed certain

28  medical records. Dkt. No. 79. Defendants were ordered to depose Plaintiff, which they did on November

20, 2020. Deposition of Easton Stokes ("Stokes Depo."), attached here as Exhibit 1. The Court requested supplemental briefing regarding how the additional evidence might impact the legal analysis. Dkt. No. 68; Dkt. No. 81. Pursuant to these orders, all parties filed supplemental briefing. Dkt. Nos. 84-86.

The Court denied the motions of the Federal Defendants and the State Defendants without prejudice, and ordered all parties to submit cross-motions for summary judgment. Dkt. No. 87. The Court expressed particular interest in the following two issues:

> (i)  Additionally, commitments under state-law procedures that lack robust judicial involvement do not qualify as commitments for purposes of § 922(g)(4)." *Mai v. United States*, 952 F.3d 1106, 1110 (9ᵗʰ Cir. 2020) (citation omitted).  In light of this sentence, does the 2002 proceeding against Plaintiff Stokes qualify as a "commitment"?

> (ii)  The arguable denial of the equal protection of the laws by reason that plaintiff is denied an opportunity to show his current fitness to possess firearms under 34 U.S.C. § 40915 simply because California has not established such a program and federal law does not require it.

Dkt. No. 87. In the briefing below, Federal Defendants address those issues as well as all of the other issues relevant to their motion.

## III.   STATUTORY AND REGULATORY BACKGROUND

### A.   The Federal Gun Control Act

The federal restrictions barring certain individuals from possessing firearms are set forth in 18 U.S.C. § 922(g). Congress enacted these provisions as part of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, after a multi-year inquiry into violent crime that included "field investigation and public hearings." S. Rep. No. 88-1340, at 1-2 (1964). Under section 922(g)(4), an individual "who has been committed to a mental institution" may not possess a firearm. Specifically, section 922(g)(4) states:

> It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate commerce.

*Id.*[1] Regulations issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") define these terms as follows:

> Adjudicated as a mental defective.

---

[1]  Section 922(g) also imposes firearm restrictions on several other groups of individuals, including convicted felons, section 922(g)(1); fugitives, section 922(g)(2); and domestic violence misdemeanants, section 922(g)(9).

> (a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease;
> (1) Is a danger to himself or to other; or
> (2) Lacks the mental capacity to contract or manage his own affairs.
> (b) The term shall include –
> (1) A finding of insanity by a court in a criminal case; and
> (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. § 850a, 876b.
> . . . .
>> Committed to a mental institution. A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

17 C.F.R. § 478.11.

During the hearings, federal law enforcement officials noted the "number of tragedies and crimes" resulting from the circumvention of local firearms laws, including an incident involving a "mentally ill youth who bought a gun in a Fairfax gunshop . . . and used it to kill a high school student." *Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 88th Cong. 3375 (1963) (pt. 14) (statement of James Bennett, Director, U.S. Bureau of Prisons). The evidence before Congress also addressed suicide, showing that "[i]n 1966, 6,855 Americans were murdered by gun[] [whereas] 10,407 suicides and 2,600 fatal accidents involved firearms." 114 Cong. Rec. 21,774 (1968) (statement of Rep. Rosenthal), and that "[i]n the last decade, 92,747 Americans took their own lives with a firearm, reflecting the fact that the surest and easiest way to commit suicide is with a gun." *id.* at 21,811 (statement of Rep. Schwengel).

Congress sought to address these problems by "regulat[ing] more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them," S. Rep. No. 89-1866, at 1 (1966), including "persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances." 114 Cong. Rec. 21,829 (statement of Rep. Bingham). Lawmakers explained that they sought to restrict access to firearms by "individuals who by their previous conduct or mental condition or irresponsibility have shown themselves incapable of handling a dangerous weapon in the midst of an open society," *id.* at 21,809-10 (statement of Rep. Tenzer), such as "persons with a history of mental disturbances," *id.* at

21,784 (statement of Rep. Celler).

The Gun Control Act originally included a provision under which an individual barred from firearm possession due to certain non-firearm offenses could apply to the federal government for "relief from the disabilities imposed by Federal laws," based on a showing "that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Pub. L. No. 90-618, § 102, 82 Stat. at 1225. In 1986, Congress expanded that relief-from-disabilities program to cover any person whom the Gun Control Act "prohibited from possessing, shipping, transporting, or receiving firearms." Firearms Owners' Protection Act, Pub. L. No. 99-308, § 105(1)(A), 100 Stat. 449, 459 (1986) (codified as amended at 18 U.S.C. § 925(c)). As relevant here, the federal program for "relief from the disabilities imposed by Federal [firearms] laws," 18 U.S.C. § 925(c), was in effect from 1986 until 1992, when Congress suspended its funding through an appropriations restriction on the ATF, which administered the program. *See* Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, tit. I, 106 Stat. 1729, 1732 (1992); *United States v. Bean*, 537 U.S. 71, 74-75 (2002).

Congress subsequently found deficiencies in the reporting of information to the National Instant Criminal Background Check System ("NICS") that made it possible for individuals with documented mental health problems to purchase and misuse firearms notwithstanding 18 U.S.C. § 922(d)(4) and (g)(4). It accordingly enacted the NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, 121 Stat. 2559 (2008). The Act, *inter alia*, authorizes federal grants to assist States to improve the quality of information they make available to the databases searched by NICS. *Id.* § 103(b)(1), 121 Stat. at 2567. To be eligible for such a grant, a State must certify to ATF that it has implemented a program under which persons who "pursuant to State law" have been adjudicated mentally defective or committed to a mental institution may "apply to the State for relief from the disabilities imposed by [18 U.S.C. § 922(d)(4) and (g)(4)]." *Id.* § 103(c), 121 Stat. at 2568; *id.* § 105(a), 121 Stat. at 2569. At present, approximately thirty States—though not California—have created qualifying programs.

### B. California's Lanterman-Petris-Short Act

California Welfare & Institutions Code §§ 5000 et seq., the Lanterman-Petris-Short Act, sets up a statutory scheme providing for the involuntary civil commitment of individuals with mental health disorders. *Id.* at § 5001. Upon a finding of probable cause, section 5150 provides that a person may be placed on an involuntary seventy-two hour hold in a psychiatric facility for evaluation and treatment when that person is determined to be a danger to him/herself or others, or is gravely disabled. A person detained under section 5150 may subsequently be detained under section 5250 for an additional fourteen days if the staff of the facility evaluates the person's condition and finds that person "is, as a result of a mental disorder . . . ., a danger to others, or to himself or herself, or gravely disabled." The treating facility is required to notify the committed person of the right to an attorney and a hearing before a judge if the facility decides to hold the committed person longer than seventy-two hours. *See* Cal. Welf. & Inst. Code § 5150(l)(1). California law also grants a right to a hearing challenging the 5250 certification at any time during the commitment, upon request of the detained person or a person acting on his or her behalf. Cal. Welf. & Inst. Code § 5275, et seq.

## IV.   FACTUAL BACKGROUND

In 2002, Plaintiff was committed to Oakcrest, a mental health treatment facility, on a psychiatric hold. *See* Cal. Welf. & Inst. Code § 5250; Complaint at ¶ 25. He remained there for sixteen days. Complaint at ¶ 26. Plaintiff's commitment to Oakcrest was pursuant to a "5250 certification," (Complaint at ¶ 25) which constitutes an involuntary commitment for people who are "a danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code §§ 5000 et seq. Plaintiff admits that he was committed pursuant to a section 5250 involuntary commitment, and also admits that he did not seek judicial review of the 5250 certification, which he was entitled to do under California law (Cal. Welf. & Inst. Code § 5275, et seq.), in order to challenge his commitment. Complaint at ¶ 25. In 2016, Plaintiff submitted a Personal Firearms Eligibility Check ("PFEC") which was denied, presumably as a result of Plaintiff's prior involuntary psychiatric commitment.[2] *Id.* at ¶ 30.

### A.   Plaintiff's Commitment Was Not Voluntary

Plaintiff's commitment was involuntary as a matter of law under Cal. Welf. & Inst. Code § 5250;

---

[2] Plaintiff's PFEC notification was silent as to the reason for his denial; Plaintiff alleges he is unaware of any other possible basis for the denial besides his psychiatric hold. Complaint at ¶ 30; Exhibit 1.

it is also clear that Plaintiff's commitment was in fact involuntary. Plaintiff's deposition testimony confirms both that the commitment was involuntary and that he was aware of that fact.  Plaintiff testified that his commitment was due to a "drug-induced psychotic episode" after taking "psilocybin mushrooms." Stokes Depo. at 68, 84, 85. Plaintiff stated that after he was transferred from Kaiser to Oakcrest, "I gave up my rights to make decisions" in part because "I didn't know what was real, what wasn't real." Stokes Depo. at 106. When questioned again to clarify whether he "gave up [his] rights to make decisions", Plaintiff testified: "I did. I believe it was either here at Kaiser or it was at Oakcrest, but I believe it was at Kaiser. That's when I gave up my decision to make – my consent to make decisions for me." Stokes Depo. at 107-08.

**B.      Plaintiff Was Notified Of, And Declined To Utilize, The Judicial Proceedings Available To Him**

Plaintiff also stated that during his commitment at Oakcrest, he was told he would have to petition in order to be discharged, which confirms that Plaintiff was both aware that he was unable to leave voluntarily, and that he could request a hearing to be released. As Plaintiff testified:

> I do remember an evaluation with a doctor and he let me know that I could petition to get out.  And I asked him, I said "I don't really feel comfortable making this choice myself.  What are your thoughts? Am I better?"
>
> And he said "No.  I think you need to stay additional to get more treatment."
>
> So I never questioned getting out or leaving.  I felt like I needed help.  And the only way to get it was to follow the advice of the doctors.

Stokes Depo. at 116-17.

Plaintiff also specifically testified regarding his knowledge of the availability of a judicial hearing to be released. When asked why he did not request a court hearing during his time at Oakcrest, Plaintiff stated:

> A.      I believe that to request a court hearing would be to get out, but I didn't have any interest in just getting out. I wanted to get better. So it just didn't seem – it didn't make sense to try to get out. I knew that I needed help.

Stokes Depo. at 121.

Plaintiff was subsequently questioned:

> Q.      So but was it your understanding that to get out, you would have to have a court hearing or something like that to get out as opposed to just walking out the door, you're 18, you're an adult you can leave?

> A.      Yeah. I believe there was a process. My memory to knowing it then, I believe it was explained to me that there would be a process to make an appeal of some sort, but to get out wasn't just walking out the front door.

Stokes Depo. at 121-22.

### C.      The Record Contains Significant Evidence Of Plaintiff's Danger To Himself And Others At The Time Of His Commitment

Under California law, section 5250 commitments are designed for those who are "a danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code § 5250(a). The record confirms Plaintiff's self-harm and danger to others that were factors in his involuntary commitment subsequent to his self-described drug-induced psychosis. For example, on his intake form for chemical dependency at Kaiser, Plaintiff's presenting problems included the burning of his own hands and striking a friend. Specifically, the form states:

> [D]rinking and smoking pot but he "freaked out" b/c of his anger and guilt. "It was a boiling point." [He] put his hands in a fire (to get out of his guilt), punched his biggest friend & apparently kissed a male. [He] reports "blacking out" from anger.

Dkt. No. 79 at 7.

In addition, Plaintiff's intake form indicated that he reported use of alcohol and marijuana since elementary school, both auditory and visual hallucinations, a significant family history of mental illness and drug use, anger at self, and months of decompensating prior to his initial intake at Kaiser's Chemical Dependency Services. Dkt. No. 79 at 7-8. A subsequent Behavioral Medicine Consult Note confirmed a "probable 14 day hold." *Id.* at 11.

In sum, there is no dispute both that California law treats Plaintiff as having been involuntarily committed, that there was factual support for his involuntary commitment, that Plaintiff knew the commitment was involuntary, and that the commitment included the availability of judicial proceedings that Plaintiff was specifically informed of and chose not to utilize. Plaintiff did not challenge his 5250 commitment at the time, using the state law and judicial proceedings that were available, and he may not collaterally attack that commitment here in federal court. Accordingly, Plaintiff is properly subject to the restrictions on gun possession contained in section 922(g)(4). *Mai*, 952 F.3d at 1111-1119; *see also Heller v. Bedford Cent. Sch. Dist.* 665 F. App'x 49, 54 (2d Cir. 2016); *United States v. McRobie*, 2009 WL 82715 (4th Cir. Jan. 14, 2009) (per curiam).

## V.    LEGAL STANDARD

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-249 (1986). A fact is "material" if it might affect the outcome of the case.  *Id.* at 248. In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

## VI.    ARGUMENT

### A.    Plaintiff's Second Amendment Argument Is Foreclosed By The Ninth Circuit's Decision in Mai

*Mai* is dispositive of Plaintiff's Second Amendment claim. Like Plaintiff Stokes, Plaintiff Mai was subject to an involuntary commitment many years ago (1999) at a young age. *Mai*, 952 F.3d at 1110.  Like Plaintiff Stokes, Plaintiff Mai alleged that he did not suffer from any lingering mental illness, and had since led a socially-responsible life. *Id.* Moreover, as here, there were no federal avenues for relief for Mai's section 922(g)(4) bar from possessing a firearm. *Id.* at 1110-11.

Under the applicable intermediate scrutiny standard, the prohibition on the possession of firearms by persons who have been involuntarily committed is "a reasonable fit with the government's indisputably important interest in preventing gun violence." *Id.* at 1109. In addition, "scientific evidence supports the congressional judgment that those who have been committed involuntarily to a mental institution still pose an increased risk of violence even years after their release from commitment." *Id.* As a result, section 922(g)(4)'s continued application to people: 1) years after their commitment; 2) in the absence of an avenue for relief from the ban; and 3) in situations where the Court had "no reason to doubt" that the person in question was no longer mentally ill, withstands Second Amendment scrutiny. *Id.* at 1118-21. Based on this reasoning, Federal Defendants are entitled to summary judgment.

### B.    The California Statutory Scheme For Involuntary Commitments Contains Robust Judicial Proceedings That Plaintiff Chose Not To Utilize

The *Mai* Court cited *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012), for the proposition that "state-law procedures that lack robust judicial involvement do not qualify as commitments for purposes of § 922(g)(4)." 952 F.3d at 1110. According to Plaintiff, because he opted not to utilize the available judicial procedures of which he was informed, his involuntary commitment cannot qualify as a prohibiting event under section 922(g)(4). Plaintiff is incorrect.

In *Rehlander*, the defendants were committed under Maine's emergency commitment procedure, and the First Circuit concluded that the specific features of that procedure did not meet the requirements of "commitment" under section 922(g)(4). 666 F.3d at 46, 49. That procedure permitted three-day involuntary hospitalizations upon certification by a medical practitioner, but did not allow substantive judicial review. *Id.* at 48. Here, by contrast, the California statute at issue requires the treating facility to notify the committed person of the right to a hearing before a judge if the facility decides to hold the committed person longer than seventy-two hours. *See* Cal. Welf. & Inst. Code § 5150(l)(1). Indeed, Plaintiff testified that he was told of his right to seek judicial review at least once, and declined to do so. Stokes Depo. at 116-17, 121-22. Furthermore, Plaintiff had a right to a hearing challenging his 5250 certification at any time during the commitment, upon his request or upon the request of a person acting on his behalf. Cal. Welf. & Inst. Code § 5275, et seq.

Thus, under *Rehlander*, "state-law procedures [] lack robust judicial involvement" only when judicial review of the commitment is actually unavailable. *See also Phelps v. Bosco*, 711 Fed. Appx. 63, 64-65 (2d Cir. 2018) (finding that where, as here, the law provides individuals or their representatives a right to seek judicial review of an involuntary commitment, the commitment may be a prohibiting event under section 922(g)(4) even if the individual did not choose judicial review). In California, the state-law procedures explicitly include the right to judicial review, and judicial involvement, but Plaintiff opted to decline judicial review even after he was notified of his rights to do so. Under such circumstances, Plaintiff's commitment qualifies as a prohibiting event under section 922(g)(4).

### C.     Plaintiff Cannot State A Legally Cognizable Second Amendment Claim

Plaintiff's first cause of action alleges that section 922(g)(4) of the Federal Gun Control Act, as applied to him, violates the Second Amendment. Complaint at ¶ 42. Plaintiff is incorrect, and Federal Defendants are entitled to summary judgment on this claim.

1    In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), after determining that the Second

2    Amendment conferred an individual right to keep and bear arms, 554 U.S. at 595, the Court nonetheless

3    recognized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." The

4    *Heller* Court expressly provided a non-exhaustive list of "presumptively lawful regulatory measures,"

5    including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at

6    626-27, 627 n. 26. The Court explained that "nothing in [its] opinion should be taken to cast doubt on"

7    such measures, *id.* at 626, and "repeat[ed] those assurances" in *McDonald v. City of Chicago*, 561 U.S.

8    742, 786 (2010) (plurality opinion).

9    Post-*Heller*, the Ninth Circuit has, like numerous other circuits, applied a two-step inquiry to

10    Second Amendment issues. *See Mai,* 952 F.3d at 1113; *Jackson v. City & Cty. Of San Francisco*, 746

11    F.3d 953, 960 (9th Cir. 2014) (citing *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013));

12    *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800

13    (10th Cir. 2010); *United States v. Marzzerella*, 614 F.3d 85, 89 (3d Cir. 2010). This two-step inquiry

14    "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if

15    so, directs courts to apply an appropriate level of scrutiny." *Jackson*, 746 F.3d at 960 (citing *Chovan*,

16    735 F.3d at 1126). Applying this standard here, as required by the Ninth Circuit, *see Mai*, 925 F.3d at

17    1113, Plaintiff's Second Amendment claims against Federal Defendants must fail. Even assuming, as

18    the *Mai* Court did, 952 F.3d at 1115, that section 922(g)(4) impacts rights within the scope of the

19    Second Amendment's protection, section 922(g)(4) as applied to Plaintiff passes muster under the level

20    of constitutional scrutiny required by the Ninth Circuit's precedents.

21    **D.    Section 922(g)(4) Is Consistent With Plaintiff's Constitutional Rights Because It
      Satisfies The Applicable Level Of Scrutiny**

22    The Ninth Circuit has assumed, without deciding, that section 922(g)(4) burdens Second

23    Amendment rights. *Mai*, 952 F.3d at 1115. While Federal Defendants maintain that Plaintiff's claim is

24    not within the scope of the Second Amendment, *see Heller*, 554 U.S. at 626-27 & n. 26, Federal

25    Defendants are entitled to summary judgment even if the section 922(g)(4) prohibition does fall within

26    the scope of the Second Amendment.

27    If application of a challenged law implicates Second Amendment rights, then—under this

Circuit's precedent—the Court proceeds to means-end scrutiny of the law. *See Mai*, 952 F.3d at 1115. Application of section 922(g)(4) to Plaintiff satisfies the intermediate scrutiny. *See id.* (applying intermediate scrutiny and upholding constitutionality of section 922(g)(4)); *Silvester v. Harris*, 843 F.3d 816, 823 (9th Cir. 2013) (observing that Ninth Circuit precedent "clearly favors the application of intermediate scrutiny in evaluating the constitutionality of firearms regulations").

1.  **Section 922(g)(4) Substantially Relates To The Important Governmental Interest Of Preventing Firearm Violence, Including Suicide, and Protecting Public Safety**

To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important government objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "A statute need not utilize the least restrictive means of achieving its interest in order to withstand intermediate scrutiny." *United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019) (internal quotation marks omitted). Section 922(g)(4), as applied to Plaintiff, meets that standard.

(a)  **Section 922(g)(4) Serves Important And Compelling Government Interests**

"[T]wo important interests support § 922(g)(4)'s ban on the possession of firearms by those who were involuntarily committed to a mental institution: preventing crime and preventing suicide." *Mai*, 952 F.3d at 1116. A primary governmental objective underlying section 922(g)(4) is to protect the public from "armed mayhem" in the form of firearms violence, and thereby to preserve peace and public safety. *United States v. Skoien,* 614 F.3d 638, 642 (7th Cir. 2010). Protecting public safety and combating crime are well-established compelling governmental interests. *United States v. Salerno*, 481 U.S. 739, 748 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest"); *Schall v. Abrams*, 467 U.S. 253, 264 (1984).

Congress enacted section 922(g)(4) following a multi-year inquiry into violent crime that revealed a "serious problem of firearms misuse in the United States." S. Rep. No. 89-1866, at 3, 53. Among other things, Congress's investigation of firearm-related killings also revealed that firearms "were the agency of death" in over half of all suicides. S. Rep. No. 88-1340, at 3. The evidence before Congress showed that "[i]n 1966, 6,855 Americans were murdered by gun[] [whereas] 10,407 suicides

and 2,600 fatal accidents involved firearms." 114 Cong. Rec. 21,774 (statement of Rep. Rosenthal), and that "[i]n the last decade, 92,747 Americans took their own lives with a firearm, reflecting the fact that the surest and easiest way to commit suicide is with a gun." *Id.* at 21,811 (statement of Rep. Schwengel).

To address these problems, Congress undertook "to regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them." S. Rep. No. 8901866, at 1; *see also* Cong. Rec. 13,219 (statement of Sen. Tydings). Congress sought to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden unpremeditated crimes with firearms as a result of mental disturbances."114 Cong. Rec. 21,829 (statement of Rep. Bingham).

Congress thus enacted provisions addressed to "individuals who by their previous conduct or mental condition or irresponsibility have shown themselves incapable of handling a dangerous weapon in the midst of an open society," 114 Cong. Rec. 21,809-10 (statement of Rep. Tenzer), such as "persons with a history of mental disturbances." *Id.* at 21,784 (statement of Rep. Celler). These provisions include section 922(g)(4), which makes unlawful for any person "who has been committed to a mental institution . . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  In sum, the government's interest "in protecting the community from crime" is "legitimate and compelling." *Schall*, 467 U.S. at 264, as is its interest in preventing suicide. *See Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (recognizing the government's interest in suicide prevention as "unquestionably important and legitimate"); *Mai*, 952 F.3d at 1120.

### (b)  Section 922(g)(4) Substantially Relates To Protecting Public Safety

A substantial relationship exists between protecting public safety (*e.g.* by preventing violent crime and suicide) and prohibiting firearms possession by persons, such as Plaintiff, who have been involuntarily committed based on a finding that mental illness creates a reasonable expectation of danger to himself or others. *See* Cal. Welf. & Inst. Code § 5250(a).

Congress' decision to adopt a prophylactic prohibition against the "presumptively risky" category of individuals who have been involuntarily committed was a justifiable response to the problem of firearms violence that it sought to address. "When reviewing the constitutionality of statutes [under

intermediate scrutiny], courts 'accord substantial deference to the legislature's predictive judgments.'"

*Drake v. Filko*, 724 F.3d 426, 436-37 (3d Cir. 2013) (quoting *Turner Broad Sys., Inc. v. FCC*, 520 U.S.

180, 195 (1997)). Moreover, even if the historical understanding – that persons with a demonstrated

history of mental illness are not guaranteed the right to possess firearms under the Second Amendment –

were not dispositive of this case, that historical record would counsel in favor of affording Congress the

room, in the context of the mentally infirm, "to make sensitive public policy judgments (within

constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks."

*Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys* , 512 U.S.

at 665); *Skoien*, 614 F. 3d at 641 (noting that "Congress is not limited to case-by-case exclusions of

persons who have been shown to be untrustworthy with weapons" and that "some categorical

disqualifications are permissible").

The Supreme Court has "recognized and given weight" to Congress's "broad prophylactic

purpose" in enacting the restrictions on firearms possession in 18 U.S.C. § 922(g). *Dickerson v. New*

*Banner Inst., Inc.*, 460 U.S. 103, 118 (1983). Congress sought to limit firearm availability "to those

whose possession thereof was contrary to the public interest." *Huddleston v. United States*. 415 U.S.

814, 824 (1974). The legislative "intent in enacting []§ 922(g) . . . was to keep firearms out of the hands

of presumptively risky people." *Dickerson*, 460 U.S. at 112 n.6; *see Barrett v. United States*, 423 U.S.

212, 220 (1976) (citing legislative history reflecting a concern with "keeping firearms out of the hands

of categories of potentially irresponsible persons").

Consistent with the intent to keep firearms out of the hands of presumptively risky persons,

section 922(g) is not limited to persons who have already committed dangerous or violent acts. In the

case of section 922(g)(4), Congress relied on a history of involuntary commitment or adjudicated mental

illness as the basis for the firearm prohibition. *See* 114 Cong. Rec. 14,733 (1968) (Sen. Long) (stating

that mentally ill individuals, "by their actions, have demonstrated that they are dangerous, or that they

*may become dangerous*" (emphasis added)). In enacting section 922(g)(4), Congress certainly was

aware that "a person committed to a mental institution later may be deemed cured and released";

nevertheless, "[t]he past . . . commitment disqualifies.  Congress obviously felt that such a person [who

had previously been committed to a mental institution], though unfortunate, was too much of a risk to be

1    allowed firearms privileges." *Dickerson*, 460 U.S. at 116.

2        Congress acted logically in relying on the above criteria as relevant indicia of a future risk of

3    violence, rather than attempting to craft a regime mandating individualized predictions of future

4    violence. Such individualized predictions would impose extraordinarily difficult, if not impossible,

5    burdens on government officials and are unlikely to be entirely accurate. And Congress was entitled to

6    adopt a statutory scheme that relied instead on objective, historical data. *See Weinberger v. Salfi*, 422

7    U.S. 749, 751 (1975) ("Congress . . . could rationally have concluded . . . that the expense and other

8    difficulties of individual determinations justified the inherent imprecision of an objective, easily

9    administered prophylactic rule."). Moreover, the Supreme Court has recognized the inherent difficulty in

10   making such "free floating" and particularized assessments of dangerousness. *See Estelle v. Smith*, 451

11   U.S. 454, 472 (1981).

12       "[I]n enacting § 922(g)(4), Congress determined that, like felons and domestic-violence

13   assailants, those who have been involuntarily committed to a mental institution also pose an increased

14   risk of violence." *Mai*, 952 F.3d at 1117.  Congress appropriately determined that persons who have

15   previously been involuntarily committed pose an unacceptable risk of misusing firearms because they

16   are susceptible to future episodes of mental illness. Indeed, the Gun Control Act "is designed to prohibit

17   the ownership of firearms not only by individuals who have already committed dangerous acts, but also

18   by those with a potential for violence." *United States v. Waters*, 23 F.3d 29, 34 (2d Cir. 1994). To

19   achieve that purpose, Congress reasonably relied not on actual evidence of future dangerousness but on

20   past commitment or adjudication of mental illness.  It has no bearing that, under this framework, some

21   individuals to whom section 922(g)(4) is applicable may not engage in, or even contemplate, gun

22   violence. Congress has chosen to err on the side of caution, and it was entitled to conclude that such

23   caution is warranted where to do otherwise "could have devastating consequences for innocent citizens."

24   H.R. Rep. No. 102-618, at 14 (1992). This clearly satisfies intermediate scrutiny, which requires only

25   that the degree of fit between the challenged law and the governmental interest it serves be "reasonable,"

26   not perfect. *Drake*, 724 F.3d at 436.

27       Beyond the legislative history, empirical evidence "shows an increased risk of violence for those

28   who have been released from involuntary commitment", *Mai,* 952 F.3d at 1117, and further

demonstrates that Congress acted reasonably in determining that persons who have been involuntarily

committed pose an enhanced risk of violence.[3] Research suggests that persons who suffer from

significant mental illness pose an increased risk of harm to themselves or others. *See* Seena Fazel &

Martin Grann, *The Population Impact of Severe Mental Illness on Violent Crime*, 163 Am. J. Psychiatry

1397, 1401 (2006) (reporting increased risk "in patients with severe mental illness compared with the

general population") (cited in *Mai*, 952 F.3d at 1117). A National Institute of Mental Health ("NIMH")

study showed that patients with serious mental illness "were two to three times as likely as people

without such illness to be assaultive. In absolute terms, the lifetime prevalence of violence among

people with serious mental illness was 16% . . . compared with 7% among people without mental

illness." Richard A. Friedman, *Violence and Mental Illness – How Strong Is The Link*, 355 New Eng. J.

Med. 2064, 2065 (2006).

Persons with mental illness also have a significantly increased risk of suicide. The NIMH reports

that over 90 percent of persons who commit suicide have a mental disorder, a substance-abuse disorder,

or both. NIMH, *Suicide in the U.S.: Statistics and Prevention*.[4] The suicide rate for persons with active

psychiatric disorders is 7 to 10 times the rate for the general population. *See* Bryan L. Tanney*,

Psychiatric Diagnoses and Suicidal Acts*, in Ronald W. Maris *et al.*, *Comprehensive Textbook of

Suicidology* 340 (2000). Consistently, a high suicide rate exists among persons who have been

previously committed. *See* Virginia A. Hiday, *Civil Commitment: A Review of Empirical Research*, 6

Bhev. Sci & L. 15, 25 (1988) (among 189 patients who entered the commitment process, 10 had

committed suicide within 19 months). And, not surprisingly, firearms are much more likely to cause

injury or death than other available weapons, such as knives. As one commentator has noted, "[a]

suicide attempt with a firearm rarely affords a second chance," while "[a]ttempts involving drugs or

---

[3] Federal Defendants have no additional obligation to produce concrete evidence in support of Congress' legislative judgment, and the Court need not consider such evidence to analyze section 922(g)(4) as it applies to Plaintiff. *See Fla. Bar. v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (noting that even under strict scrutiny, some restrictions on speech can be upheld "based solely on history, consensus, and 'simple common sense.'"). Such evidence is nonetheless provided here to the extent that it is helpful for the Court's analysis. *See, e.g. United States v. Staten*, 666 F.3d 154, 163-67 (4th Cir. 2011) (relying on empirical data in conducting Second Amendment means-end analysis); *Skoien*, 614 F.3d at 643-44 (same).

[4] http://adhdclinic.com/health_topics/suicide_prevention/suicide-in-the-us.html

cutting, which account for more than 90% of all suicidal acts, prove fatal far less often." Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New. Eng. J. Med. 989, 990 (2008).

Because there are an estimated 12 to 25 attempted suicides for every suicide death, the inference is strong that removing firearms from the hands of mentally ill persons can save lives. *See* Joseph R. Simpson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals With a History of Treatment for Mental Illness*, 35 J. Am. Acad. Psychiatry Law 330, 338 (2007) (concluding that individuals with psychiatric diagnoses may be at a higher risk of suicide if there are firearms in their households); Mark A. Ilgen *et al.*, *Mental Illness, Pervious Suicidality, and Access to Gins in the United States*, 59 Psychiatric Servs. 198, 198-200 (2008) (explaining that restricting access to lethal means is one of only two suicide interventions with reasonable empirical support). Additional examination of suicide method data revealed that:

> [h]aving a gun in the home was a strong risk factor for gun-related suicide . . . but was inversely related to committing suicide with a non-firearm method . . . That is, persons with a gun in the home were more likely than others to use a gun to commit suicide and less likely than others to commit suicide by means of drug overdose, hanging, or other method. . . .

Douglas J. Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study,* 41 Annals Emergency Med. 771, 777 (2003).

For all of these reasons, the fact of Plaintiff's involuntary commitment to a mental institution under a provision providing that he was "a danger to others, or to himself or herself, or gravely disabled," Cal. Welf. & Inst. Code § 5250(a), defeats any claim that section 922(g)(4) is not substantially related to preventing future violent crime or suicide. This outcome reflects Congress and the nation's long-established judgment that such a person is "too much of a risk to be allowed firearms privileges." *Dickerson*, 460 U.S. at 116. Even were this Court to conclude that Plaintiff can now possess firearms without the risk of danger, it would not affect the requisite fit between section 922(g)(4) and Congress' objectives. As the Fourth Circuit recognized when rejecting an as-applied Second Amendment challenge to the section 922(g)(8) restriction, which prohibits gun possession from those subject to a domestic violence protective order: "the prohibitory net cast by [the statute] may be somewhat over-inclusive given that not every person who falls within it would misuse a firearm . . . if permitted to possess one," but "[t]his point does not undermine the [statute's] constitutionality . . .

1  because it merely suggests that the fit is not a perfect one; a reasonable fit is all that is required under

2  intermediate scrutiny." *United States v. Chapman*, 666 F.3d 220, 231 (4ᵗʰ Cir. 2012) (citations omitted).

### 2.    Section 922(g)(4) Is Constitutional As Applied To Plaintiff

4         As discussed *supra*, the Ninth Circuit has recently rejected a Second Amendment as-applied

5  challenge to section 922(g)(4)'s prohibition on firearm possession by a plaintiff who had been

6  involuntarily committed to a mental institution. *Mai*, 952 F.3d at 1111-1119. Two other courts of

7  appeals have come to the same conclusion in unpublished opinions.  *See Heller v. Bedford Cent. Sch.*

8  *Dist.* 665 F. App'x 49, 54 (2d Cir. 2016); *United States v. McRobie*, 2009 WL 82715 (4ᵗʰ Cir. Jan. 14

9  2009) (per curiam).

10        Despite this authority, Plaintiff argues that, because he does not have a forum to demonstrate

11  current fitness to possess firearms, section 922(g)(4) is unconstitutional as applied to him. Complaint at

12  ¶ 45. Such an argument was squarely addressed and rejected by the Ninth Circuit in *Mai*, where the

13  plaintiff also did not have an avenue for relief from the prohibition under federal law. 952 F.3d at 1111,

14  1120-21. As the Court held, even in the absence of an avenue of relief from a categorical, lifetime ban,

15  "§ 922(g)(4) nevertheless remains a reasonable fit for the congressional goal of reducing gun violence."

16  *Id.* at 1120. The governmental interests of preventing violence, including suicide, that impacts an

17  individual, families, and community, are powerful and compelling. *Id.* In addition, the evidence of

18  increased risk of suicides from those released from involuntary commitment (about 39 times the risk of

19  those not previously committed), is significant. *Id.*

20        Indeed, there does not appear to be any caselaw within this Circuit in which a court, in

21  determining whether *any* section 922(g) prohibition was constitutional, considered the dangerousness of

22  an individual following a prohibiting event. *See, e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1118

23  (9th Cir. 2010); *United States v. Chovan*, 735 F.3d 1127, 1141 (9th Cir. 2013) (upholding section

24  922(g)(9) prohibition based on domestic violence misdemeanor conviction against as-applied Second

25  Amendment challenge and rejecting the plaintiff's argument that "§ 922(g)(9) is unconstitutional as

26  applied . . . because his 1996 domestic violence conviction occurred fifteen years before his § 922(g)(9)

27  conviction, he is unlikely to recidivate, and he has in fact been law-abiding for those fifteen years").  As

28  such, even where, as here, a plaintiff is unable to challenge his section 922(g)(4) prohibition under

1    federal law, "the prohibition on those who have been involuntarily committed to a mental institution is a

2    reasonable fit for the important goal of reducing gun violence." *Mai*, 952 F.3d at 1121.

3         Federal Defendants acknowledge that Plaintiff asserts that he is currently "mentally fit and not a

4    danger to himself or others." Complaint at ¶ 29. As the Ninth Circuit held, however, the Second

5    Amendment inquiry requires an assessment of "congressional judgment about a category of person, not

6    about Plaintiff himself." *Mai*, 952 F.3d at 1119. "[T]he Second Amendment does not demand an

7    individualized hearing to assess Plaintiff's own personal level of risk." *Id.* (internal citations and

8    quotations omitted). There is plainly a substantial fit between the compelling government interests of

9    preventing firearms violence, including suicide, and protecting public safety, and Congress' choice to

10   address the problem of gun violence through a prohibition on firearm possession by individuals who

11   have suffered from such severe mental illness that they were committed to a mental institution. As such,

12   Federal Defendants are entitled to summary judgment on Plaintiff's Second Amendment claims.

13        **E.      Plaintiff's Equal Protection And Due Process Claims Are Without Merit**

14        In his second cause of action, Plaintiff argues that his due process and equal protection rights

15   have been violated. First, Plaintiff maintains that the "ban on a certain class of individuals – those who

16   have been involuntarily committed – from acquiring a firearm without providing for a means to seek

17   review and relief from such ban violates Plaintiff's right to equal protection of the laws guaranteed

18   under the Due Process Clause of the Fifth Amendment." Complaint at ¶ 50. Even though he did not

19   plead such a claim, Plaintiff now also argues that his equal protection rights are violated because as a

20   resident of California, he does not currently have a forum to demonstrate whether he is now fit to

21   possess firearms.

22        Second, Plaintiff alleges that he "has been deprived of his Second Amendment right to keep and

23   bear firearms without being afforded notice and an opportunity to be heard on the matter prior to the

24   deprivation and/or through a post-deprivation proceeding to seek review and relief from the

25   deprivation." Complaint at ¶ 51. Because Plaintiff's due process and equal protection claims are without

26   merit, Federal Defendants are entitled to summary judgment on these claims.

27        **1.      Plaintiff's Equal Protection Claim Based On The Classification of Individuals Who
                    Have Been Involuntarily Committed Is Without Merit**

28

1    Plaintiff's equal protection claim is pled as follows:

> The unconstitutionally broad ban on a certain class of individuals – individuals who have been involuntarily committed – acquiring a firearm without providing for a means to seek review and relief from such ban violates Plaintiff's right to equal protection of the laws guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Complaint at ¶ 57. Plaintiff also alleges that the same ban on the same class of individuals (individuals who have been involuntarily committed) "violates Plaintiff's right to equal protection of the laws guaranteed under the Due Process Clause of the Fifth Amendment of the United States Constitution."[5] Complaint at ¶ 52.

As demonstrated *supra*, section 922(g)(4) and its application to Plaintiff withstands the intermediate scrutiny standard applied to Second Amendment claims. *Mai*, 952 F.3d 1116-19. In addition, the *Mai* Court specifically held that the absence of a forum to demonstrate current fitness withstood intermediate scrutiny, because even without an avenue of relief from a categorical, lifetime ban, "§ 922(g)(4) nevertheless remains a reasonable fit for the congressional goal of reducing gun violence." *Mai*, 952 F.3d at 1120.

Numerous courts have held that when a law assessed under an enumerated rights challenge withstands strict or intermediate scrutiny, the law will also survive an equal protection challenge applying rational basis review. For example, in *Kwong v. Bloomberg*, the Court explained that where a litigant asserts corresponding Second Amendment and equal protection claims, and the Second Amendment claim fails, "courts have applied 'rational basis' review to Equal Protection claims on the theory that the Second Amendment analysis sufficiently protects one's rights," 723 F.3d 160, 170 n.19 (2d Cir. 2013) (citing authority); *see also Nordyke v. King*, 681 F.3d 1041,1043 n.2 (9th Cir. 2012) (en banc) ("As to the Nordykes' equal protection claim, because the ordinance does not classify shows or events on the basis of a suspect class, and because we hold that the ordinance does not violate either the First or Second Amendments, rational basis scrutiny applies."); *Jefferies v. Sessions*, 278 F. Supp. 3d 831, 847 (E.D. Pa. 2017) (dismissing Plaintiff's claim that section 922(g)(4) violated his Second

---

[5] An equal protection challenge brought under the Fifth Amendment is subject to the same analysis as an equal protection challenge under the Fourteenth Amendment. *Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 981 (N.D. Cal. 2012).

1    Amendment rights, and also dismissing his "equal protection claim under the Fourteenth Amendment.");

2    *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012) ("Given that the Second Amendment

3    challenge fails, the equal protection claim is subject to rational basis review.").

4       *National Rifle Association v. McGraw,* 719 F.3d 338, 348-50 (5th Cir. 2013), is also instructive.

5    The Fifth Circuit applied intermediate scrutiny and found that a Texas law prohibiting 18-20 year olds

6    from public carry of a handgun did not violate the Second Amendment. *Id.* Furthermore, because the

7    law did not target a suspect class, the plaintiff's equal protection challenge was assessed under rational

8    basis review, which requires only that the law in question "be rationally related to a legitimate

9    government interest to survive an Equal Protection challenge." *Id* at 350. Given that the law in question

10   "survives the more stringent intermediate scrutiny," the Court also upheld the law "against plaintiffs'

11   equal protection challenge." *Id; see also SKF USA Inc. v. U.S. Customs & Border Protection*, 556 F.3d

12   1337, 1360 (Fed. Cir. 2009) (holding that because the challenged Byrd Amendment "serves a substantial

13   government interest" and therefore is "valid under the First Amendment", it also is "clearly not violative

14   of equal protection under the rational basis standard"); *Currier v. Potter*, 379 F.3d 716, 731-32 (9th Cir.

15   2004) (holding that, after the Court concluded that the "regulations [at issue] do not violate the First

16   Amendment, [the] equal protection challenge must fail" under a rational basis review).

17      Here, Plaintiff maintains that the class of people impacted by section 922g(4) is "individuals who

18   have been involuntarily committed." Complaint at ¶¶ 52, 57. Plaintiff's involuntary commitment was

19   based on his mental status, and the Supreme Court has consistently applied rational basis review to cases

20   involving persons who are mentally impaired or intellectually disabled. *See Cleburne v. Cleburne Living

21   Center, Inc.*, 473 U.S. 432 (1985); *Schweiker v. Wilson*, 450 U.S. 221 (1981); *Heller v. Doe by Doe,* 509

22   U.S. 312 (1993). Because section 922g(4) survives constitutional challenge under intermediate scrutiny,

23   *Mai*, 952 F.3d 1116-19, it must by definition survive a challenge under the lesser rational basis scrutiny

24   applied to equal protection claims such as Plaintiff's. *See McGraw*, 719 F.3d at 349-50.

25       **2.**  **Plaintiff's Equal Protection Claim Based On His Current Lack Of A Forum To Demonstrate Fitness To Possess Firearms Is Without Merit**

26

27      Plaintiff cites to no caselaw in support of his claim that his equal protection rights are violated

28   because he is a resident of a state that does not have a program to demonstrate current fitness to possess

firearms. Indeed, Plaintiff does not even attempt to establish the threshold issue of what level of scrutiny would apply to his claim under the equal protection clause. *See, e,g,*, *Giannani v. Real*, 911 F.2d 354, 358 (9th Cir. 1990) (finding that in order to decide whether a law violates the equal protection clause, the reviewing court must first determine the appropriate level of scrutiny). Importantly, the Ninth Circuit has already held that where a plaintiff did not have an avenue for relief from the section 922(g)(4) prohibition under federal law, "§ 922(g)(4) nevertheless remains a reasonable fit for the congressional goal of reducing gun violence" and thus satisfies intermediate scrutiny review under the Second Amendment. *Mai*, 952 F.3d at 1111, 1120-1121. Because a law assessed under an enumerated rights challenge withstanding intermediate scrutiny will also survive an equal protection challenge applying rational basis review, *Kwong*, 723 F.3d at 170 n.19, Plaintiff must first demonstrate that his equal protection challenge should be assessed under strict scrutiny in order to credibly argue that he may be entitled to relief.  This Plaintiff cannot do.

While Plaintiff does not precisely identify the class he alleges is impacted by the lack of a current forum to demonstrate fitness, presumably he is alleging that class is residents of California and other states (approximately 20) that do not have a qualifying relief from disabilities program. Residents of particular states, however, are not a "suspect class" for equal protection purposes, and thus the statute in question is subject to rational basis review. *See, e.g. Matsuo v. United States*, 532 F. Supp. 2d 1238, 1248 (D. Hawaii 2008), *aff'd* 586 F.3d 1180 (9th Cir. 2009) (federal pay equality statute that excluded residents of certain states did not involve a suspect classification); *compare Silveira v. Lockyer*, 312 F. 3d 1052, 1087-88 (9th Cir. 2002) (finding that "[s]tatutes that treat individuals differently based on their race, alienage, or national origin" involve suspect classifications). Because a state's lack of a relief from disabilities program survives constitutional challenge under intermediate scrutiny, *Mai*, 952 F.3d at 1111, it must by definition survive a challenge under the lesser rational basis scrutiny applied to equal protection claims such as Plaintiff's. *See McGraw*, 719 F.3d at 349-50.

### 3.   Any Substantive Due Process Challenge Is Redundant In The Face Of Plaintiff's Second Amendment Challenge

When, as here, a plaintiff asserts both an enumerated rights challenge and a substantive due process challenge involving that enumerated right, the Supreme Court has analyzed the scope of the

1    enumerated right rather than the more general substantive due process claim. *See, e.g., Graham v.*

2    *Connor*, 490 U.S. 386, 395 (1989); *Albright v. Oliver,* 510 U.S. 266, 273 (1994). For example, in a

3    complaint alleging violations of both "the Fourth Amendment and Due Process Clause . . .  we analyzed

4    the constitutionality of the challenged application of force solely by reference to the Fourth

5    Amendment's prohibition . . . and hold that *all* claims that law enforcement officers have used excessive

6    force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than

7    under a 'substantive due process' approach." *Graham*, 490 U.S. at 395 (emphasis in original). The

8    Supreme Court reasoned that "[b]ecause the Fourth Amendment provides an explicit textual source of

9    constitutional protection against this sort of physically intrusive governmental conduct, that

10   Amendment, not the more generalized notion of 'substantive due process', must be the guide for

11   analyzing these claims." *Id.*  So too here; because the Second Amendment provides "an explicit textual

12   source of constitutional protection" with regards to firearm possession, that Amendment "must be the

13   guide" for analyzing Plaintiff's claims.  *Id.*

14          The Court affirmed this reasoning in *Albright*, explaining "[i]t was through these [enumerated]

15   provisions of the Bill of Rights that the Framers sought to restrict the exercise of arbitrary authority by

16   the Government in particular situations." *Albright*, 510 U.S. at 273. Accordingly, a substantive due

17   process challenge is redundant in the face of an asserted enumerated rights challenge, and where an

18   enumerated rights challenge – including a Second Amendment challenge – more specifically addresses a

19   claim, courts have dismissed substantive due process challenges. *See, e.g.*, *White v. City of New York,*

20   2018 WL 1545676 at *6 (E.D.N.Y. Mar. 29, 2018) (citing *Albright* and holding that "[t]o the extent that

21   Plaintiff attempts to assert a separate 'due process' claim based on the same conduct that underlies his

22   Fourth Amendment claims for false arrest and malicious prosecution, his claim is dismissed as

23   duplicative"); *Levys v. Shamlin,* 2017 WL 5714027 at *3. (W.D. Pa. Nov. 28, 2017) (finding that

24   because the "Fourth Amendment is the explicit textual source of constitutional protection against

25   unreasonable searches and seizures by the government and its agents . . . Plaintiff's due process claims

26   . . . are dismissed as duplicative to his Fourth Amendment claims"); *Second Amendment Arms v. City of*

27   *Chicago,* 135 F. Supp. 3d 743, 762-63 (N.D. Ill. 2015) (finding no Second Amendment violation, and

28   concluding that because "the right to sell firearms is a Second Amendment concern, . . . Plaintiff's

1  substantive due process challenge is dismissed, as Plaintiff must pursue these theories under his . . .

2  Second Amendment claim[].")

3          The Ninth Circuit has also concluded that substantive due process claims are duplicative of

4  enumerated rights claims. In *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1127 (9th Cir. 2002),

5  for example, the Court affirmed a dismissal of due process claims where a Fourth Amendment challenge

6  had also been asserted. Specifically, the Ninth Circuit agreed with the District Court "that Fourth

7  Amendment principles and not those of due process, govern this case" because "[the Fourth]

8  Amendment, not the more generalized notion of 'substantive due process,' must be the guide for

9  analyzing these claims." *Id.* (citations omitted). Similarly, in *Hawthorne v. Kernan*, 2020 WL 6891819,

10  at *5 (N.D. Cal. Nov. 24, 2020), the court cited *Albright* and held that "Plaintiff's due-process claim

11  arising out of Defendant's . . . alleged use of excessive force is preempted by the Eighth Amendment

12  and should not be analyzed as a substantive due process claim." Accordingly, Plaintiff's due process

13  claim was dismissed. *Id.* at *9.

14          Here, because Plaintiff has asserted a Second Amendment claim (which must be denied under

15  *Mai*), any related substantive due process challenge must be denied as duplicative. The gravamen of

16  Plaintiff's claim is based on an "explicit textual source of constitutional protection" regarding

17  possession of firearms, *Connor*, 490 U.S. at 395, and thus he is pre-empted from asserting a due process

18  claim premised on the deprivation of that substantive right. *Galbraith,* 307 F.3d at 1127; *see also*

19  *Nordyke v. King*, 644 F.3d 776, 794 (9th Cir. 2011) (finding that "although the right to keep and bear

20  arms for self-defense is a fundamental right, that right is more appropriately analyzed under the Second

21  Amendment" than under the due process clause) (citation omitted), *vacated by* 681 F.3d 1041 (9th Cir.

22  2012) (en banc) (affirming the district court's dismissal of the Second Amendment claim); *Bell v. United*

23  *States*, 2013 WL 5763219, at *3 (E.D. Pa. Oct. 24, 2013), *aff'd*, 574 F. App'x 59 (3d Cir. 2014).

24          **4.      Plaintiff Cannot Show A Deprivation Of Any Procedural Due Process Right**

25          Plaintiff alleges that he "has been deprived of his right to keep and bear firearms without being

26  afforded notice and an opportunity to be heard on the matter prior to the deprivation and/or through a

27  post-deprivation proceeding to seek review and relief from the deprivation." Complaint at ¶¶ 51, 58. To

28  begin with, Plaintiff is not entitled "to a collateral attack in federal court on a commitment he did not –

and has not in any way – challenged in the state court." *United States v. McIlwain*, 772 F.3d 688, 698

(11th Cir. 2014). Furthermore, Plaintiff has not cited a single case in support of his procedural due

process claim, and courts that have considered the issue have confirmed that such a claim is without

merit when, as here, it is brought in conjunction with a section 922(g) Second Amendment claim.

In *Jefferies*, for example, the court found that the plaintiff "does not have a Fifth Amendment

right to procedural due process before the United States applies § 922(g)(4) to him because of his

involuntarily commitment." 278 F. Supp. 3d at 846. "The statute subsection is clear that anyone who has

been committed for mental health is subject to it; thus a hearing on whether the plaintiff is still

dangerous is not in fact relevant." *Id.* (internal citation omitted); *see also Culp v. Madigan,* 270 F. Supp.

3d 1038, 1059 (C.D. Ill. 2017) (denying relief on the plaintiffs' procedural due process claim and

holding that "because this Court has found no Second Amendment violation, Plaintiffs have not

demonstrated that they were deprived of a property or liberty interest.").

In sum, given that there is no violation of a fundamental, enumerated right, Plaintiff is unable to

bring either a substantive or a procedural due process claim. Similarly, given that section 922g(4)

survives constitutional challenge under the intermediate scrutiny applied to Second Amendment claims,

*Mai*, 952 F.3d 1116-19, it must by definition survive a challenge under the lesser rational basis scrutiny

applied to Plaintiff's equal protection claims. *See McGraw*, 719 F.3d at 349-50. Judgment should be

granted to Federal Defendants on Plaintiff's equal protection and due process claims.

## VII.   CONCLUSION

For the foregoing reasons, along with the record in this matter and the previous briefing, Federal

Defendants should be granted summary judgment on all of Plaintiff's claims.


Respectfully submitted,


DATED: April 28, 2021                    STEPHANIE M. HINDS
                                         United States Attorney

                                         By:      /s/ *Julie Bibb Davis*
                                         JULIE BIBB DAVIS
                                         Assistant United States Attorney
                                         Attorneys for Federal Defendants

1

2

**[PROPOSED] ORDER**

3
       For good cause shown, and pursuant to Federal Rule of Civil Procedure 56(a), Federal

4
Defendants' motion for summary judgement is GRANTED.

5

6
IT IS SO ORDERED.

7
Date: _____, 2021

                                      _____

8
                                      HON. WILLIAM ALSUP
                                      United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28