# EXHIBIT 1

Stokes v. United States Dept. of Justce, et al.
C-19-cv-04613 WHA

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5    - - - - - - - - - - - - -

 6   EASTON STOKES,              )

 7              Plaintiff,    )  CASE NO.

 8   vs.                       )  3:19-CV-04613 WHA

 9   UNITED STATES DEPARTMENT   )

10   OF JUSTICE, et al.,        )

11         Defendants.          )

12    - - - - - - - - - - - - -

13

14

15

16         REMOTE DEPOSITION OF EASTON STOKES

17             FRIDAY, NOVEMBER 20, 2020

18

19

20

21              BEHMKE REPORTING AND VIDEO SERVICES, INC.

22     BY: ANGELA SINCLAIR, RMR, RPR, CRR, CCRR, CSR NO. 13902

23                        455 MARKET STREET, SUITE 970

24                   SAN FRANCISCO, CALIFORNIA 94105

25                             (415) 597-5600
```

1

2

3

4

5

6

7

8         Remote Deposition of EASTON STOKES located in

9   Santa Rosa, California, taken on behalf of Federal

10  Defendants via Zoom videoconference, with the

11  witness in Santa Rosa, California, commencing at

12  9:02 A.M., FRIDAY, NOVEMBER 20, 2020, before Angela

13  Sinclair, Certified Shorthand Reporter No. 13902,

14  pursuant to Notice of Deposition.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFF EASTON STOKES:
 3          LAW OFFICES OF TIMOTHY KELLY
 4          BY:  TIMOTHY KELLY, ATTORNEY AT LAW
 5               (VIA VIDEOCONFERENCE)
 6          1403 Spyglass Parkway
 7          Vallejo, California 94591
 8          Telephone:  (707) 570-7507
 9          Email:  tskelliot@gmail.com
10
11   FOR THE FEDERAL DEFENDANTS:
12          UNITED STATES ATTORNEY'S OFFICE
13          BY:  JULIE DAVIS, ASSISTANT U.S. ATTORNEY
14               ERIC SOSKIN, ASSISTANT U.S. ATTORNEY
15               (VIA VIDEOCONFERENCE)
16          1301 Clay Street, Suite 340-S
17          Oakland, California 94612
18          Telephone:  (510) 637-3701
19          Email:  julie.davis@usdoj.gov
20                  eric.soskin@usdoj.gov
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL - (CONTINUED):
 2  FOR THE STATE DEFENDANTS:
 3         DEPARTMENT OF JUSTICE
 4         OFFICE OF THE ATTORNEY GENERAL
 5         BY:  JERRY YEN, DEPUTY ATTORNEY GENERAL
 6         1300 I Street
 7         Sacramento, California 95814
 8         Telephone:  (916) 210-7836
 9         Email:  jerry.yen@doj.ca.gov
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                        INDEX
2    FRIDAY, NOVEMBER 20, 2020
3    EASTON STOKES                          PAGE
4       Examination by MS. DAVIS              7
5    P.M. SESSION                            125
6       Examination resumed by MS. DAVIS     125
7       Examination by MR. YEN               126
8
9
10
11
12
13                       -oOo-
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                          EXHIBITS
2                        EASTON STOKES
3     Number              Description              Page
4                   (No exhibits marked.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              FRIDAY, NOVEMBER 20, 2020; 9:02 A.M.

 2

 3                   EASTON STOKES,

 4                 affirmed as a witness,

 5                 testified as follows:

 6         MS. DAVIS:  Thank you, Madam Court Reporter.

 7  And thank you for appearing here today.

 8         There's one housekeeping matter I want to get

 9  on the record before we get started.  I just want to

10  make sure that all the attorneys agree that this

11  deposition is a remote deposition and can be used for

12  all purposes for in-person deposition under the federal

13  rules.  Do you stipulate?

14         MR. KELLY:  Yes, so stipulated.

15         MS. DAVIS:  Jerry?

16         MR. YEN:  Yes, I do.

17         MS. DAVIS:  Okay.  Thank you.

18  EXAMINATION BY MS. DAVIS:

19     Q.  All right.  Mr. Stokes, I represent the federal

20  defendants in this action, so I represent the

21  United States.  And we're going to be asking you some

22  questions about the case that you filed.

23         Have you ever been deposed before?

24     A.  No.  This is my first time.

25     Q.  Okay.  So I'm going to give you some
```

1    information about a deposition to start out with.  Let

2    me know if you have any questions.

3           First, and most importantly, we need verbal

4    answers because the court reporter is recording this.

5    That means no nods or head shakes because they can't be

6    recorded.

7       A.  Okay.

8       Q.  Do you understand?

9       A.  I do.

10      Q.  In addition, please say "yes" or "no" as

11   opposed to "uh-huh" or "huh-uh," again, so that the

12   court reporter can record it.

13      A.  Yes, I understand.

14      Q.  Okay.  Also, we can't speak at the same time,

15   so please wait until you're sure I've completed the

16   question before you respond.  It's okay if you ask for

17   clarification or if you pause before answering.

18      A.  Okay.

19      Q.  Also, it's okay to say "I don't know" or "I

20   don't have an opinion," but I am entitled to your best

21   recollection of the events.

22      A.  Okay.

23      Q.  Do you understand?

24      A.  I do understand, yeah.

25      Q.  Thank you.  While we're not in a courtroom and

1    this situation seems informal, the deposition is under
2    oath; therefore, it's the same testimony in a courtroom
3    and you are required to tell the truth.
4           Do you understand?
5       A.  I do understand, yes.
6       Q.  Okay.  Your attorney or the other attorneys in
7    this deposition may object to a question.  Even if
8    there's an objection, you may still answer the question.
9    The objection will just be recorded in the transcript.
10      A.  Okay.
11      Q.  Do you understand?
12      A.  I do understand, yes.
13      Q.  Okay.  Also, if you don't ask me to clarify, I
14   will assume that you've understood the question and that
15   your answer is based on a full understanding of my
16   question.
17          Does that make sense?
18      A.  That does, yes.
19      Q.  Okay.  We can take breaks during the day.  If
20   you need to take a break, just let us know.  However, we
21   can't take a break when a question is pending.
22   Therefore, if I or one of the other attorneys ask you a
23   question, you need to answer it before requesting a
24   break.
25          Does that make sense?

1      A.  That does, yes.

2      Q.  Okay.  Do you feel as if you're able to

3  understand questions and respond to them today?

4      A.  Yes, I am.

5      Q.  Okay.  And this next question, this is a

6  standard question that we ask.  This is not specific to

7  you or your circumstances and meant to imply anything.

8  It's just to make sure the deposition is a good one.

9          Have you taken any drugs or alcohol within the

10  last 24 hours, including prescription drugs?

11      A.  No, I have not.

12      Q.  Okay.  Anything else that might impair your

13  ability to answer questions truthfully and fully today?

14      A.  No.

15      Q.  Okay.  Thank you.

16          Did you speak with anybody to prepare for

17  today's deposition?

18      A.  Very little, but yes.  I talked to my attorney,

19  Tim Kelly.

20      Q.  Okay.  So you don't have to give me any of the

21  content of the communications between you and your

22  attorney.  Did you review -- but did you review any

23  documents with your attorney?

24      A.  I did not.  I was told that they would be on

25  the record, and if I didn't understand the exact

```
 1  timeline, I could ask for information as far as
 2  clarification of the question and what's already on the
 3  record, I believe was available.
 4       Q.  Okay.  I'm just going to say you don't have
 5  to -- please don't have any communication between you
 6  and your attorney.  You're not required to answer that.
 7            MS. DAVIS:  And, Tim, we will not construe that
 8  as any waiver of the privilege, okay?
 9            MR. KELLY:  Absolutely.
10  BY MS. DAVIS:
11       Q.  Have you spoken to anyone else about your
12  deposition who wasn't your attorney?
13       A.  No.
14       Q.  Okay.  Have you spoken to anybody else about
15  this lawsuit?
16       A.  Yes, I have.
17       Q.  Who?  Who did you speak to?
18       A.  Friends and family.  I haven't kept this a
19  secret.
20       Q.  Okay.  What sort of things have you discussed
21  with your friends and family about this lawsuit?
22       A.  Just that it was happening.  And there was a
23  newspaper article in the Mercury News, and I shared that
24  with my friends and family.  Not everybody but privately
25  with certain family members and friends.
```

1      Q.  There was an article in Mercury News about this
2   particular lawsuit?
3      A.  Yes, there is.
4          MR. KELLY:  Ms. Davis --
5   BY MS. DAVIS:
6      Q.  Do you remember when that article was?
7      A.  I believe August of 2019.
8      Q.  Thank you.  Did you ever discuss this lawsuit
9   on social media?
10     A.  Never.  No.
11     Q.  Never?  Okay.
12         And can you tell me -- outside of
13  communications with your attorney, which is privileged,
14  can you please let me know anything else you've done to
15  prepare for this deposition?
16     A.  I Googled it just to see what the rules are,
17  and that was about it.
18     Q.  You mean Googled the rules for a deposition?
19     A.  Yes.
20     Q.  And do you have any questions about those rules
21  before we proceed?
22     A.  I do not, no.
23     Q.  Okay.  And just so we have this, can you please
24  state your full name for the record and spell it?
25     A.  Easton Atwood Stokes, E-a-s-t-o-n A-t-w-o-o-d

1  S-t-o-k-e-s.

2      Q.  Okay.  Thank you.  So before we start the

3  questioning, I just want to address one thing.  During

4  this deposition, I'll be asking you questions of a

5  personal nature regarding, for example, questions about

6  your family and your mental health treatment.  I'm not

7  asking you these questions to try to make you

8  uncomfortable.  I'm asking them because they are topics

9  that have been placed into issue by this lawsuit you've

10  brought and all the topics that the judge in this case

11  has asked us to address.

12          Do you understand that?

13      A.  I do, yes.

14      Q.  And once again, I just have to note that even

15  if they are questions of a personal nature, you are

16  under oath and you're required to answer them truthfully

17  and fully.

18          Do you understand?

19      A.  I do, yes.

20      Q.  So we're going to go ahead and start with some

21  background information.

22          What's your current address?

23      A.  2317 George Lane, Santa Rosa, California 95403.

24      Q.  How long have you lived there?

25      A.  Two years.

```
 1        Q.  And where did you live before that?
 2        A.  2014 Illinois Avenue, Santa Rosa,
 3   California 95401.
 4        Q.  And how long did you live there?
 5        A.  I lived there since 2010.
 6        Q.  Okay.  And how long have you lived in Sonoma
 7   County?
 8        A.  My entire life.  I worked out of county in
 9   Placerville and in Marysville for about a year each.  So
10   I would stay -- during the week I would stay in those
11   cities, but I would come back on the weekends.
12        Q.  Okay.  So did you go to high school in Sonoma
13   County?
14        A.  I went to -- yes, I did.
15        Q.  And what high school was that?
16        A.  El Molino High School.  It's in Forestville.
17   Forestville.
18        Q.  Okay.  And when did you graduate?
19        A.  2002.
20        Q.  And do you have any post-high school education?
21        A.  I do.  I got my associate's degree at the
22   Santa Rosa Junior College, and I got my bachelor of
23   arts --
24        Q.  Okay.
25        A.  Say that one more time, please.
```

```
 1        Q.  Where did get your bachelor of arts degree?
 2        A.  Oh, I went to Sonoma State University.  I
 3   graduated in 2010.
 4        Q.  Okay.  And when did you get your AA?
 5        A.  That would have been 2005.
 6        Q.  And what was your major at Sonoma State?
 7        A.  It's environmental studies.  That's
 8   environmental studies, water quality and hazardous
 9   materials.
10        Q.  Okay.  And are you married, Mr. Stokes?
11        A.  I am not.
12        Q.  Have you ever been married?
13        A.  I have not.
14        Q.  Do you live with someone currently?
15        A.  I have two roommates.
16        Q.  Who are those roommates?
17        A.  Ivan and Kevin.
18        Q.  And can you tell me their last names?
19        A.  Ivan Handlesman and Kevin Pollson (phonetic).
20        Q.  And do you -- you said you weren't married.  Do
21   you have someone you're romantically involved with right
22   now?
23        A.  Yes.  Caitlin Rose.
24        Q.  And is Caitlin your girlfriend?
25        A.  Yes, she's my girlfriend.  We've been together
```

1    for about five and a half years.

2         Q.  Okay.  Do you have any children?

3         A.  I do not have children.

4         Q.  Does your girlfriend have any children?

5         A.  She does not.

6         Q.  Okay.  And you don't live together, you and

7    your girlfriend?

8         A.  We do not.

9         Q.  Okay.  I'm going to circle back to a question

10   that I asked you earlier, since we're talking about your

11   roommates and your girlfriend.

12            How did you describe -- you mentioned that you

13   had spoken about this lawsuit to your friends and

14   family.  How did you describe this lawsuit to them?

15        A.  That I was petitioning the government to get my

16   Second Amendment rights restored.

17        Q.  Okay.  And what else did you tell them about

18   the lawsuit?

19        A.  That was the basic part.  That was the most --

20   that was the most significant part of this.  And if

21   friends asked, most of them already know all the

22   circumstances of my drug-induced psychotic episode that

23   happened in 2002.

24        Q.  And did you speak to them about preparing the

25   declaration that your attorney filed in this case?

```
1        A.  No.
2        Q.  No, you didn't speak with them about the
3   declarations?
4        A.  No.
5        Q.  Okay.  Mr. Stokes, what is your current job?
6        A.  I'm a carpenter.  I work for Evans
7   Construction.
8        Q.  And how long have you worked for Evans
9   Construction?
10       A.  That was June of 2019.
11       Q.  And what's the address of Evans Construction?
12       A.  I believe that's on the record.  I don't know
13   his business address.
14       Q.  Okay.  What is your work schedule?
15       A.  I work Monday through Friday from 7:00 a.m.
16   until 3:30.
17       Q.  And so it's a full-time job?
18       A.  Yes, it is.
19       Q.  Okay.  And how long have you been working
20   there?
21       A.  That was from June of 2019, and I'm currently
22   working for him.
23       Q.  Okay.  And --
24       A.  About a year and a half.
25           MR. KELLY:  Ms. Davis, I can provide the
```

1  address for Evans Construction which we actually -- if
2  that is helpful.
3        MS. DAVIS:  Okay.  We can address this later.
4  You don't -- if he doesn't know it, that's fine.
5  BY MS. DAVIS:
6     Q.  So I'm sorry, repeat again.  How long have you
7  been working for Evans Construction?
8     A.  Since June of 2019.  So just shy of a year and
9  a half.
10    Q.  Okay.  And where did you work prior to that?
11    A.  I was -- I worked with Brad Truline, and we
12 were building custom homes in Sonoma County.  That was
13 from 2016; we started working together.
14    Q.  From 2016 until you started working for Evans
15 Construction?
16    A.  No, no.  With Brad Truline.  We started working
17 construction together building custom homes starting in
18 2016.
19    Q.  Right.  I'm asking you, did that job end when
20 you started working for Evans construction?
21    A.  I met Brian Evans through Brad Truline.  They
22 worked together for over 20 years.
23    Q.  Okay.  And do you like working for Evans
24 Construction?
25    A.  I do.  He's a very good boss.  It's a very good

1  learning environment.  Very professional.  I like

2  working for him a lot.

3      Q.  So you mentioned that you have a BA in

4  environmental science and I think water safety?

5      A.  Water quality.

6      Q.  Water quality.  Okay.

7          Do you also have any separate training in

8  carpentry?

9      A.  I do.  In between the junior college and Sonoma

10 State, I got college debt from going to the junior

11 college, and I didn't feel comfortable with that.  So I

12 went to -- I worked for Western Water, and we built

13 wastewater treatment facilities all across the Central

14 Valley in California.  That was from 2005 to 2008.

15     Q.  Okay.  Is there a reason that you switched from

16 the water quality jobs that seems to dovetail with your

17 educational background into carpentry?

18     A.  Yeah.  First off, I wanted an educational

19 background, just 'cause my father was in the

20 construction business when I was little.  And he ended

21 up getting hurt.  He hurt his back and wasn't able to do

22 construction anymore, so he didn't really have anything

23 to fall back on.

24          And furthermore, after experiencing stage III

25 colon cancer at 27, it changed my outlook a little bit.

```
1    And instead of just wanting to work a career inside, for
2    the future I decided that I really enjoy being outdoors.
3    I like the physical and mental challenge of building,
4    and I just feel really good when I do it.  So there's
5    more lucrative positions in my field, but I chose more
6    of a passion, and building is -- I'm very passionate
7    about building.
8        Q.  Okay.  Do you have any licenses related to
9    carpenting -- being a carpenter?  Excuse me.
10       A.  I was certified as an all-terrain forklift
11   operator, trench safety, CPR classes.  A lot of those
12   have expired.  A lot of those I got with Western Water.
13   Rigging cranes, trench safety.  A lot of those have
14   expired.  But I don't have a contractor's license, no.
15       Q.  Okay.  So do you have any other professional
16   licenses in association with construction or anything
17   else at this moment?
18       A.  No, I do not.
19       Q.  Okay.  And do you plan to -- you mentioned that
20   you enjoyed being a carpenter and working outdoors and
21   so forth.  And do you plan to do that indefinitely, or
22   do you plan to go back to water quality work?
23       A.  That's a good question.  I plan to do this -- I
24   don't have a complete blueprint to my long-term plans.
25   I would like to do this until -- for another five years
```

1  at least, just so I really understand how to do -- build

2  a house completely.  I'd like to be -- really master

3  this profession.

4          I do think about the future as far as being a

5  wastewater treatment operator or a drinking water --

6  drinking water operator.  Also I think about water

7  distribution, but I'm less interested in that.  I'm more

8  interested in water treatment.  Being as I have a

9  background in the construction part and then also the

10 education, they go hand in hand.  There's a lot of

11 outdoor opportunities and I do find that field very

12 interesting, but currently I like -- I enjoy

13 construction very much.

14      Q.  Okay.  Thank you for that.

15          I have some other questions about your work

16 history.  In the employment history that you filed with

17 the Court, it stated that from October 2010 to

18 December 2017 you were self-employed as an agricultural

19 farmer?

20      A.  Yes.

21      Q.  Can you describe what you were doing there?

22      A.  Yes, I can.  So I graduated in 2010.  I

23 wasn't -- I searched in Sonoma County, Marin County, and

24 Napa County for many different operator positions,

25 operator in training for wastewater and for drinking

```
 1    water.  And I was unable to get a position in that
 2    field.  I tried for about three months, and the job
 3    market was very suppressed.
 4            I tried construction, but I physically wasn't
 5    capable of working.  I was severely anemic and I had
 6    cancer at that time.  And the only way I could support
 7    myself financially in accordance with California
 8    Proposition 215 I cultivated medicinal marijuana in
 9    those years.  I followed all the state laws and the
10    local laws.  I worked directly with dispensaries and
11    followed all the laws.
12        Q.  So let's talk about that a little bit more.
13    You had your own medical marijuana farm?
14        A.  I wouldn't describe it as a farm.  It was a
15    ten-foot-by-ten-foot area in my garage.
16        Q.  Okay.  But you grew it?
17        A.  Yes, I did.
18        Q.  You weren't working on this farm?
19        A.  No.  It was in my garage at that residence I
20    told you about, the 2014 Illinois Avenue.
21        Q.  Okay.  And you did that for seven years
22    according to --
23        A.  Yes.
24        Q.  -- the information we have?
25        A.  I started in -- yes, seven years.  I started
```

1    transitioning out of that in 2016.

2         Q.  Okay.  And you grew this marijuana to sell?

3         A.  To dispensaries, yes.  There were four separate

4    dispensaries in Sonoma County and I worked directly with

5    them.

6         Q.  Okay.  Can you tell me what those dispensaries

7    were?

8         A.  Yes.  That would be Peace and Medicine in

9    Sebastopol, there's OrganiCann in Santa Rosa, and then

10   there's Mercy Wellness in Rohnert Park.  And I tried a

11   few other places, but those were the people that I

12   worked directly with.

13        Q.  I think there were three you had listed, and

14   you said you had done four?

15        A.  There were several other -- I don't recall the

16   exact names.  That would have been in 2014 before I had

17   these relationships really in.  And basically I would go

18   to all of the local dispensaries in the Sonoma County

19   and build a relationship with them, and those were the

20   three that really worked well.

21        Q.  Okay.  Did you sell the marijuana to anybody

22   else other than these dispensaries?

23        A.  No, I did not.

24        Q.  And about how much would you say that you grew

25   over the course of a year?

 1      A.  That's a guess.  I would say just about
 2  10 pounds per year.
 3      Q.  And how much money would you make per year
 4  selling 10 pounds of marijuana?
 5      A.  That would be about $2,500 per --
 6      Q.  Per year?
 7      A.  No.  2,500 times 10.  So that would be
 8  35,000 [sic].  And then you have to subtract business
 9  expenses for electricity bill, rent, nutrients, just the
10  cost of doing business.
11      Q.  Okay.  But this was a job that -- this was your
12  full-time job supporting yourself during those years?
13      A.  It wasn't necessarily full-time.  It was, I
14  would guess, maybe 20 hours per week.  Once again, I
15  went through 12 rounds of chemotherapy.  I had my entire
16  large intestine removed.  I had an ileostomy bag for 12
17  months.  I had pancreatitis three times.  I had my right
18  shoulder operated on, the SLAP and labrum.  It was a
19  complete rebuild of my right shoulder.  The chemotherapy
20  gave me arthritis.  It really depleted my bones and
21  joints.  So I was not capable of working full-time.
22      Q.  Okay.  So being a marijuana grower for the
23  dispensaries, this took place during your diagnosis and
24  treatment and recovery for cancer; is that correct?
25      A.  Yes, it is.

1      Q.  Okay.  And then for a period of time
2  afterwards, since you did it in 2017?
3      A.  Yeah.  There's a transition.  It's interesting
4  too.  The way I look at cancer, a lot of people look at
5  it as, oh, you had it then and you've beaten it and now
6  it's over.  I went in two weeks ago to have an upper and
7  lower endoscopy, and I don't really look at it as really
8  ever being over.  We have a -- I have a relationship
9  with UCSF.  I see them at least every year.  I see my
10  oncologist at least every year.  So I don't really look
11  at it as over.  I'm still dealing with that every single
12  day.
13      Q.  Yeah, I can imagine.  I mean, getting cancer,
14  especially at that young age, must be devastating.
15      A.  It was a challenge, but I had a very good
16  support group, friends and family to really help me out
17  through that process.
18          MR. KELLY:  Hello?  Ms. Davis, are you there?
19          THE WITNESS:  She dropped out.
20          MR. KELLY:  Other people seem to be here, so
21  I'm guessing the connection problem is on Ms. Davis's
22  side.  Is everyone else seeing her frozen?
23          THE REPORTER:  Yes.  Do we want to go off the
24  record?
25          MR. YEN:  Why don't we go off the record and

1  figure her out.

2          (Break taken at 9:27 a.m.)

3  BY MS. DAVIS:

4      Q.  How did you -- Mr. Stokes, how did you learn

5  how to be a marijuana cultivator?  How did you get into

6  that field?

7      A.  I wasn't able to work construction.  I wasn't

8  able to get a job.  So I looked it up online as far as

9  different ways to make money without -- I Googled that

10  and that was the main method, is Google.  And then I got

11  into contact with a hydroponics store in Petaluma, and I

12  asked them questions here and there.  But a lot of

13  Google searching and figuring it out myself.

14      Q.  Okay.  Did you work with anybody else?  Did you

15  know anybody else who was doing this work?

16      A.  No.

17      Q.  And did you yourself have a medical marijuana

18  prescription?

19      A.  I did.  In order to cultivate, I got my own

20  license 2 permit, yes.

21      Q.  You had a license to cultivate?

22      A.  It was a medicinal Prop 215 license, and that

23  would allow me to cultivate.

24      Q.  So was that a license to cultivate for personal

25  use or for commercial sale?

```
 1        A.  I -- commercial sale.
 2        Q.  So did you have a license for personal use?
 3        A.  Yes, I did.
 4        Q.  And can you tell me when you got that license?
 5        A.  That would have been two thousand -- I'm not
 6   sure when I did.
 7        Q.  You're not sure?  Was it --
 8        A.  I don't recall.  I know I had one in 2010 to
 9   run this business, this small business.
10        Q.  So, again, I'm talking here -- I want to talk
11   about your license for personal use right here.  Not the
12   one for the business.
13        A.  Okay.
14        Q.  So do you --
15        A.  Yes.  I believe 2005.
16        Q.  Is there any reason that you got a license for
17   usage of medical marijuana in 2005?
18        A.  Yes, there is.  I had a court case.  I had a
19   misdemeanor charge in 2005, and my vehicle was searched
20   and I had a small amount of marijuana with me.  And my
21   speech teacher's husband at the Santa Rosa Junior
22   College, who was also a teacher on campus, he encouraged
23   me to get a license before going to court for personal
24   consumption.
25        Q.  So you were using marijuana prior to that
```

1  traffic stop?

2     A.  No.  No, I was not using it.  That would be

3  weekends.  That would be on weekends.

4     Q.  Right.  I don't mean that you were using it at

5  the actual traffic stop, but you were someone who used

6  marijuana during that time period?

7     A.  Yes, I did.

8     Q.  And you used it on the weekends you said?

9     A.  It was occasionally.  I was in construction at

10 that point, and for pain purposes -- I had hurt my back,

11 I had hurt my hand.  At that point, talking to a

12 genetics counselor, I had already had three marble-sized

13 tumors growing in my large intestine from my rectum, and

14 I was slowly bleeding out.

15        From my understanding, from about the age of

16 14, FAP starts to attack.  It starts growing polyps in

17 the large intestine.  So that would be -- it took many

18 years for me to get to 2010 and have my entire large

19 intestine full of bleeding polyps.

20        So I believe, from my understanding, is that my

21 body was being attacked for a very long time.  And the

22 doctor that I talked to said that had they known that I

23 had FAP, they would have removed my large intestine at

24 the age of 13 or 14.  I didn't know -- nobody knew that

25 I had that because it was a one in 26,000.  None of my

1  siblings had that.  None of my parents had that.  So
2  that was a genetics anomaly.  One in 26,000 people will
3  get that.
4        So I had been experiencing arthritis, body
5  depletion, and anemia for many years before getting my
6  large intestine removed.
7        Q.  So are you saying that prior to getting your
8  license for medical personal use of marijuana -- again,
9  I just want to reiterate:  This line of questioning
10  we're focusing on your personal use, not your license
11  for commercial sale -- that you were doing so for pain
12  purposes?
13        A.  Yes, I was.
14        Q.  And how long had you been doing that?
15        A.  I would say between -- when I started doing
16  construction for Western Water is when my body started
17  to hurt on a regular basis.  So that would have
18  been 2005, about three months into construction.  So
19  September, October, November.  Probably about November
20  of 2005 is when my body started to feel pain regularly.
21        Q.  And what led you to explore the use of
22  marijuana for pain relief?
23        A.  I tried other options as far as ibuprofen,
24  over-the-counter herbs as far as just -- I talked to
25  doctors and herbalists as far as what is the best

1    option.  The only thing that I notice would work -- the

2    ibuprofen would work.  It just became a problem with

3    stomach ulcers, and a long-term use of ibuprofen didn't

4    seem like an option.  What else worked is turmeric.  That

5    seems to really work with inflammation.  But as far as

6    pain management has gone for me, those were the best

7    options.

8            After getting my large intestine removed and

9    having a blood transfusion, my anemia went away.  And at

10   this point in my life, I do not experience very much

11   pain.  I do not -- I haven't smoked marijuana in about

12   three years, maybe four.  My body has responded very

13   well to cancer treatment.

14       Q.  Okay.  So during this time before you had the

15   license for personal use, did you ever have a doctor

16   recommend marijuana --

17       A.  It was --

18       Q.  -- as a pain relief?

19       A.  Not necessarily before.  But once I started to

20   seek treatment about two months into construction, I did

21   talk to several different doctors.  And that was

22   recommended to me, yes.

23       Q.  So is there a reason that you didn't get a

24   license until this traffic stop, then?

25       A.  It didn't seem like a reason.

1      Q.  Could you explain that in more detail?  What do
2   you mean "it didn't seem like a reason"?
3      A.  I didn't need -- I did not have a license
4   before that traffic stop and, with further
5   understanding, I believe that I should have the entire
6   time.
7      Q.  Okay.  And who was it that recommended that you
8   get a license?
9      A.  That was a doctor at -- it's currently Vista
10   Family Health Center.  But that was recommended at a
11   medical practice in Santa Rosa.
12      Q.  Okay.  Is that a medical marijuana dispensary?
13      A.  No.  That was a standard health center.
14      Q.  I'm sorry, do you have a --
15      A.  Standard health clinic.
16          I'm sorry, I interrupted you.
17      Q.  So was there a primary care doctor you would
18   see there?
19      A.  I didn't really have a primary care doctor
20   there that often.  I went to -- there was a medical
21   facility on Chanate that was for low income, people with
22   low income, and that's where I would seek treatment.
23      Q.  Okay.  Did you not have health insurance at
24   that time?
25      A.  I did not have health insurance.

```
 1        Q.  Do you have health insurance now?
 2        A.  I currently do.
 3        Q.  What was this traffic stop for?
 4        A.  I was -- this would have been 2005.  I was
 5   pulled -- I was parked by 7-Eleven.  I was waiting for
 6   my girlfriend at the time, Razia Shaikh.  And she was at
 7   her friend's -- she was at the movies watching the movie
 8   with her friend, and I was waiting for her to get out of
 9   the movie.
10        And I had gone -- it was an industrial parking
11   lot right across from the 7-Eleven on Lakeville Highway
12   in Petaluma, and the officer pulled right next to me and
13   said that I looked suspicious for being parked on
14   private property and that I didn't belong there and
15   searched my vehicle at that point and then arrested me
16   for having a firearm in my truck unloaded and that --
17   and I had marijuana in my truck as well.
18        Q.  What sort of firearm did you have in your
19   truck?
20        A.  It was a replica.  It was a .44 Magnum
21   single-action replica of an old cowboy gun.  I don't
22   recall what it was called, but it was from the 1920s.
23        Q.  Why did you have this gun?
24        A.  I had testified against Saleh Khazaly.  My
25   girlfriend at the time, Razia, we had been together
```

```
 1   from 2004 to 2008.  She had a restraining order against
 2   Saleh Khazaly.  I have the spelling for that in the
 3   documentation.
 4          So I testified against him in court for a
 5   violation of his restraining order and to renew her
 6   restraining order.  And after that court process, he
 7   followed me to the parking lot in the Sonoma County
 8   Court parking lot and he threatened me with my life and
 9   told me that he was going to kill me.
10          So I lived in Placerville at the time five days
11   a week.  I was working for Western Water.  I was working
12   out of town, and then on the weekends I would come back
13   and I would stay with Razia and her family in Petaluma.
14   And her next-door neighbor she had dated prior to me
15   meeting her, and that was the man -- her next-door
16   neighbor was Saleh Khazaly and he's a very intimidating,
17   violent person that I ended up having to deal with
18   several, many times while dating Razia Shaikh.
19      Q.  Did you report this threat to the police?
20      A.  I did -- I did not report that to the police.
21   I had been threatened by him many times.  And I didn't
22   report -- besides testifying in court, I did not report
23   that to the police.
24      Q.  So you said "besides testifying in court."
25   When you were in court on this restraining order, did
```

1   you testify as to these threats?

2       A.  He didn't threaten me -- he had threatened me

3   many times before, said he was going to kick my ass.  He

4   would bang on the door.  He had threatened me, and I

5   testified against that.  I was also testifying that he

6   had violated his restraining order in the process of

7   threatening my girlfriend.

8       Q.  Right.  But just to confirm, when you were in

9   court on this, you did testify about his threats against

10  you on the record?

11      A.  On the record I testified that he threatened

12  me.  He hadn't threatened me with my life until after I

13  testified against him.  Then it became more personal, I

14  believe for him, and that's when he threatened me with

15  my life.

16      Q.  And did you report that particular threat to

17  the police?

18      A.  I did not.

19      Q.  Why not?

20      A.  I didn't have the foresight to do that.  My

21  girlfriend had a restraining order against him.  Looking

22  with hindsight, I should have gotten my own restraining

23  order against him.  I just dealt with it the best that I

24  could, which was on many different weekends he was a

25  problem.  And the only reason why -- go ahead.

1        Q.   So as best you could, you got a gun?  I'm
2   trying to circle back.
3        A.   That was a certain -- it was a period of time
4   afterwards when I was staying at my girlfriend's place
5   that I wasn't able to sleep, and I was concerned for my
6   life and her life.  And I had inherited that gun from my
7   father.  He passed away in 2006, I believe.
8        Q.   So this --
9        A.   I began --
10       Q.   This gun was a gun from your grandfather?
11       A.   No.  It was from my father.  He had passed away
12   in, I believe, January of 2006.
13       Q.   Okay.  And let's try to tease out this
14   timeline.  Your father passed away in 2006.  You're
15   saying that he -- as part of your inheritance you got a
16   gun?
17       A.   I did, yes.
18       Q.   Just one gun?
19       A.   Just that one, yes.
20       Q.   And when was the threat to your life?
21       A.   That would have been -- I have the subpoena on
22   file where that was -- it was a specific date that I
23   testified.  That would have been two thousand -- I
24   believe that was 2005 or 2006.  I have that subpoena on
25   file.

```
 1           And that was the day that he followed me to the
 2   parking lot or he was parked near that area.  He
 3   followed me out of the courtroom and threatened me.  I
 4   don't remember the exact date, but I do have that on
 5   record.
 6           MR. KELLY:  I can provide some of those dates
 7   if that would be helpful at this point.
 8           MS. DAVIS:  We can follow up.  We don't have to
 9   interrupt the deponent's questioning.  We can follow up
10   with some of the stuff later.  That's not necessary.
11           MR. KELLY:  Just trying to be helpful.
12           MS. DAVIS:  But thank you.
13   BY MS. DAVIS:
14      Q.  Okay.  So you had the threat, and you happened
15   to inherit a gun shortly thereafter?  You didn't try to
16   procure a gun in another way in response to this threat?
17      A.  No.  I had my father's, which I inherited.
18   That seemed like the most logical step.  I was working
19   construction to get out of debt so that I could go back
20   to school.  I was saving as much money as I could to get
21   back to work -- to go back to school.
22      Q.  Did you have a license for this gun?
23      A.  No, I did not.  It was from the '20s, and it
24   was given to me by my father.  I did not have a license.
25      Q.  Did you attempt to get a license for it?
```

1      A.  I never did.

2      Q.  Why not?

3      A.  I -- it never occurred to me to do so.

4      Q.  Did you carry ammunition for this gun?

5      A.  Only when I would go to Razia's -- when I would

6   stay in Petaluma and stay with my girlfriend's family

7   after the incident where he threatened me with my life,

8   I would carry that separately.  And before I would go to

9   bed, I would put five rounds in the cylinder, and I

10  would sleep -- I would have that right by me.  And I

11  would sleep with that in my backpack sealed up, but I

12  would have it right by me, yes.

13     Q.  What do you mean "sealed up"?

14     A.  Just zipped up in my bag.  It wasn't loose and

15  free and it wasn't in a locked box, but I feared for my

16  life and I had it close to me.  And when I would wake

17  up, I would unload it, keep the ammunition separate from

18  the firearm except when I was sleeping.

19     Q.  Okay.  Would you carry this gun with you at all

20  times?

21     A.  No.  Only when I was staying at my girlfriend's

22  house.

23     Q.  So where were the gun and the ammunition when

24  you weren't there?

25     A.  I would drive back to Placerville where I was

1   living.  I would keep the ammunition separate, and I

2   would leave it at my house where I was staying in

3   Placerville while I was working out there.

4       Q.  So what I'm trying to clarify is the gun and

5   the ammunition were in your possession during that time?

6       A.  They were both in my possession, yes, but I

7   never kept them physically together.  I kept them

8   separate so I could put them together before I went to

9   bed only when staying at Razia Shaikh's house.  I didn't

10  feel threatened in Placerville or anywhere outside of my

11  girlfriend's house.

12      Q.  Okay.  And when was the last time that you had

13  contact with your ex-girlfriend?

14      A.  She would wish me happy birthday here and

15  there.  I've talked to her maybe six months ago.  I talk

16  to her once in a while, maybe twice a year, to say

17  hello.  She'll call me on my birthday or I'll call her

18  on her birthday and say hello.  We have a friendly

19  rapport.

20      Q.  When did you break up?

21      A.  That would have been 2008.

22      Q.  And when was the last time you had contact with

23  her ex-boyfriend who had been threatening you?

24      A.  I saw him maybe in Petaluma maybe in two

25  thousand -- if I were to guess here, this is a guess --

1   around 2014 or '15.  And he was a little bit different.

2   He appeared to be on some sort of, I don't know if it

3   was drugs or alcohol.  But he was much less threatening.

4   He was drooling -- basically drooling on himself.  Not

5   able to move as well.  And he was a little bit less

6   threatening, but very unstable.  I believe he's gone

7   to --

8        Q.  Where is this?

9        A.  In the town of Petaluma.

10       Q.  You saw him in the town of Petaluma?

11       A.  I've seen him several times in Petaluma.  He

12  still lives there.  I did see him in Petaluma.

13       Q.  So you said he was drooling.  Was he sitting on

14  a park bench, or what was the context that you saw him?

15       A.  No.  He -- context, okay.  The last time I saw

16  him would be at Funny Farms Hydroponics.  I was an

17  employee there in 2014 and '15, and I would see him come

18  in with a couple of friends once in a while to that

19  shop.  And I worked there about three days a week.

20            And he apologized at one point, and he never

21  really seemed coherent.  I had heard he had gone to jail

22  for abuse and violation of restraining orders with other

23  women.  And he was in a different -- I would describe

24  him as unstable and still a little intimidating but much

25  more subdued, overweight, and a little bit less -- much

1   less threatening towards me.

2        Q.  Did he recognize you?

3        A.  Yes, he did.  He pretended to not really know

4   me in front of his friends.  And then after coming in

5   several times, I would ignore him and stay away from him

6   to the best of my ability.  And he came in at one point

7   and apologized for -- he didn't really have a reason.

8   He just said he was sorry.

9        Q.  Okay.  Do you have any concerns about meeting

10  him again given his instability?

11       A.  I fear for any of his future girlfriends, but I

12  haven't seen him since about 2014 or 2015.  I don't

13  really go to Petaluma.  I don't really fear running into

14  him, and I just don't really have fear of him in

15  general.

16           Going through colon cancer and going through

17  that process has changed my perspective in many ways.

18  And I have a lot less fear in general.  I'm sorry, I'm

19  stumbling a little bit.  I don't feel threatened by him,

20  and I don't run into him very often at all.  I haven't

21  seen him since 2014 and '15.

22       Q.  Okay.  You're doing great, by the way.

23       A.  Thank you.

24       Q.  When you say he seemed unstable, can you just

25  describe a little bit about what you mean by unstable?

1       A.   The first -- some of my first memories, I was

2   helping unload furniture at my girlfriend's house.  She

3   had procured a really beautiful old bookshelf and it was

4   very heavy, and I had two of my friends, one of them

5   from grade school, Ross Luther, and his cousin lived in

6   the area.  And we had a moving van, and we were moving a

7   large piece of furniture, and we're moving it into her

8   house.  This man comes out in his underpants, and he was

9   shouting.  He was threatening all three of us and in a

10  very violent rage.  He came onto Razia's property on the

11  grass and was right in our face.

12          I'm with Ross Luther who's 6'3", 220 pounds,

13  athletic but very friendly.  His cousin's not very

14  imposing, but he's a large man.  And myself, I'm average

15  height.  And he just bulled right at us and threatened

16  all three of us and was threatening us with violence and

17  has no fear.  And to be honest, we were all concerned

18  and scared of him.

19          And that's when Razia called the police and had

20  the police come over, and we reported that incident

21  directly.  That was just one of many incidences.  There

22  were several times -- he was a stalker, and he would

23  stalk her and I happened to be in her vicinity.

24      Q.   So --

25      A.   So by myself -- one last part.

1           I was concerned for our safety when he was in
2   his underpants with no weapons and just very physically
3   dominant, very angry and aggressive.  And I don't know
4   how the three of us would have done if he attacked us.
5   I feared him regularly.
6           Q.  Okay.  Thank you for that.
7           I also wanted to address, you mentioned that he
8   seemed unstable when you saw him after you and your
9   ex-girlfriend broke up when you were working at Funny
10  Farms Hydroponics.  How did he seem unstable in those
11  circumstances, meaning after you broke up with your
12  girlfriend?
13          A.  He parked his car -- this happened several
14  times, but one time when it really stood out and I
15  talked to my coworkers, and he came in and he parked
16  really slow.  He took up several different parking
17  spots, parked sideways, took a while to get out of his
18  car, had spilled some sort of drink on his shirt.
19  Didn't smell like alcohol, but he was slurring his words
20  and was very slow and subdued.
21          And it seemed like -- my guess, not a
22  professional guess, but it seemed like he was on some
23  sort of pills or something.  He didn't smell like pot;
24  he didn't smell like alcohol, but he was just really a
25  mess.  And he would generally come to the store -- most

1    of the time he would get a ride with one of his friends,
2    but he just never really was able to have full
3    sentences, communicate very well, and he just didn't
4    seem sober almost ever.
5         Q.  Okay.  So can you tell me, what kind of
6    business was Funny Farms Hydroponics?
7         A.  That was a hydroponics store.  They would sell
8    products for regular farmers, for indoor cultivation to
9    people.  It's a public store.
10        Q.  Was it focused on farming or indoor cultivation
11   of marijuana?
12        A.  There was regular vegetable farmers who would
13   come in and get supplies.  So they're full -- many seeds
14   and supplies for regular vegetables and fruit and roses,
15   but it also specialized in indoor hydroponic
16   cultivation.
17        Q.  Of marijuana?
18        A.  Yes.
19        Q.  Was this man, who had threatened you, coming in
20   to get supplies for marijuana, do you recall?
21        A.  It appeared that way.  A lot of people were
22   very -- tried to be discreet, but it appeared that that
23   was what he was up to.
24        Q.  Does this store require that people show their
25   licenses for marijuana cultivation before?

```
 1        A.   No.  It doesn't work like that, no.
 2        Q.   How does it work?
 3        A.   It's a store you can just walk in and go to.
 4   It's no longer in business.  They went out of business
 5   years ago.  But it's a public store or privately owned
 6   but a store that you can just walk into like any other
 7   store.  Like a farm supply store.
 8        Q.   So it seems that you worked there during the
 9   time that you were also cultivating marijuana.  Is that
10   how you knew about this store?
11        A.   No.  I learned about it -- it was just the
12   least expensive place to get supplies, soil, any sort of
13   supply that's related to that field.
14        Q.   Okay.  Let's circle back to the gun that was in
15   your possession when you got pulled over.  What happened
16   to that gun?
17        A.   It was taken by the police and it was
18   decommissioned.  It was destroyed as evidence.
19        Q.   It was -- meaning the police destroyed it?
20        A.   They confiscated it and destroyed it.
21        Q.   Okay.  And did they tell you that?
22        A.   That -- my lawyer told me that.
23        Q.   And did they tell you why they did that?
24        A.   Because it was -- it was confiscated.  It was
25   illegal -- it was a misdemeanor of illegal
```

1    transportation of a firearm.

2         And I believe that when that happened, to the

3    best of my understanding, they just destroy -- I'm not

4    exactly certain.  It seemed like that's what they did

5    when they confiscated firearms that weren't being taken

6    care of properly.

7         Q.  So was the illegal transportation charge

8    because it was unlicensed?

9         A.  It was because it wasn't in a locked box.  I

10   should have had that in a safe, in a locked box.

11        Q.  So the charge just had to do with the storage

12   of the gun and not --

13        A.  The transportation --

14        Q.  -- your transport?

15        A.  I'm not a hundred percent sure, but that was my

16   understanding of it.

17        Q.  And have you -- not counting the guns that you

18   have listed in your complaint here, the ones that you

19   have inherited from your grandfather, have you had any

20   firearms since then?

21        A.  I have not owned or possessed a firearm since

22   then, no.

23        Q.  Do you have access to firearms?

24        A.  I do not.

25        Q.  Do either of your roommates have firearms?

```
 1        A.  I -- no, they do not.  To the best of my
 2    understanding, I. . .
 3            MR. KELLY:  Did you freeze again?
 4            MS. DAVIS:  I can hear you, but I can't hear
 5    Easton.
 6            THE WITNESS:  Can you hear me now?
 7            MS. DAVIS:  Yeah, I can hear you now.
 8            Can you repeat the question, Madam Court
 9    Reporter?
10            (Record read.)
11            MR. KELLY:  He answered the question.
12    BY MS. DAVIS:
13        Q.  Did you have any --
14        A.  No.  My best answer would be --
15            MR. KELLY:  I think because it looked like you
16    froze, so he stopped talking.
17            MS. DAVIS:  Sorry about that.
18    BY MS. DAVIS:
19        Q.  What about your roommates; do any of your
20    roommates have ammunition?
21        A.  I don't believe so, no.
22        Q.  Do you have access to any ammunition?
23        A.  I do not, no.
24        Q.  Does your girlfriend have any guns?
25        A.  No, she does not.
```

```
 1        Q.  So do you still -- are you still a marijuana
 2   user?
 3        A.  I am not, no.
 4        Q.  Mr. Stokes --
 5        A.  Could you repeat that?  Your screen's frozen.
 6   I couldn't hear.
 7        Q.  When did you stop using marijuana?
 8        A.  Can you repeat that one more time?
 9            MR. KELLY:  She said, "When did you stop using
10   marijuana?"
11            THE WITNESS:  I -- the last time I used was
12   when I had pancreatitis.  I used that for pain control.
13   My screen is doing something funny.
14            MS. DAVIS:  Okay.  Are you -- Madam Court
15   Reporter, are you able to hear all of us?  I'm not sure
16   if it's on my end or if someone else is having problems.
17            (Brief pause in proceedings.)
18            MS. DAVIS:  We're switching subject matters,
19   and we've been going for about an hour right now.  So
20   why don't we take a few minutes; is that okay?  And I'll
21   try to log on from a different device.  I think the
22   problem is from my end.  Is that okay?
23            MR. KELLY:  How long?  Seven minutes?
24            MS. DAVIS:  How about -- it's 10:02.  How about
25   we come back at 10:10?  Is that okay?
```

```
 1          MR. KELLY:  Great.  Thank you.
 2          MS. DAVIS:  Thanks, everyone.
 3          (Break taken at 10:02 a.m.)
 4          (Record read.)
 5   BY MS. DAVIS:
 6      Q.  So when was the date of this time that you
 7   stopped using marijuana?
 8      A.  I believe that was the middle of 2017.
 9      Q.  Okay.  And --
10      A.  That wasn't like I had continually been using.
11   It was more a specific event that happened three
12   separate times.  I had pancreatitis three separate times
13   in 2017, and that was the last time that I had used
14   medicinal marijuana or marijuana of any kind.
15      Q.  And just to clarify, your testimony is that you
16   were using it for medicinal or pain relief reasons?
17      A.  Yes.
18      Q.  Had a doctor recommended it as relief for
19   pancreatitis or other issues that you were experiencing?
20      A.  It was more that I -- at the beginning of
21   chemotherapy I hadn't used that, and then I watched a
22   movie called 50/50 where a young man ended up having
23   cancer and he went into -- I'm going a little bit off
24   topic here, but basically I got it from a movie to help
25   the infusion process.  And also when I had my large
```

1    intestine removed, I also used then because it really

2    helped turning my gut back on.

3         Q.  Were your doctors aware that you were using

4    marijuana, medicinal?

5         A.  Yes.  I've been 100 percent honest with my

6    oncologist, with Dr. Kim at UCSF, the surgeon.  I'm

7    completely honest with that and open.

8         Q.  Okay.  But just to confirm, your testimony is

9    since 2017 you haven't used any marijuana?

10        A.  Since that -- I believe it was the middle of

11   2017.  That last time was the third and final time of

12   having pancreatitis, yes.

13        Q.  Do your roommates use marijuana?

14        A.  I don't believe so, no.

15        Q.  What about your girlfriend?

16        A.  She -- I don't believe so either.  I think she

17   used to before I met her, but I don't see her using that

18   in her life, no.

19        Q.  Is marijuana something you would turn to for

20   pain in the future?

21        A.  If there's something uncontrollable and that

22   the pharmacy medicines don't work, I would definitely

23   use that for emergencies.  I don't have an interest for

24   daily recreational use, no, but for emergencies

25   definitely.

```
 1          Like I said earlier, with the chemotherapy I
 2   used the medications that were prescribed by my
 3   oncologist.  And for nausea and for pain control and for
 4   gut activity, there was no pharmaceutical drug that
 5   could compare as far as providing relief and being
 6   helpful.  And I would recommend that for anybody that
 7   has to go through the same experience that I went
 8   through, that it was a very helpful tool.  But
 9   recreationally I don't have any interest in that.
10          So I don't know if I answered that question
11   completely.
12      Q.  No, you did.  You've been very thorough.  Thank
13   you.  I appreciate it.
14          I want to follow up on one more thing from the
15   arrest that you had for the possession of the gun.  And
16   you said you hadn't owned a firearm since that time or
17   had access to firearms; is that correct?
18      A.  That is correct.  There was -- I did -- let me
19   rephrase that.  That was inherited from my father.  And
20   I ended up losing that.
21      Q.  Right.
22      A.  And then I did get my hunter safety course in,
23   I believe, firearms safety.  I'm not sure the exact
24   year, but I did at some point earlier on -- when was
25   that?  I got my hunter safety course, and I had hunt at
```

```
 1   my grandfather's ranch.  That would have been -- the
 2   last time I did that was 2008 or 2009.
 3            So I did have access to my grandfather's old
 4   hunting rifle, but after finding out that I was -- let
 5   me rephrase that a little bit more, clarify.
 6            The -- when I originally had that charge, the
 7   misdemeanor of illegal transportation of a firearm, I
 8   was notified that I am not legally allowed to own or
 9   possess a firearm.  With talking to my lawyer, my speech
10   teacher's husband who's also a speech teacher
11   Ken Bireze (phonetic), he told me that there was a
12   five-year ban on possession and use of any firearm.
13       Q.  So this was at the time of your arrest; you
14   were notified at that point that you could not get a
15   license for a firearm?
16       A.  Yes.
17       Q.  And do you still hunt?
18       A.  I do not.  I haven't since about 2009.  I
19   haven't.
20       Q.  Are you interested in hunting?
21       A.  Once again, going through chemotherapy and
22   stage III colon cancer, it's changed my perspective.
23   I'm a little bit more -- it's a little bit more
24   emotionally sensitive to take the life of another
25   animal.  I am -- I do eat meat, so there's a little bit
```

1   of a contradictory there.  I like the idea of that in
2   the future, of being able to go hunting once a year and
3   have a meat full of -- a freezer of meat.
4          So I'm conflicted as to the future of that.  If
5   I get permission from the Court to own and possess
6   firearms, I believe that at some point in the future I
7   would like to purchase a hunting rifle and hunt.  But
8   that's not my immediate concern.  I don't have an
9   immediate interest in hunting, but I do like the idea of
10  it.
11     Q.  Okay.  So you would possibly be interested in
12  acquiring firearms other than the ones that you've
13  inherited for hunting?
14     A.  For hunting, yes.  I'd like to do that at some
15  point in my life.
16     Q.  Okay.  When you were told that you couldn't own
17  a firearm, going back to the time you were arrested and
18  you had a firearm in your car, was that notification
19  under federal law or state law, if you recall?
20     A.  I believe it was a federal -- to the best of my
21  understanding, it was a five-year federal ban for having
22  a -- for 5150.  That's what I was informed by my lawyer.
23     Q.  So at that time you knew that this issue was --
24     A.  At the time I knew that that was definitely an
25  issue.  I was under the assumption that five years after

1  my 5150 in 2002, I was under the assumption that that
2  would disappear and be done.
3      Q.  Okay.  So your lawyer told you that -- but at
4  that point it had already been five years past your
5  5150; is that correct?
6      A.  No.  It had not.  Are we talking about the
7  incident of my misdemeanor?
8      Q.  Yeah.
9      A.  No.  It did overlap.  It hadn't been five
10 years.
11     Q.  So it hadn't quite been five years.  So you
12 were under the impression that once the full five years
13 had lapsed, you could get a license?
14     A.  That was my understanding, yes.
15     Q.  Okay.  Do you -- just out of curiosity, do you
16 do any other outdoor activities, like fishing?  You
17 mentioned that you enjoyed working in the outdoors.
18     A.  Yeah, I really enjoy the outdoors.  I like to
19 go crabbing once in a while, take the crab boats out.
20 Fishing, I mostly like to fish for the food and for the
21 social friends and family.  I'm not an avid fisherman
22 that likes to go out by himself, but I do enjoy fishing
23 with other people.
24         I also enjoy mountain biking, hiking,
25 kayaking.  My girlfriend -- I really enjoy being

```
 1   outside.  My girlfriend hiked the entire Pacific Crest
 2   Trail in 2018, and I was able to meet with her for the
 3   month of June -- from June 15th till July 15th.  And I
 4   was able to hike 400 miles with her.  We went from
 5   Horseshoe Meadows from Mount Whitney to South Lake
 6   Tahoe, and I had a little section up in Burney Falls,
 7   another 50 miles in Burney Falls, for a total of about
 8   400 miles.  And that really was special.  We were going
 9   to do the Pacific Crest Trail this April, but as of --
10   they weren't giving out permits to do that, and they're
11   going to make their final decision in January if we
12   are -- if they're going to give out permits.
13          We're planning that they're not going to give
14   out permits because of COVID-19 and we don't think it's
15   going to be 100 percent under control, obviously, by
16   January.  So we've come up with another plan to do the
17   Pacific Northwest Trail where we're going to hike from
18   Montana right near Glacier to Washington.  And that's
19   about 1200 miles.  And we're planning to do that in a
20   two-month period, and we're going to bring small
21   collapsible fishing poles for different sections of that
22   hike.
23      Q.  And --
24      A.  But yeah, I really enjoy being out.  I feel
25   good being outside, yeah.
```

1        Q.  Would you want to bring a firearm on that hike?
2        A.  No.  It is not legal to.  Even if I was -- the
3    only way you can legally do that, assuming that I was
4    allowed to possess and own firearms, you're still not
5    allowed to through certain sections of that trail, so --
6    and also being responsible for that the entire time
7    would be too much of a burden as far as going for a swim
8    or going into -- it would be too much of a burden, even
9    if we were legally allowed to, to maintain
10   responsibility 100 percent of the time.
11        We're going to bring whistles and pepper spray,
12   bear spray, and we have a device, a satellite device so
13   that you can call for help if you get into a position
14   that you're not able to get out of.
15        But no, I have no interest in carrying a
16   firearm on that hike.  I did not carry one on the
17   Pacific Crest Trail.  I would like to follow all the
18   rules and the laws, and if I'm granted permission to own
19   and possess firearms, I would like that.  And I would
20   still follow all the rules and the laws.  But also if
21   I'm not granted it, if the Court decides that it's not
22   okay for me to, then I'm going to follow all those rules
23   as well because it just is the right thing to do, and I
24   don't feel comfortable breaking laws.
25        Q.  So did you research this law about not being

1  able to carry firearms on the PCT?

2       A.   There's times in certain sections when you're

3  in -- there's some sections that you'd probably be

4  allowed to, but there are certain parts, many parts that

5  you go through that it clearly says -- I saw the signs.

6  It says "no firearms."

7       Q.   Right.

8       A.   So it's clearly stated in many different

9  sections that you're not allowed to.  And really I think

10 the biggest danger on the Pacific Crest Trail is

11 mountain lions, and I don't believe that firearms are

12 the answer to protect yourself from mountain lions.  I

13 think pepper spray would work fine and being really

14 aware and conscious about your surroundings or my

15 surroundings.

16      Q.   So you mentioned that if your ability to

17 possess a gun was restored, that you would be interested

18 in potentially purchasing a hunting rifle.  Are there

19 any other firearms that you would be interested in

20 owning or possessing?

21      A.   No.  That would be my grandpa's service pistol,

22 the Ithaca 1911.  He got his in 1943, and he flew every

23 mission that he had with that.  And that's really

24 sentimental to our whole family and me.

25           And then my great-grandfather, Harry Clark

1   Stokes, who was my grandfather's father, he was a
2   government hunter in Grants Pass, Oregon.  And he left
3   my grandfather with his hunting rifle, and I would like
4   to own that one but basically keep it in the family and
5   have it in good enough condition so that it could fire.
6   But I don't have any interest in firing these or using
7   these of any kind.  I just want them to be in good shape
8   and take care of them.
9        Q.  So if you don't want to use them, why do you
10  want to keep them in working order?
11       A.  Part of the value of any firearm is generally
12  that it works, any collector.  The sentimental part of
13  them is that this is my grandpa's service pistol and
14  it's in working condition.
15            And the same with the hunting rifle.  There's
16  clearly more value to something that works versus
17  something that doesn't work.  And if I'm not granted
18  permission, then I would request that these items go to
19  a different family member that can take care of them and
20  pass them on to somebody else eventually that has the
21  best interest of keeping them in the family as their
22  family heirlooms.
23       Q.  Would you want to use the hunting rifle to
24  hunt?
25       A.  I would like to at some point.  I don't feel

1  good about that right now, and it's hard to say being

2  that I don't have the ability to -- I don't have the

3  legal ability to own or possess a rifle, so it's hard

4  for me to have these wants when there just clearly is

5  conflict.  But I do like the idea of owning a hunting

6  rifle and being able to hunt.

7      Q.  Right.  Understood that right now you're not

8  permitted to own one.  I understand that.

9          I just want to clarify that if you were

10  permitted to own one of these rifles, you would want to

11  keep it in working order and potentially use it to hunt?

12      A.  Are we talking about my grandfather's --

13      Q.  Yeah.  Your grandfather's.

14      A.  I would want to keep it in working order, but I

15  would not want to hunt with that, no.

16      Q.  Why not?

17      A.  It's old.  That particular design was 1894.  It

18  specifically is from 1906.  It's -- I just wouldn't want

19  to take it outside if it's raining or get it dirty or

20  put wear and tear on something that has a lot of wear

21  and tear.  It's an antique and it's sentimental, and I

22  would just like to keep it in good shape.  That

23  particular rifle I do not have interest in using it as a

24  hunting rifle.

25      Q.  So for hunting you would procure another rifle

1   if you were permitted to?

2      A.  If I was legally permitted to, I would buy a

3   brand-new some sort of bolt-action rifle with a scope so

4   that I could shoot longer range.  Yeah, I wouldn't go --

5   I wouldn't go with an iron-sight 100-something-year-old

6   rifle as a hunting rifle.

7         MR. KELLY:  Ms. Davis, I'm sorry to interrupt.

8   I just want to acknowledge that you had asked me the

9   serial number and date of manufacture, and I e-mailed

10   you this morning and said I thought it was 1904.  I

11   misspoke there.  My client said it's 1906.

12         MS. DAVIS:  Thank you.

13   BY MS. DAVIS:

14      Q.  So, Mr. Stokes, just to get your testimony on

15   this on the record, that rifle was manufactured in 1906?

16      A.  Yes.  Yeah, I looked up the serial number and

17   that is a 1906 manufacturer.

18      Q.  Okay, great.  Thank you.

19         It seems like you know quite a bit about

20   hunting and hunting rifles.  Had you hunted a lot in the

21   past?

22      A.  Not a lot but a little bit at my grandfather's

23   place.  The only animal I've ever hunted is wild boar.

24   And I'm competent.  I took a hunter safety course.  I

25   learned from that.  And I've hunted there from -- I got

```
 1   my hunter's license, I believe -- I'm not exactly sure
 2   when I got my hunter's license.
 3        Q.  Do you still have a hunter's license?
 4        A.  I don't have an active hunting license, no, but
 5   I believe by passing that safety course I will always --
 6   that certification doesn't go away.  But a hunting
 7   license, no, I do not have one.
 8        Q.  So it's a certification that you pass a hunter
 9   safety course, but you have to get a license every
10   year --
11        A.  Every year you would --
12        Q.  -- or whatever the safety requirement is?
13        A.  Yes.  You have to get a yearly pass every year.
14   And then for pigs you'd have to get tags, pig tags for
15   each individual pig.
16        Q.  Okay.  And just to clarify this, would you
17   procure a firearm or be interested in procuring a
18   firearm for personal safety reasons?
19        A.  I would not.  I don't feel threatened in my
20   life at all.  For safety I feel like -- my understanding
21   is that having one around for safety, the odds of ever
22   needing that are very limited, but it just requires a
23   great amount of responsibility to keep it safe so
24   people -- a child or someone doesn't stumble upon it and
25   accidentally hurt themselves.  Statistically I believe a
```

1    dog is more effective as a security -- for security, and
2    I think pepper spray is good enough for me.  I also
3    don't pose -- I don't have any individual threats.  No
4    one's out to get me at this point in my life.  So I
5    don't feel threatened in my life.
6         Q.  And the guns from your grandfather and I think
7    your great-grandfather, you said you want to keep them
8    in working order; you wouldn't use them for hunting.
9    Would you use them for something like target practice?
10        A.  No, I would not.
11        Q.  Okay.  Have you had any other gun safety
12   training besides from your hunting safety course?
13        A.  No, I have not.
14        Q.  Okay.  And what other experience with firearms
15   do you have other than your hunting training with
16   hunting rifles?
17        A.  One -- yeah, I don't have any other training in
18   that.  I did use a crossbow -- not a crossbow.  A
19   compound bow for hunting.  I got good at target
20   practice, but I decided I don't really like that as a
21   method of harvesting an animal.
22        Q.  You mean bow hunting?
23        A.  Yes.  I don't like that.  I just don't like it.
24        Q.  Okay.  All right.  I'm going to switch topics a
25   little bit right now.  And just to reiterate, as we

1   discussed before, I have to ask you these personal

2   questions.  These are not to put you on the spot.  This

3   is just the nature of the lawsuit.

4           So have you ever seen a mental health

5   professional since 2002?  So after the time of the

6   commitment at issue in this lawsuit.

7       A.  There was a commitment, I believe it was

8   16 days at Oakcrest.  And then afterwards I would see a

9   psychologist from Kaiser.  And I don't recall if it was

10  once a week or once every two weeks, but that's the only

11  other psychological treatment I've had of any kind.

12      Q.  For how long?

13      A.  Say that one more time.

14      Q.  How long -- you said you would see a

15  psychologist at Kaiser.  How long did that go?

16      A.  By July of 2002 they had taken me completely

17  off of my medication which was Zyprexa, and I have never

18  seen a psychologist since that final visit in July of

19  two thousand -- it was either late June or early July.

20      Q.  And since then you haven't seen any kind of

21  mental health professional?

22      A.  No.

23      Q.  Okay.  Have you ever been screened for

24  depression or other mental health issues by a doctor?

25      A.  I do not believe so, no.

1      Q.  Okay.  What about -- you noted in your
2  declaration that you had a family history of relatives
3  with bipolar, your sister and I think another two of --
4      A.  It was --
5      Q.  -- your grandparents.
6          Let me finish.
7      A.  I'm sorry.
8      Q.  So have you ever been -- given that family
9  history, have you ever been screened for bipolar
10 disorder?
11     A.  I believe I was screened.  I asked my
12 psychologist at Kaiser towards at that -- right at that
13 last meeting when -- I was stunned that he took me
14 completely off of Zyprexa.  And that's when I asked him,
15 "Am I bipolar or what am I?  What is going on?  Why am I
16 being removed from medication if clearly there was
17 something wrong with me?"
18         And that's when he said, "You are not bipolar.
19 You had a one-time incident of a drug-induced psychotic
20 episode."  So I believe that at Kaiser I was screened
21 for bipolar.  I believe that was a main part of the
22 process.
23     Q.  You believe you were.  Did anybody ever tell
24 you that specifically?
25     A.  I asked specifically if I was bipolar, because

```
 1    my father was bipolar and my sister was bipolar.  And
 2    that's why I asked specifically, "Am I bipolar?"  And
 3    the doctor said no.
 4         Q.  And given this family history, in the past
 5    18 years has any doctor ever questioned you about this
 6    or given you a screening for bipolar?
 7         A.  No.
 8         Q.  Have you shared your family history of bipolar
 9    depression with your doctors?
10         A.  Yes.
11         Q.  And have they asked you any questions about it?
12         A.  Any time I talk to I believe an oncologist or
13    get my upper/lower GI scoping, the nurse, a part of
14    their process is to ask if you're safe, if you're okay.
15    There's all kinds of different questioning that I would
16    get regularly.  And I believe a lot of those
17    questions -- and they'd ask you directly, "Are you
18    depressed?"  So I would answer these questions
19    truthfully on a regular basis.  And I am not depressed.
20    I don't have any psychological issues.
21         Q.  But you haven't actually been to a mental
22    health professional or had a screening in the past
23    18 years; is that correct?
24         A.  That is correct.
25         Q.  Okay.  You noted that your -- that you have
```

```
 1   quite a number of relatives that were mentally and
 2   emotionally unstable, and you are very candid in your
 3   declaration about the number of relatives that you have
 4   who have been diagnosed with various mental health
 5   disorders or a relative that had committed suicide.
 6           Can you describe a little bit by what you mean
 7   by mentally and emotionally unstable?
 8       A.  As far as my mother's side of the family, I
 9   asked her for a complete history because Judge Alsup
10   wanted to know my complete family history of mental
11   illness.  I know about my father's side, but I don't
12   know very much about my mother's side.
13           John Wayne Shepard is my mother's father, and
14   he was a very caring and loving human being and he went
15   out of his way to support me over the years with
16   Christmas cards and Christmas presents and a birthday
17   card, and we'd have conversations and we'd write each
18   other letters back and forth.  But I don't know anybody
19   else on my mother's side of the family.  So I had to ask
20   her directly:  What is our mental health of your
21   siblings, or your parents, of that whole side of my
22   genetic sequence?
23           And she let me know that her brother, one of
24   her brothers was very depressed and he ended up taking
25   his own life years ago and that her mother was diagnosed
```

```
 1    in the '60s, early '60s, and went to a hospital and was
 2    very bipolar or manic-depressive or whatever they called
 3    it then, that her mother was unstable.  And she told me
 4    about her other brother.  And she said, "I don't know
 5    what he is.  He's mentally and emotionally unstable.  I
 6    think he's bipolar, but I don't know the exact language
 7    for him."  But this is information that I've learned
 8    from my mother so that I could answer these questions
 9    for the Court.
10         Q.  Has any medical professional ever indicated to
11    you that you might be at increased risk for bipolar or
12    other mental health disorders because of your family
13    history?
14         A.  I -- no.  No medical professional has ever said
15    that I am specifically.  I understand that a lot of the
16    time that can be genetic, passed down genetically.
17              I've asked -- who was that?  That was my
18    oncologist.  We were talking about this, and he wanted
19    to know about my family history of mental illness, and I
20    gave him all of the information that I had.  And then we
21    had a small conversation about, is this a genetic --
22    does this get passed down genetically?  Is this a nature
23    or nurture condition?  And that's when he suggested that
24    it's both.
25              But I have never -- no doctor has ever said to
```

1  me that you seem mentally unstable or questioned me at
2  all.  I've had a very good rapport, very honest and good
3  rapport with all of my medical professionals.  I feel
4  like if they're asking me questions, then those are
5  important.  And I feel like if I don't tell them the
6  truth, then I won't get good medical care.  It seems
7  counterproductive just in general to be dishonest,
8  especially to professionals that are asking me
9  questions.  So. . .
10      Q.  So have you ever answered the question "are you
11  depressed" with a yes over the time --
12      A.  No.
13      Q.  No?  So --
14      A.  I was concerned about it.  This is interesting.
15  It would be my last semester of the junior -- or Sonoma
16  State, and I was sleeping between classes and I didn't
17  have any energy.  And I Googled "depression."  And I was
18  wondering like, what's wrong with me?  Is this what
19  depression's like?
20          And that's when I sought help from a medical
21  professional, and I told them I'm not feeling well.  I
22  am sleeping all the time.  I don't have any energy.  And
23  he would ask me questions.  I believe that was Dr. Carlo
24  Farone at Vista Family Health Center.  He was the one
25  who ordered me a blood test to see -- to do a blood

1  screening.

2       That's when he came back and he said, "I don't

3  know how you drove here, and I can't recommend you going

4  anywhere else, but you have the lowest hemoglobin that

5  I've ever seen.  You need to go to an emergency room to

6  get a blood transfusion right now."

7       So I asked him directly, "Am I depressed?

8  What's wrong with me?"  And he took my blood sample, and

9  it came back with very little oxygen in my blood.

10      Q.  So was this how you found out you had cancer?

11      A.  Yes, it is.

12      Q.  Did this start that process?

13      A.  Yeah.

14      Q.  So have you ever had thoughts of self-harm or

15  suicidal ideations?

16      A.  Never.  Even when I had my drug-induced

17  psychotic episode, that was never a thought in my mind.

18      Q.  Okay.  Do you ever have feelings of excessive

19  stress or anger?

20      A.  No.

21      Q.  Have you ever had any problems with anger

22  management?

23      A.  No.

24      Q.  Have you ever been accused of violence?

25      A.  Never.

1      Q.   Okay.  Who do you turn -- do you have someone
2   that you speak with when you are feeling down?
3      A.   Coffee shop baristas, patrons at the bar,
4   anybody.  I'm very open about any sort of -- as far as
5   talking about my feelings.  I'll talk to anybody about
6   my feelings.
7      Q.   So do you sometimes have feelings about being
8   down or depressed?  And, again, I'm saying feelings.  I
9   know you haven't had any sort of diagnosis of
10  depression.
11     A.   I'm very --
12     Q.   Go ahead.
13     A.   Sorry.
14     Q.   No, go ahead.
15     A.   I'm a very positive, happy, outgoing person.
16  Depression doesn't -- being dumped by Razia Shaikh, that
17  was like, oh, man, this hurt my feelings.  So getting
18  dumped in 2008 was like, oh, I'm feeling feelings.  But
19  there was never depression or a sunken state of stress
20  or anxiety.  I think it was a regular response to the
21  end of a relationship.
22     Q.   So when you said dumped in 2008, you broke up
23  your girlfriend at the time?
24     A.   My girlfriend broke up with me in 2008.  And
25  that's the closest I can think of to answering your

1    question as far as feeling unhappy feelings.  But that
2    was a regular response to the end of a relationship.
3        Q.  Okay.  So you mentioned that you would, you
4    know, that you would share -- you're open with sharing
5    your feelings; you can share with the bartender at the
6    bar.  How often do you drink alcohol?
7        A.  Very little.  I would -- celebrations.  I have
8    very little alcohol consumption in my life.
9        Q.  Can you just -- how much per week?
10       A.  Right now the last drink I had was maybe six or
11   seven months ago.
12       Q.  Okay.  And was that in conjunction with a
13   social event?
14       A.  Yes, yeah.
15       Q.  So do you regularly go to bars?
16       A.  I will get dinner at my favorite bar in Bodega.
17   I'll go there every Thursday and have dinner.  That's
18   the town I was raised in.  And my favorite cook Tali,
19   she cooks every Thursday, and I pick up dinner every
20   single Thursday at that bar.
21       Q.  But do you drink during those times?  Do you
22   get a drink at the bar?
23       A.  I haven't in quite some time, no.
24       Q.  Do you -- excuse me, sorry.
25           Do you drink at home?

```
 1        A.   No, I do not.
 2        Q.   So you said the last drink that you had was six
 3   or seven months ago.  Would you say that on average you
 4   drink twice a year or more?
 5        A.   Probably a little bit more than that, Christmas
 6   or New Year's.  I guess my relationship with alcohol
 7   is -- yeah, I prefer to be sober, to be honest.
 8        Q.   Have you ever had a problem with alcohol?
 9        A.   No.
10        Q.   Did you ever feel like you were drinking too
11   much?
12        A.   There was a time that I felt like that I want
13   to go get a beer after work with my coworkers regularly.
14   I would have -- I guess the peak of my drinking would be
15   about two beers, but it would be every day after work
16   and socializing and having a good time.
17             And it got to the point where I believe it
18   was -- it just didn't feel -- it just felt like too much
19   having two beers every single day.  It became like,
20   where are we going after work?
21             So that just became -- I'm more conscious about
22   that, and I prefer to be sober.  On special occasions I
23   will have beer or champagne, if someone's getting
24   married.  I have a very healthy relationship with
25   alcohol.
```

1    Q.  When was that period of time where you felt
2  like the daily two beers after work might be too much?
3  What year was that?
4    A.  I think that was between 2017 and 2018.  Just
5  getting back into construction every single day, it was
6  a fun social activity to go to the bar after work and
7  have a beer, have a couple beers, have some food.  And
8  that's when it just became -- it just became too much.
9    Q.  And you mentioned that you'd had some feelings
10  of sadness after your girlfriend broke up with you
11  in 2008.  What's your relationship history since then?
12  Have you had other relationships you've been in?
13    A.  I've been with Caitlin Rose.  That would have
14  been March 18th, five and a half years ago.  That's the
15  only other relationship I've had since 2008 as far as a
16  long-term girlfriend.  I casually dated here and there
17  but didn't find someone that I was really passionate
18  with with similar interests.  But currently I'm in the
19  longest romantic relationship that I've ever been in.
20    Q.  What does your current girlfriend do for a
21  living?
22    A.  She worked as a -- she was in the tech industry
23  for the last three or four years.  She would manage an
24  office for MightyHive and then Sauce Labs, but in the
25  tech industry working for a tech firm.

1      Q.  And you said she "had" that.  Is she no longer
2   working?
3      A.  She is not currently employed right now.  I
4   think that -- with the coronavirus, she hasn't been
5   working since then.
6      Q.  Okay.  Is she looking for a job?
7      A.  I believe that she does résumé -- she'll write
8   résumés.  She'll find a gig on the Internet where she's
9   helping write résumés.  She was doing the Arizona trail
10  right before the coronavirus happened.  So her passion
11  is to hike, and she likes to figure out how to just
12  basically hike as often as possible through trails and
13  whatnot.
14     Q.  And do you plan to, say, take a leave of
15  absence for your job when you guys do this?
16     A.  I'm going to -- I haven't told my boss yet, but
17  if we get the permit to do this and if we're allowed
18  to -- we're looking into that right now, to get the
19  permit and hike through that area -- I'm going to take
20  two months off to do that, yes.
21     Q.  And you will be able to go back to your job?
22     A.  I'm going to talk to Brian Evans about that.
23  I'm going to give him -- as soon as we come up with a
24  plan.  I believe we're going to come up with a plan in
25  January because that's when we find out if we're allowed

1  to hike the Pacific Crest Trail or not.  But I will talk

2  to my boss to see if he's okay with that.  I believe

3  he'd let me take a leave of absence, but I will cross

4  that bridge when I get there.

5        Q.  And are there any other incidents in your life

6  or situations that cause you to feel down or depressed?

7  You mentioned the time when you broke up with your

8  girlfriend.  Is there anything --

9        A.  No.  I'm a very balanced, happy person in

10 general.

11       Q.  What about during the time of your cancer

12 diagnosis and treatment?

13       A.  You know, that was interesting.  A lot of

14 people would ask me and assume that it was a very

15 negative time and I'm so sorry and this, but it was

16 really empowering to really see what I was made of at

17 that point.  It was actually a lot of clarification.  I

18 was in the moment for the entire time basically with

19 that on my shoulders.

20            So that was a really surprisingly beautiful

21 process.  The doctors never told me that I had to say

22 good-bye to my friends.  There was always hope.  And I'm

23 very optimistic by nature, so there was always -- I felt

24 there was always hope and opportunity to get through

25 that.  If the doctors told me it was worse and that I

```
 1   have to say good-bye to my friends, I don't know how I
 2   would have reacted with that.  But that was a -- that
 3   process was more beautiful than you would really
 4   anticipate.
 5       Q.  Okay.  Thank you for being so candid.
 6           What about when your grandparents -- I'm
 7   sorry -- when your grandfather passed away?
 8       A.  My grandfather is currently alive.
 9       Q.  I'm sorry, is this your great-grandfather that
10   the weapon is from?
11           MR. KELLY:  His father.
12           MS. DAVIS:  I'm sorry.
13           THE WITNESS:  There's three different
14   generations.
15           MS. DAVIS:  Let's have the witness answer.
16           MR. KELLY:  I'm sorry.
17           THE WITNESS:  There's three different
18   generations here.  My great-grandfather, Harry Stokes,
19   that's where the 1894 Winchester is from.  And then my
20   grandfather, Burton Stokes Sr.  He is alive.  He's 101
21   right now.  And my father, Burton Stokes Jr.  He passed
22   away in 2006.  And that's where my .44 Magnum that I
23   lost, that's where I got that one from.
24   BY MS. DAVIS:
25       Q.  And did you have feelings of loss or sadness
```

1   after his death?

2        A.  My grandmother had passed away about one year

3   before in 2005, maybe 11 months before my father had

4   passed, and that was definitely sad.  It was the first

5   time with processing death of someone really special in

6   my life.  And that was really sad, but there was a lot

7   of family support and friend support.  And I took two

8   weeks off of work and just stayed with my grandfather

9   and my father and our whole family.  And then when my

10  father passed, it was very sad.  But there was -- yeah,

11  it is sad when important loved ones pass away.

12       Q.  Do you still experience feelings of sadness

13  about that?

14       A.  No.  I think about my dad on a regular basis

15  and I have happy thoughts.  I think about just the good

16  times that we've had.  And same with my grandfather.  I

17  say that -- it took a while.  Maybe -- I'm not sure

18  exactly how long, but it transitioned from sadness to

19  really appreciating the time spent with both of those

20  people that were a really significant part of my life.

21  I'm -- yeah, that was it.  I was just thinking about my

22  grandfather.

23       Q.  No, that's fine.  Go ahead.

24       A.  And I'll be sad when he passes.  But also he's

25  101.  I hope he just keeps on going.  But I'm certain I

```
 1   will be sad when he goes, but I'll also really
 2   appreciate the time that I have with him.
 3        Q.   Okay.   That's a long life.   It's great to have
 4   him around.
 5             Do you have situations that make you angry on a
 6   day-to-day basis?
 7        A.   No.
 8        Q.   So how would you characterize your general
 9   mood?
10        A.   I'm excited about work.   I wake up early for
11   work and I make myself a pot of -- a cup of coffee and
12   some eggs and some toast, and I'm excited to go to work.
13   I really enjoy working with my coworkers and just
14   learning how to be a carpenter.
15             Depending on the time of the year, I will
16   either go for a jog or go for a mountain bike ride.   Not
17   every day but several times per week.   I like that.   I'm
18   just happy about being alive in general.   I'm sorry, I'm
19   starting to wander off topic there.
20        Q.   No, it's fine.   Let me ask a more specific
21   question because my question was kind of vague.
22             When was the last time that you were angry?
23        A.   I'm not an angry person.   Maybe being a child
24   would be the last time.   I don't really feel angry.
25        Q.   So in general you -- is it your testimony that
```

```
 1  anger is an emotion that you don't typically experience?
 2       A.  It's not normal.  We'll just say, for example,
 3  if I get cut off in traffic, it's not like you jerk, I'm
 4  angry.  It's more like make some commentary about their
 5  poor driving and be kind of humorous about that.
 6            But angry, I just don't really experience anger
 7  very often at all.  And the last time I remember being
 8  angry would be with a cousin playing cards and they
 9  cheated or something like that.  But I'm talking being
10  an eight-year-old or a nine-year-old kid.  I don't
11  really experience being angry.
12       Q.  Okay.  I have a couple other subject matters to
13  get into.  We're going to switch a little bit.  But --
14       A.  I was -- sorry.
15       Q.  I'm sorry.
16       A.  I was just getting a little bit parched.  This
17  is the longest I've ever talked in a while.
18       Q.  Oh, absolutely.  If you need a water break or
19  anything else, just let me know.
20            How is your relationship with your girlfriend,
21  Caitlin?  Do you guys ever fight?
22       A.  We'll have differences of opinion here and
23  there, but fighting?  No fighting.  We might -- we'll
24  talk things through or get to a certain point and have a
25  break as far as if we disagree about something, but
```

1    we're not a fighting couple.

2         Q.  Okay.  So you don't experience a lot of

3    conflict in that relationship?

4         A.  No.  Difference of opinion here and there but

5    not fighting or anger or conflict, no.

6         Q.  Okay.  Have you ever been -- outside of the

7    situation that we've already discussed where -- with the

8    car when you were in the lot, have you ever been

9    arrested?

10        A.  No.

11        Q.  Okay.  Have you ever been indicted for any

12   crime?

13        A.  No.

14        Q.  Have you ever been convicted of any crime?

15        A.  Besides that one incident?  No, that's -- my

16   misdemeanor charge of illegal transportation of a

17   firearm.  I believe that was 2006.

18        Q.  Correct.

19        A.  That was the only time I've been in trouble.

20        Q.  Okay.  Were you ever in the military?

21        A.  I have not.

22        Q.  Did you ever attempt to join the military?

23        A.  I did not.

24        Q.  Okay.  And have you ever been the subject of a

25   restraining order?

1        A.  I have not.

2        Q.  Okay.  Has anyone ever tried to take out a

3   restraining order against you?

4        A.  No, never.

5        Q.  And we have had a lot of discussion about your

6   history with marijuana, that you were a grower, that

7   you've used it medicinally.  Other than marijuana, have

8   you ever taken -- other than marijuana or prescription

9   drugs, have you ever taken any other drugs?

10       A.  I did one time in 2010.  I went to a concert

11  in -- at the Phoenix in Petaluma, and it was a

12  classmate, a female friend that was really kind.  I had

13  tried a pill of ecstasy at the concert, and within about

14  an hour I was experiencing anxiety and fear, and I ended

15  up calling my friend to pick me up and get me out of

16  there.  And that was the only other time that I've

17  experimented with a drug outside of what you just

18  mentioned.

19       Q.  Okay.  So let's just -- I just want to nail

20  that down.  In 2010 you took ecstasy one time?

21       A.  Yes.

22       Q.  And other than that and other than your

23  marijuana use or prescription drugs, you have not used

24  any drugs?

25       A.  Correct.

1      Q.   Okay.  Have you ever been prescribed opiates or

2    other pain --

3      A.   Yes, I've been prescribed opiates.  The first

4    time I was prescribed opiates would have been the

5    year 2000.  I was an athlete at El Molino High School.

6    I was a wrestler and I had dislocated my shoulder

7    several times in the season, and I was prescribed --

8    what the heck is that called? -- Vicodin.  And that was

9    one prescription and that ended.

10         And then when I went home after having my large

11   intestine removed, they sent me -- I was on Dilaudid.  I

12   was in the hospital for about ten days, and then they

13   released me and I ended up -- my stomach got blocked up

14   immediately, and I had to go back to the hospital that

15   night and I stayed for another about five days.  So

16   about two weeks.  And I was on their opiate Dilaudid --

17   I believe it was Dilaudid or something like that -- the

18   whole time.  And when they released me again, they sent

19   me home with opiates.  I don't remember the name of

20   them, what that is.

21         And then I ended up doing all the chemotherapy

22   and then there was a month break in between chemotherapy

23   and having my ileostomy pouch reversed, and I stayed in

24   the hospital for I believe five days or five or six

25   nights, maybe seven at the most.  And once again I was

1  on Dilaudid, I believe.  And then when they sent me
2  home, they gave me a prescription of opiates then as
3  well.
4          And then in I believe it was 2014 -- it might
5  have been two thousand -- I think it was 2014 when I had
6  my shoulder surgery, the SLAP and labrum, and the doctor
7  sent me home with opiates as well.
8          Q.  So when was the last time that you used opiates
9  or any other prescription painkiller?
10         A.  That would have been the hospital.  I believe
11 it was -- I'm trying to remember if there's been any --
12 they didn't send me home, but when I had pancreatitis
13 that was the last time.  That was -- there was nothing
14 to take home, but that was the last prescription.  No
15 prescription, but the drug they gave me was Dilaudid
16 while I was there.
17         Q.  What was --
18         A.  And there was no prescription when I went home.
19             For pancreatitis.
20         Q.  And when was that?
21         A.  That would have been I believe 2017.  I had a
22 polyp removed from my pancreas valve.
23         Q.  And --
24         A.  Go ahead.
25         Q.  No, no.  Go ahead.

```
 1        A.  So they removed a polyp from my pancreas valve.
 2   It irritated the pancreas valve.  I stayed for five
 3   nights in the hospital at UCSF.  And when they sent me
 4   home, I don't believe there was any prescriptions to
 5   take with me.  And then there was a six-month follow-up,
 6   and they sent the camera in that same pancreas valve,
 7   and they biopsied the area where they removed that
 8   polyp.  And they sent me home, and within several hours
 9   I had developed pancreatitis again, and I went back to
10   the hospital.
11            But each -- and six months after that, there
12   was a 12-month checkup.  The same thing happened.  They
13   sent the camera in the pancreas valve, took a biopsy of
14   that site, and I got pancreatitis again.  But they
15   did -- that was all in the hospital.  They didn't send
16   me home with any prescription drugs.  That was my last
17   experience with any opiate of any kind, was that third
18   time of pancreatitis at UCSF.
19        Q.  Okay.  And since then you haven't had any
20   opioid or any other painkiller drugs?
21        A.  Never.
22        Q.  So we're going to circle back a little bit.
23            You said that the only time you had used
24   unlawful drugs was this ecstasy in 2010?
25        A.  Yeah.
```

1      Q.  But prior to that, you know, what's important
2  in this lawsuit is that you have spoken of a
3  drug-induced psychosis --
4      A.  Yes.
5      Q.  -- in 2002; is that correct?
6      A.  Yes.
7      Q.  So let's talk about that incident.  Why don't
8  you describe that incident in your own words right now,
9  and I will be asking you some questions, but I'd like to
10  hear how you would describe that incident.
11      A.  That would have been -- I believe it was a
12  Friday and there were -- it was a party.  It was a high
13  school party.  And someone was passing out psilocybin
14  mushrooms and I tried some of those.  And it was very
15  scary, lots of anxiety and fear, and I ended up not
16  sleeping that entire next -- that night.  And I stopped
17  eating at that point.
18          And then the following evening, a group of
19  friends and I went to Salmon Creek Beach in Bodega Bay,
20  and we got into a minor car accident on the way there.
21  And then once we continued on to the beach, we get
22  there, and at some point I -- how's the best way to
23  describe that?  I ended -- I was not acting well.  I
24  completely lost orientation, scared and confused and
25  didn't really understand what was real and what wasn't

1   real.  And I ended up throwing my jacket and several

2   other possessions into the bonfire that we had found.

3          Somebody -- there was a group of people, young

4   people similar age to us having a bonfire, and we went

5   over to it and we're hanging out with them.  And then I

6   ended up throwing my sweatshirt and some other personal

7   items into the fire.  And then I remember being hot and

8   scared and then running to the shore, to the tidal break

9   and getting my feet in the water, and I remember running

10  back to the campfire or the bonfire and getting warm,

11  warming up and then running back in to get my feet wet

12  in the water.

13         And I -- yeah, not very rational.  And that's

14  when my friends carried me to the car, and we went --

15  they took me home at that point.

16     Q.  And is it your testimony that this was the one

17  and only time that you used mushrooms?

18     A.  Yes.

19     Q.  You never used them before that time?

20     A.  No.  This was the day -- this was even the day

21  before.  I didn't even use them on that night where I

22  had my drug-induced psychotic episode.  It was from

23  mushrooms the day before on Friday night, and this was a

24  Saturday night that I had my episode.

25     Q.  And that Friday night was the first time that

```
 1  you used mushrooms?
 2       A.  Yes.
 3       Q.  So while you were in high school, you never
 4  used illegal drugs?
 5       A.  No.  I had smoked marijuana recreationally here
 6  and there, and that was illegal.  But no other drugs,
 7  no.
 8       Q.  Had you been drinking alcohol?
 9       A.  Which occasion?
10       Q.  Had you been drinking alcohol at the time --
11  around the time that you took the mushrooms?  You said
12  you were at a party.
13       A.  I was at a house party.  We had a few beers,
14  and then I had mushrooms after that, and then I stopped
15  drinking.
16       Q.  Did you drink regularly when you were in high
17  school?
18       A.  No.  That would be occasional.  I was an
19  athlete, and that was a pretty big priority.
20       Q.  Okay.  So who were you living with at the time
21  of this incident?
22       A.  This would have been in 2002.  I was living
23  with my good friend Donny Barker and their family.  That
24  would have been Nancy Barker, Don Barker.  My good
25  friend Donny had a little brother named Alex, and then
```

1   he had a little brother named Max.  And Lily was about

2   two years old, the youngest sister of four.

3        Q.  Why weren't you staying with your parents?

4        A.  My mother had -- my mother left when I was

5   about 10 in about 1994.  And she got married and went to

6   England with her husband, David.  And so she abandoned

7   us, and then I lived with my father and my sister Marie.

8            And there was a certain point when my dad

9   didn't want me to do as many sports and had a hard time.

10  It just wasn't that easy of a family life.  I loved my

11  father, but there was a moment when I was going through

12  my mid teens, I wasn't able to drive, and that's when I

13  started spending more and more times at the Barkers over

14  the years.  And then by the time I was -- I believe my

15  junior year I was staying at the Barkers' full-time.

16       Q.  Okay.  So your mother wasn't in the country;

17  your father had custody.  Did he object to your living

18  with another family?

19       A.  He did not.

20       Q.  Why not?

21       A.  We didn't get along, and I didn't feel like he

22  was providing as a father.  And I think that he was sad

23  about our relationship at that time.  He would still

24  come to my wrestling meets.  He'd come to my soccer

25  games.  And we would talk -- we would talk, but I just

1   didn't feel like he was providing as a father figure.

2          And I just did the best I could with what I

3   had, and the Barkers took me in and provided a nice

4   place for me to stay.

5      Q.  So your sister Marie that you were living with,

6   that's the sister that has bipolar; right?

7      A.  Yes.

8      Q.  Was she exhibiting symptoms at that time?

9      A.  Her first time would have been when she was I

10  believe 16 in high school.  It was the end of her

11  sophomore year of high school.  It might have been her

12  junior year.  You know, I think it might have been her

13  junior year.  And she did.  She had a mental breakdown

14  and -- pardon me -- she went to the hospital and was

15  diagnosed as bipolar.

16     Q.  So was this part of the difficulties of living

17  in your dad's house, was living with your sister as

18  well?

19     A.  It was challenging, yeah.  It was definitely a

20  challenge.  I'm trying to answer that as clearly and as

21  best as possible.  It was a tough situation in general.

22  And that was a really hard part of my life.

23     Q.  So did you have feelings of anger or

24  abandonment based on your mother leaving and your father

25  being unable to provide a stable environment?

1        A.  It took many years to really put all of that

2    together.  But looking back at it in retrospect, I was

3    abandoned by my mother.  We were.  And that caused a

4    little bit of a chain reaction.  When my mother left, my

5    oldest sister Christine, we would spend time -- we were

6    raised together as well.  She didn't have a place to

7    stay.  And she was about 16, and she ended up moving to

8    my aunt's house which is not her blood relative.  It's

9    my father's -- Christine, we share the same mother.  We

10   do not share the same father.

11          And her living situation was really

12   challenging, and she ended up moving to Montana with my

13   father's sister.  And she has six children.  And so it

14   was really kind of several parts to the abandonment.

15   And this is all with retrospect.  I realize now that

16   that was really sad when my mother left and then my

17   oldest sister left.  And my father, he was very caring

18   and loving, but he checked out as well.

19        Q.  So you said -- you just testified that it took

20   you a long time to come to terms with that, but you also

21   testified that you've never seen a mental health

22   professional or a therapist.  How did you come to terms

23   with these incidents from your childhood and youth then?

24        A.  It just seems like the longer I get away from

25   that, the better perspective I have looking at it.  My

1    mother came back -- okay.  My mother came back in -- it

2    was 10 years later.  I was about 20.  And she wanted to

3    get together and see all of us.  And my eldest sister

4    Christine said that she would be willing to see all of

5    us, but there needed to be a therapist present to direct

6    and guide the conversation.

7          So I did leave that out.  I didn't think about

8    that until right now.  But we had a several-hour session

9    with my mother and both of my sisters and me.  And

10   I'm -- can you repeat the question?

11        Q.  No, you've answered it.  My question was

12   basically you said it took you a long time to come to

13   terms with these situations from your childhood and your

14   youth.  But you also said you didn't have a therapist

15   helping you with it, so I was asking you how that

16   process had gone.

17        A.  I think the longer --

18        Q.  I think you answered it.

19        A.  Okay.  Thank you.

20        Q.  Do you still have any feelings of loss from

21   that experience?

22        A.  No anger, but definitely loss.  My mother was

23   very loving.  Very strict, but also she was very

24   artistic.  I feel like in a way my artistic wings were

25   more somewhat clipped when she left.  I had done -- when

1    I was four years old, we went to "The Nutcracker" and

2    watched a professional performance of "The Nutcracker"

3    at the Luther Burbank Center, but it was a San Francisco

4    company that came up.  And that was so special.  And I

5    was like, "Mom, I want to do that."

6            So she ended up signing -- I was too young to

7    join ballet, but the next year I was old enough.  And at

8    five years old I was able to do ballet.  And I did that

9    until she left.  I did ballet for ten years.  I did tap

10   and jazz, a lot of theater performances.

11           And when she left, I was able to -- my dad was

12   more interested in sports.  He would go to the

13   performances, but he was more of a sports guy.  And

14   looking back at it, that art side of me was -- just went

15   away.  So I guess that makes me a little bit sad to

16   think about that.  So I do feel loss.

17       Q.  Was there any violence in your home when you

18   were growing up?

19       A.  No.  My dad was not violent at all.

20       Q.  What about your mom?

21       A.  She was more strict.  No beatings, but if we

22   would swear I did get slapped.  I remember getting soap

23   in my mouth when I was really young for swearing.  I

24   thought that was pretty cruel.  But it wasn't like bad

25   beatings.  It was more like her method of discipline.

```
 1  She was more strict and more somewhat controlling to try
 2  to make us more proper and learn the rules and whatnot.
 3          But I don't know if I would -- to the standards
 4  in those times, I wouldn't necessarily consider that
 5  violent.  But nowadays looking at it, I think, yeah,
 6  your parents aren't allowed to do that stuff.  But
 7  there's no beatings or whippings or any sort of extreme
 8  violence.  It was more like a slap if I was bad.
 9      Q.  Okay.  How often would this be?
10      A.  Not very often.
11      Q.  Like what would be your estimate?
12      A.  I don't have a perfect memory, but maybe every
13  couple of months.
14      Q.  So going back to this incident, which you've
15  characterized as drug-induced psychosis, in your
16  complaint you filed a declaration that stated, quote, "I
17  was experiencing mental changes that worsened after
18  ingesting psilocybin."
19          What were the mental changes that you were
20  experiencing before you ingested the mushrooms?
21      A.  Before -- for me it was more of after.  It was
22  once --
23      Q.  Okay, wait.  We can get into after.  But I want
24  to ask specifically about this because you stated in a
25  sworn declaration that you were experiencing "mental
```

1   changes that worsened after the psilocybin."

2           So I want to focus on before you were

3   ingesting -- before you ingested the drug, what are the

4   mental changes that you were referring to in that

5   statement?

6       A.   I'm unclear about that part, about that exact

7   wording.  I don't know how to answer that to the best --

8   I was having a good time, fun high school, and it was --

9   I know you don't want to hear about after, but it was

10  immediately after consuming those psilocybin mushrooms

11  is when I wasn't able to sleep or eat, and that's when I

12  became disoriented and fearful.

13          But before then I don't -- I don't know how to

14  answer that question very clearly.  I believe that -- I

15  was somewhat of a regular -- besides living with my

16  friend's parents and not having my own regular family

17  life --

18      Q.   Right.

19      A.   -- I considered my high school pretty regular.

20      Q.   Okay.  Did you have a good relationship with

21  the family that you were staying with?

22      A.   Yes.  Very, very loving, very sweet family.

23  Even after I went to the hospital, they took me to

24  Hawaii on the family trip on July of 2002.  So and I'm

25  still -- I love that family very much.  They've been

1  very supportive throughout my life.

2       Q.  Okay.  And are you still in touch with the

3  children of that family, who would have been I guess

4  your high school classmates?

5       A.  Yeah, I see -- irregularly now with

6  coronavirus.  I don't really see anybody very often.

7  But I'm definitely in touch with Donny.  He was in my

8  grade.  And I see Alex, Alex Barker, the younger brother

9  once in a while.  I went to Max, the youngest brother, I

10  went to his wedding at their family property.  That

11  would have been while I was doing -- I had my colostomy

12  bag.  So that would have been right around 2011, 2012.

13  So I've been in communication with the Barker family.

14       Q.  Okay.  And just to circle back one more time,

15  just to clarify where I'm getting -- it's your

16  declaration of Easton Stokes that you filed with your

17  complaint on August 12th, 2019.  It's paragraph 3.  And

18  it says, "I was experiencing mental changes that

19  worsened after I ingested psilocybin."

20            But as you're sitting here today, you're

21  testifying that you did not have mental changes prior to

22  this?

23       A.  No.  The mental changes for me, to the best of

24  my memory, were right after ingesting psilocybin

25  mushrooms and not being able to sleep, not being able to

1  eat.  And that for me is when my life really took a

2  turn, and that was a big part -- that was very traumatic

3  for me.

4      Q.  So are you saying that that declaration is

5  incorrect that was filed with your complaint?

6      A.  I'm not certain with the wording.

7          THE WITNESS:  Tim Kelly, do you have --

8  BY MS. DAVIS:

9      Q.  No.  I'm sorry.  During the deposition you have

10 to testify.  We can't hear testimony from your attorney.

11 So any --

12     A.  I don't know if I would use that wording myself

13 directly.

14     Q.  Yeah.

15         MS. DAVIS:  Tim, we can't correct the record.

16 I need to just hear from your client at this point.

17 BY MS. DAVIS:

18     Q.  But you're saying that's not correct?  That's

19 really what I want to nail down.

20     A.  I don't feel that part -- I feel -- I'm just

21 trying to piece this together as well as I can.

22         My memory is after when things really got bad.

23 I'd say before there was a feeling of sadness that high

24 school was ending but also excitement about going to

25 college.

1          Could you re-clarify?  I just don't know how to

2     answer that question any better.

3          Q.  That's fine.  If you're saying that that's

4     incorrect, that's your statement.  I don't -- it's not

5     up to me to clarify your statement.

6          A.  I don't find that as accurate.  I find a more

7     accurate way is after the psilocybin is when my

8     condition really got bad.  I believe before then that I

9     was living a regular -- besides not living at home with

10    my family, I feel like I was on track to go to college,

11    to get a degree, and pursue a career.

12          So yeah, I don't like that part of the -- that

13    doesn't sound a hundred percent accurate.  I would word

14    that a little bit differently.

15          Q.  Okay.  This is a declaration that you filed

16    under oath.  So it's inconsistent with your testimony

17    now.  And I just want to clarify which one you're saying

18    as you sit here today is correct, what you're saying now

19    or what you said in that declaration?

20          A.  What I'm saying now is correct.

21          Q.  Okay.  So in the declaration filed by

22    Nancy Barker, who I believe is the woman you were living

23    with; right?  The mother of the family that you were

24    living with?

25          A.  Uh-huh.

1      Q.  She says that you had actually gone several

2  days without sleep.  So I'm trying to nail down the

3  timeline here.

4          When -- did this not sleeping occur before you

5  had taken the mushrooms?

6      A.  That was Friday after.  So Friday night I

7  didn't sleep.  Saturday night I might have gotten an

8  hour.  And then Sunday night, those three days in a row

9  was very minimal.  Maybe an hour here, hour there.  And

10  then Monday, that first Monday is when I went in to

11  Oakcrest or I went to Kaiser, directly to Kaiser and

12  they transferred me to Oakcrest.

13      Q.  Okay.  So the not sleeping that she refers to,

14  your testimony is that that occurred after you took the

15  mushrooms; you were unable to sleep for several days?

16      A.  Yes.  That was between the Friday and the

17  Monday and -- Friday and Monday, yes.

18      Q.  So --

19      A.  We haven't -- sorry.  Go ahead.

20      Q.  I'm just -- so your recollection is you took

21  the drugs on a Friday, and it was Monday you were

22  transported to the hospital?

23      A.  I drove my -- I drove with Nancy Barker.  It

24  would have been Nancy Barker, Donny Barker, and

25  Mike O'Brien and Micah Black.  We drove -- we had all

1   talked together and I needed help and I voluntarily went
2   with -- Nancy was the driver, and she took all of my
3   friends.  We went to Kaiser.  And from there I was
4   transported from Kaiser to Oakcrest.
5       Q.  Okay.  We'll get into that.  I'm trying to get
6   the previous timeline correct now, but thank you for the
7   other information.
8           So the Friday night was you took the mushrooms.
9   The Saturday night was the trip to Bodega Bay?
10      A.  Yes.
11      Q.  And during this entire time you did not sleep.
12  That's what you think that Mrs. Barker's referring to?
13      A.  Yes.  And that Sunday was also -- I might have
14  had a couple hours here and there, but my sleeping
15  rhythm was off.
16      Q.  Okay.  Another declarant, Joseph Bassignani --
17  I may be pronouncing the name wrong.
18      A.  Jonathan.
19      Q.  I'm sorry.  For the court reporter that last
20  name is B-a-s-s-i-g-n-a-n-i.
21          He stated that you were having some problems
22  with a girl that you were dating?
23      A.  I don't believe that he said there was
24  problems.  At that time I wasn't dating anybody at that
25  time.

```
 1        Q.  I'm going to quote from -- and you're right, it
 2   doesn't say problems, but I'm going to quote from his
 3   declaration.  It says, in reference to you, "He was
 4   talking about our relationships with current girlfriends
 5   and about one girlfriend he had been dating."
 6             That that was on your mind during
 7   Mr. Bassignani's --
 8        A.  I believe it might have been a classmate Lola,
 9   and we weren't even dating.  I just had a crush on Lola,
10   but we were not dating.
11        Q.  So you're saying that you didn't have concerns
12   about this young woman?
13        A.  Oh, I may have had concerns.  I don't -- this
14   is in the middle of what was described to me as a
15   drug-induced psychotic episode, and I don't believe
16   that -- I was not being rational or having clear
17   thoughts at all.  This would have been right in the
18   middle of that.
19             So if I'm talking about -- it wasn't my
20   girlfriend, but I would refer to my friend Jon who
21   brought that up.
22        Q.  Okay.  So you don't recall that you had a
23   girlfriend you had been dating at that time?
24        A.  I -- yeah, I had -- the girlfriend who I was
25   dating before this happened would have been Heather
```

1    Bowen, and we had dated and that was a really -- how
2    would I describe that?  Like a high school, kind of a
3    kids relationship.  But I hadn't -- I didn't have a
4    girlfriend at that particular time, no.
5         Q.  So would your relationship with these girls
6    have caused you some mental stress or anguish prior to
7    taking the mushrooms?
8         A.  I don't believe so, no.
9         Q.  So you have no recollection of having concerns
10   or worry about your relationships with girls prior to
11   the mushroom ingestion?
12        A.  No.
13        Q.  Okay.  So let's keep moving forward.  You said
14   that after this sort of three-day drug-induced psychosis
15   where you weren't sleeping, you were taken to Kaiser.
16   Do you recall how that came about?
17        A.  As far as the thought process or the chain of
18   events that led to me going there?
19        Q.  Yeah.  The chain of events going there.
20        A.  I didn't feel -- it was Monday morning and I
21   wasn't -- I was emotionally un-capable of attending
22   school, and I wasn't able to just pretend like nothing
23   happened.  I was not well.  And that's when -- once I
24   wasn't able to attend school, it was -- I needed help
25   and I wasn't sleeping.  I was very vocal with my

1  friend's mom and my friend's dad as to I'm not doing
2  well and I need help.
3         And could you repeat the question?  I'm not
4  sure if I'm getting off topic.
5     Q.  No, it was fine.  And we'll come back to that,
6  but let me just confirm one thing.
7         Why did you take the mushrooms on Friday night?
8  Do you recall that?
9     A.  Yes.  It seemed like it would be fun.  I didn't
10 realize how serious and how scary those are.  And it
11 just seemed like a fun thing to do.
12    Q.  Were you -- were your friends, did they
13 regularly ingest mushrooms?
14    A.  This was -- it was more of like a house party.
15 And this wasn't my close friends.  I didn't do this with
16 my close friends.  This would have been a house party,
17 and it was a big party and it just was going around, and
18 it was like, oh, cool, I can handle that, I'll try that.
19 And that was really scary.  It was a really bad decision
20 and quite terrifying, to be honest.
21    Q.  Did any --
22    A.  Go ahead.
23    Q.  Did your friends take the mushrooms as well?
24    A.  No, they did not.  Not my close group of
25 friends.  It was a bigger house party.  And some people

1    were doing it and I'd say most people were not.

2        Q.  What about any of the friends who went to

3    Bodega Bay?

4        A.  They -- none of them had mushrooms that night.

5    I don't recall who was even there at that house party

6    that night.

7        Q.  Had the people that you were with when you

8    drove to Bodega Bay, had any of them ingested alcohol?

9        A.  We -- not before, but I believe some of them

10   were drinking beer when we got there.  The driver was

11   sober.  I hadn't drank anything that day and I didn't

12   drink while we were there, but I believe some of my

13   friends were drinking when we got there.

14       Q.  You said you had gotten into a minor accident

15   on the way there.  What happened with that?

16       A.  Yes.  One second.

17           It was on Highway 1 right through the town of

18   Bodega Bay and there's a hairpin left-hand turn.  And

19   the driver took it too fast.  I was in the passenger

20   seat closest to the impact, and we -- he applied the

21   brakes when he shouldn't have and slid into the

22   guardrail and lifted the car up a little bit.  I was

23   right there in the driver's seat or the passenger -- I

24   was a front passenger in the car and everybody else was,

25   like, pretty concerned and scared and getting through

1    the adrenaline rush of just getting into a car accident.

2            I remember that I didn't even react, and that's

3    when it seemed like something was wrong.  I was

4    completely just unresponsive to that level of danger.

5        Q.  So you were unresponsive, but it seems like you

6    have a very clear memory of exactly what happened?

7        A.  I remember the car accident, yes, but I

8    wouldn't describe -- I did not have a very clear memory

9    of after Friday when I stopped sleeping and not feeling

10   myself.  I would describe my -- I wouldn't describe my

11   memory as very clear.  I have good memories of certain

12   pieces, but when I stopped sleeping, my memory -- a lot

13   of my -- I became -- things became much more unclear.

14       Q.  But you remember this incident on Saturday

15   night?

16       A.  Yes, I do.  Yes.

17       Q.  And had Donny Barker, is that the -- is that

18   your friend?

19       A.  Yes.

20       Q.  Had he used alcohol or any drugs during this

21   incident at Bodega Bay?

22       A.  Donny Barker, I don't -- he was not in the car

23   when we went out to the beach.  It was James Cardwell

24   was driving.  Micah Black was in the car, me, Jonathan.

25   I believe there were five of us that went to that --

1  were there in that minor car accident.

2       Q.  Okay.  Is there a reason that Donny Barker

3  wasn't there?

4       A.  He was doing something else.

5       Q.  Okay.  All right.  So now let's go to Monday.

6  It was Nancy Barker who drove you to Kaiser?

7       A.  Yes.  It was Nancy that drove.  There was

8  also -- that would have been Mike O'Brien.  Mike

9  O'Brien's also -- we have the same half-sister.  My

10 oldest sister Christine is my half-sister.  We share the

11 same mother.  And then that -- and we've been friends

12 for a long time.  Christine's father, Brendan O'Brien,

13 is the father of Mike O'Brien.  So he's not my family

14 relative, but he is a good friend of mine.

15          So Nancy was driving, Micah Black was there,

16 Mike O'Brien was there, me.  I think I have that all.

17 And Donny drove with us then as well.

18      Q.  Donny drove with you where?

19      A.  To Kaiser Hospital.

20      Q.  Why did they all come with you to Kaiser?

21      A.  It was to be supportive, to be comforting, and

22 to be around me.  I was scared and didn't really have a

23 good perspective of reality.  I was in really a bad, a

24 very challenging emotional state.  I didn't really

25 understand what was going on.  I just knew that I wasn't

```
 1  well, I wasn't sleeping, and I was scared.  So my
 2  friends were very supportive and they all helped me
 3  through this process.
 4       Q.  So who did you meet with at Kaiser?
 5       A.  I don't recall exactly who I met.  I remember
 6  filling out some questionnaire in the very beginning,
 7  but I don't have a very clear memory of my -- of the
 8  transfer of this.  I remember some sort of inpatient
 9  that questioned, but I don't -- I was really exhausted
10  and out of it.
11          I felt safe -- I felt more safe just by being
12  in that environment where there was professional care,
13  but I -- could you rephrase that question or repeat the
14  question?
15       Q.  Who did you meet with at Kaiser?
16       A.  I'm not 100 percent sure.  I don't know how the
17  inpatient process went.
18       Q.  Was this a hospital?
19       A.  Yes.
20       Q.  And what happened after you arrived at Kaiser?
21       A.  I was there for a while.  My friends were there
22  with me.  And I ended up getting transported from
23  Kaiser, voluntarily transported with consent.  They
24  wasn't -- there wasn't a service where I could get --
25  I'm guessing on that part as far as why I didn't just
```

1  stay there.  I don't think they have a psychiatric ward,
2  and it was clear --
3       Q.  I don't --
4       A.  -- to everybody --
5       Q.  I don't need you to speculate as to their
6  decision.  I just want to know what happened from your
7  perspective.
8       A.  From there I gave up my rights to make
9  decisions, and I believe it was Nancy Barker who was
10  talking with the nurses as to what's the best course of
11  action.  I needed help.  I needed professional care.
12  And it wasn't an option -- it wasn't a good decision for
13  me just to go home.  There was nowhere else for me to
14  go.  I needed medical treatment.  And I voluntarily went
15  to Kaiser in an ambulance, and that's when I was
16  declared a 5150.
17       Q.  But you also said you gave up your rights to
18  make decisions?
19       A.  Yes.  I wasn't -- I was very consenting to this
20  process.  I didn't know what was real, what wasn't real.
21  I was scared and I trusted everybody that was around me
22  to make decisions for me.
23       Q.  Okay.  So if you trusted other people to make
24  your decisions and you gave up your rights to make
25  decisions, it seems that other people were making the

1   decisions for you?

2        A.  I was -- it was more of a process I believe

3   where it was, hey, this is what happened, are you okay

4   with this?  Yes.  There's nowhere for you to stay here

5   and get help and get treatment.  Where there is help and

6   treatment is at Oakcrest.  Are you willing to go to

7   Oakcrest?  Yes.

8            And the hospital provided an ambulance for me

9   to get there.  We had just driven from Occidental to

10  Santa Rosa which is probably 16 miles, I'm guessing.

11  But we made it a pretty good distance with private

12  driving getting there voluntarily.  And once I was

13  there, it was -- the professional way to get from Kaiser

14  to get treatment at Oakcrest was in an ambulance.

15       Q.  Okay.  I just want to clarify.  So agreeing to

16  something is very different from giving up your rights

17  to make decisions, and I think the two are getting

18  conflated.  So I want to clarify with you your

19  testimony.

20           You stated you gave up your rights to make

21  decisions; is that correct?

22       A.  I did.  I believe it was either here at Kaiser

23  or it was at Oakcrest, but I believe it was at Kaiser.

24  That's when I gave up my decision to make -- my consent

25  to make decisions for me.  I believe that's when I gave

1   it to Nancy Barker.

2       Q.  And do you recall signing a document to that

3   effect?

4       A.  I do.  Everything's a little bit spotty.  I'm

5   not sure if this was at Kaiser or at Oakcrest, but I do

6   recall signing documents to have Nancy Barker make

7   decisions for me.

8       Q.  Do you recall signing documents at both places?

9       A.  I do not.  I'm not certain if it was at Kaiser

10  or if it was at Oakcrest.

11      Q.  Could it have been both?

12      A.  I don't know how that works.  So I would say it

13  could have, but I'm not -- I don't know.

14      Q.  And as of today do you have records from either

15  place?

16      A.  I do have records from Kaiser, yes.  I

17  requested my complete -- all of the medical records that

18  exist.  And I have -- I did get that and I'd be willing

19  to share that.  It's a file.  I'd be willing to show it,

20  share that.

21          MR. KELLY:  Yeah.

22  BY MS. DAVIS:

23      Q.  When did you get those?

24      A.  That was maybe a week ago.

25      Q.  Okay.

```
 1          MS. DAVIS:  Yeah, we can talk about this time,
 2   Tim, but these should probably be produced pursuant to
 3   the judge's order.
 4          MR. KELLY:  Absolutely.  I haven't even had a
 5   chance to review them, but I will certainly turn over
 6   what I have.
 7          THE WITNESS:  What happened is I sent you the
 8   link but it wasn't able to because it was
 9   password-protected.
10          MS. DAVIS:  I'm sorry.  This is attorney-client
11   privilege, and it's really risky for us to have you talk
12   about stuff.
13          MR. KELLY:  Just so I won't interrupt, I will
14   certainly provide them to you.  I haven't even seen them
15   myself, but we are in the process of trying to get
16   medical records.
17          MS. DAVIS:  Okay.  Given that, I just want to
18   put this on the record for at least the federal
19   defendants.  Jerry, you can chime on if you want, but I
20   think that we should probably reserve some time from
21   this deposition to go over any issues that might be --
22          MR. KELLY:  Absolutely.
23          MS. DAVIS:  Because these issues go directly to
24   the issues in this lawsuit that Judge Alsup has asked us
25   to explore, we may need to question your client further.
```

1  So we may need to reserve some time.

2          MR. KELLY:  Absolutely.  I think that's a very

3  good idea.

4  BY MS. DAVIS:

5      Q.  So you've gotten your medical records from

6  Kaiser, which is great.  Have you gotten other paperwork

7  or medical records from Oakcrest?

8      A.  I have not, no.

9      Q.  Okay.  In her declaration Nancy Barker spoke --

10 states that you went into the evaluation interview

11 yourself.  Do you recall what was discussed in that

12 evaluation interview at Kaiser?

13     A.  I cannot recall this part.

14     Q.  Okay.  Do you --

15     A.  I don't remember.  Everything is really blurry.

16 I'm on three days of maybe a couple hours of sleep.  I'm

17 somewhat -- I remember being relieved to be in a place

18 where I felt like I was going to get care.  But I don't

19 recall that process, no.

20     Q.  All right.  So who took you to Oakcrest?

21     A.  From Kaiser to Oakcrest I was transported in an

22 ambulance.  I remember sitting in the back and having a

23 conversation with the EMT.  I was sitting in their

24 little jump seat.  I was not like gurneyed down and out

25 of it.  I was sitting in the back part of the ambulance,

1   and I remember just having a casual conversation with
2   the EMT.
3        Q.   Okay.  What was -- do you recall what you
4   discussed?
5        A.   It was basic -- I think he was just keeping me
6   engaged with the weather and the day and just -- I think
7   he was just being professional as to keeping me engaged
8   with the situation as far as -- I don't recall anything
9   specific.  I don't think it was an in-depth
10  conversation.  It was more just like, hey, how are you?
11  I'm guessing at this point, but I remember it was a very
12  casual basic conversation just to get me there.
13       Q.   And do you recall what treatment you received
14  while you were at Oakcrest?
15       A.   What do you mean by "treatment"?
16       Q.   You were there 16 days; is that right?
17       A.   Yes.
18       Q.   So how about -- we'll be more general.
19            What happened while you were there?
20       A.   Okay.  So I remember getting there and being in
21  a room and being very confused and disoriented.  And
22  they gave me some sort of sedative, and I just fell
23  asleep for about -- I don't recall, 72 hours of just
24  being asleep.  And when I woke up I was confused as to
25  how -- I asked what day it was.  Like, what day is it?

1  What time is it?  What's happening?  I was surprised
2  that it had been three days.
3        Q.  Okay.  What happened --
4        A.  Sorry, someone was in the background from your
5  TV.
6        Q.  Sorry.
7        A.  That's all right.
8        Q.  There are multiple people teleworking at our
9  house.  So sorry about that.
10       A.  No worries.
11            So I recall -- once I came to, I recall it was
12  having a bunkmate, a roommate in a small room.  There
13  were no doors.  I remember eating and having meals.  I
14  remember being on Zyprexa.  There's no more sedative
15  after that initial period.  I remember, maybe five or
16  six days into it, just feeling restless and needing to
17  move around.
18            So I went for -- every time they let me outside
19  I would go for a run on the perimeter of Oakcrest's
20  facilities.  It was a really beautiful outdoor setting,
21  the oak trees and nice grass that time of the year, and
22  I remember just running as much as I could while I was
23  outside or sitting in the sun.
24            But I remember whatever medication -- it was
25  Zyprexa.  Basically I went in at probably 145 pounds and

1    I left at about 170 pounds.  And when I was running I
2    wasn't really able to sweat, and I remember that was
3    weird, go for a run even with the jacket on and I wasn't
4    able to sweat.
5         I recall earlier on having a lot of friends
6    coming to visit me.  They actually -- and there's a
7    weird -- it's a little bit of what I would perceive as a
8    little bit jealousy from other people.  It was so much
9    commotion.  I had a lot of school friends come and visit
10   me, parents' friends, and they started to have to make
11   rules as to how to have guests.
12        And they would have a group of friends come in.
13   There was a line of really close people.  My
14   ex-girlfriend Heather Bowen came in to see me there.  I
15   remember Jon Kincheloe, who's one of my best friend's
16   father, he came and visited and we chatted outside.
17        I remember doing little projects to keep people
18   engaged, little groups, and this is not with the guests
19   but with the -- not with my friends but with the people
20   that were inpatient -- of doing group activities, having
21   circle conversations or drawing or doing a music thing.
22        I remember this was also a facility that
23   would -- people that were mentally -- I don't even know
24   how you'd say that, but people that were waiting to go
25   to court but not capable of staying in a jail also

 1   stayed here.  And my bunk -- my roommate was waiting to
 2   go to see the judge, and he was a Sonoma County -- going
 3   to see the Sonoma County judge.  Very friendly.

 4          I remember one time there was -- there was a
 5   few scary incidents.  There's no doors.  I remember at
 6   one point waking up for just no reason, and there was an
 7   older woman with toothpaste dripping down her face and I
 8   was just, like, confused.  And she was saying weird
 9   stuff to me while I was sleeping.  And that's when I
10   went and got help from staff, and that was really a
11   frightening part.

12          I remember about maybe -- it might have been a
13   week or a week and a half.  I remember the last week
14   that I was in there, it was the student -- my student
15   counselor at El Molino High School -- would bring me
16   homework assignments or send homework assignments with
17   my friends, so I was able to somewhat stay on focus.
18   And they're really basic simple, like, worksheets and
19   read this and answer these questions with history and a
20   little bit of math and a little bit of science.  It was
21   basically to keep me in the school program.

22          And I was -- when I did get out, I was able to
23   transition right back to El Molino High School.  And
24   that was a really challenging time, to have people know
25   that I had been in the hospital and been gone for so

1    long.  And I had really good friends that would visit
2    me, but that was a real -- that was a big challenge, to
3    kind of face the herd and be a part of school.  And I
4    didn't get bullied or made fun of, but it was really --
5    I was on guard.  It wasn't as friend -- I wasn't having
6    as much as a good time.  It was really a lot of work,
7    and I had really good friends that would help me through
8    that process as far as just being emotionally supportive
9    to get back to school and finish school.
10       Q.  Was there a time during those 16 days where you
11   thought that you didn't belong there?
12       A.  No.  It was hard, but it wasn't -- I wanted to
13   graduate, and I really wanted to graduate and just
14   continue.  I thought that giving up and quitting would
15   have really been have a negative impact for the rest of
16   my life.  If I wasn't able to rise to that challenge
17   then, then it seemed like an obstacle that I really had
18   to do.
19       Q.  So when you say graduate, did the therapist
20   that you worked with talk about this in terms of
21   graduating from a program while you were there?
22       A.  No.  I didn't have any therapy.  It was
23   graduating from high school to get my diploma.
24       Q.  Oh, okay.  That's not what I'm asking about.
25          Was there any time when you were at Oakcrest

 1  where you thought you didn't belong there?

 2      A.  Oh, that I didn't belong at Oakcrest?

 3      Q.  Yeah.

 4      A.  No.  I knew that something was wrong.  I didn't

 5  know what it was and this was the place to get help.  So

 6  I trusted the professionals to -- no, I felt like I was

 7  really out of it, and I was still scared of that

 8  incident where I didn't -- no, I felt like I needed

 9  help.

10      Q.  Okay.

11      A.  I didn't fit in with your average -- I

12  definitely stood out like a sore thumb compared to the

13  other people that were getting medical treatment.  There

14  was one other person that was about my age, but other

15  than that, almost everybody else was much older.

16          Did I answer that well enough?

17      Q.  No, you answered that fine.

18          Did you ever ask if you could leave the

19  facility?

20      A.  No.  I do remember -- I don't remember how far

21  into it.  It might have been seven days, it might have

22  been ten days.  I'm not sure how long, but I do remember

23  an evaluation with a doctor and he let me know that I

24  could petition to get out.  And I asked him, I said, "I

25  don't really feel comfortable making this choice myself.

1  What are your thoughts?  Am I better?"

2          And he said, "No.  I think you need to stay

3  additional to get more treatment."

4          So I never once questioned getting out or

5  leaving.  I felt like I needed help.  And the only way

6  to get it was to follow the advice of the doctors.

7      Q.  So the doctor said that you would have to

8  petition to get out?

9      A.  He said -- I don't recall -- I don't know how

10  that works, but he said there was an opportunity to try

11  to get out if I wanted to.  And I left that decision --

12  basically he didn't make the decision for me, but I

13  asked him, like, "Am I better?  What -- am I better?"

14          And he said, "No, I think you need more

15  treatment before getting out of here."  So I opted to go

16  with the doctor's recommendation.

17      Q.  But the doctor didn't indicate that you were

18  free to leave at any time?

19      A.  There was at least that one time that I could,

20  I did have the option to -- it seemed like there was an

21  option to leave, yeah.

22      Q.  But the option -- you specifically said that

23  you would have to petition to leave?

24      A.  I don't remember 100 percent.  I don't remember

25  exactly how this works, but there was -- I do recall an

```
 1   opportunity to either leave or get out, and I remember
 2   talking -- basically going with what the doctor
 3   recommended.  And I don't know if it would have been --
 4   I didn't have anywhere to go.
 5        Q.  You couldn't go back --
 6        A.  Sorry.  I'm stalling out a little bit.
 7            I don't -- there was an opportunity to try and
 8   leave.  I don't know if it would have been walk out or
 9   don't walk out.  But there was an opportunity to either
10   leave or to try to get out, but in my mind I didn't have
11   anywhere that was ready to go.  And I didn't -- I wanted
12   to leave that up to the doctor's advice as far as -- I
13   didn't know if I was better or not better.
14        Q.  Were you unable to stay with the Barkers any
15   longer?
16        A.  After it was decided -- I did not go move in
17   with the Barkers afterwards, no.
18        Q.  Why not?
19        A.  It was a very -- it was decided that it
20   wasn't -- I guess to break routine and not just jump
21   back into whatever my life was.  It was almost the end
22   of high school, and we had talked about if I could move
23   in with my father or what the best option was.
24            And I ended up moving in with Gabe Chestly, who
25   was my older sister's boyfriend, and he had an extra
```

1  room right by the junior college that was kind of
2  setting me up for college.  I rented a room from him.
3  And that was, like, okay, what are we going to do right
4  now and what are we going to do next.  And it seemed
5  like that was the best option for me, was to have my own
6  space and finish high school and go to college from
7  there.
8      Q.  So when you say "it was decided," who decided
9  this?
10     A.  I was talking with Nancy Barker, my father, my
11 sister, and Gabe.  All these people would come and visit
12 me.  In the beginning there was no -- it was more get
13 help and get treatment.  But towards the end I believe
14 it was like, what is he going to do?  Where is he going
15 to go?  So it was brought up to me what are my best
16 options, and I went with what I thought was the best
17 option for my future.
18     Q.  Were any of the doctors involved in this
19 decision-making process?
20     A.  No, I don't believe so.  I do believe, though,
21 when you leave this hospital I don't think they want
22 someone to just go out on the street and leave.  I
23 believe the hospital wanted to know where I was going.
24     Q.  Okay.
25     A.  I believe.  I could be wrong on that.  That's

```
 1   just to the best of my memory.
 2        Q.  So before you were discharged, the best of your
 3   memory is the hospital wanted to know where you were
 4   going?
 5        A.  Yes.
 6        Q.  And you were 18 years old at this time; right?
 7        A.  Yes, I was.
 8        Q.  Did you receive any sort of therapy while you
 9   were at Oakcrest?
10        A.  There was like group -- there's no one-on-one.
11   To the best of my knowledge, I don't believe there was
12   like individual therapy there.  It was more of like
13   group sessions and doing different art or music or
14   talking in a circle.  I remember talking in a circle
15   with a pretty large group of maybe ten people.  To the
16   best of my memory, I don't recall any individual
17   one-on-one therapy.  But I could be wrong about that.
18   I'm not 100 percent certain.
19        Q.  So group therapy; is that right?
20        A.  Yes.  That was the main -- that was their main
21   method.
22        Q.  Did you have any individual therapy that you
23   recall?
24        A.  No.  I had -- upon leaving, I was connected
25   with a psychologist at Kaiser.
```

1    Q.   Okay.  And did you -- you said that you

2    received Zyprexa while you were there?

3    A.   Yes.

4    Q.   Did you receive any other drugs?

5    A.   I believe when I first got in there, I was

6    given a sedative.  But after that I believe it was just

7    Zyprexa as the follow-up to that.  And like I said,

8    whatever the sedative was, it put me out for nearly

9    three days.  I'm guessing that I woke up and I had water

10   or food, but I really don't recall my first three days

11   there.  I just slept, yeah.  So that's my memory, I

12   slept for about three days straight.

13   Q.   Okay.  Did you ever request a court hearing

14   while you were there?

15   A.   I did not.

16   Q.   Why not?

17   A.   I believe that to request a court hearing would

18   be to get out, but I didn't have any interest in just

19   getting out.  I wanted to get better.  So it just didn't

20   seem -- it didn't make sense to try to get out.  I knew

21   that I needed help.

22   Q.   So but was it your understanding that to get

23   out, you would have to have a court hearing or something

24   like that to get out as opposed to just walking out the

25   door, you're 18, you're an adult, you can leave?

1         A.  Yeah.  I believe there was a process.  My
2    memory to knowing it then, I believe it was explained to
3    me that there would be a process to make an appeal of
4    some sort, but to get out wasn't just walking out the
5    front door.
6         Q.  So you did understand that you would have to
7    make some sort of appeal to get out of Oakcrest?
8         A.  Something would have to happen that was --
9    yeah.  I'm a little bit -- at that time I didn't know
10   exactly how that all worked.  But I knew that walking
11   out the front door was not really an option.
12        Q.  That wasn't an option.  Okay.
13            And when you left Oakcrest, did you request
14   your medical records?
15        A.  I did not, no.
16        Q.  Why not?
17        A.  I don't -- I went -- I was working directly
18   with Kaiser.  And I don't know -- I don't know how that
19   could have -- at the time I don't know how that could
20   have helped me deal with it.  My focus was to graduate
21   high school, to get into the junior college.  But I
22   guess just with hindsight, I guess that would make
23   sense.  I didn't know the place was going to close down,
24   I didn't know the records would be helpful in the
25   future, and I was trying to do the best I could moving

```
 1   forward.
 2       Q.  Do you happen to know -- and don't discuss this
 3   with your attorney on the record, but do you happen to
 4   know if these Kaiser records include your Oakcrest
 5   records?
 6       A.  I believe that they would be different.  I
 7   think that they were two separate entities.  And when
 8   Kaiser sent me to Oakcrest, it was them passing off the
 9   treatment to a facility that would treat me.  And then
10   they were -- they must have been in communication
11   because I was directly linked up with a psychologist
12   from Kaiser.
13           MS. DAVIS:  Okay.  It's noon now, and we've
14   been going pretty straight since 9:00.  So I think we
15   should break for lunch right now, and then we'll come
16   back and we may have some more questions.  And Mr. Yen's
17   going to have some questions for you as well.  But if
18   everybody agrees, I think this is probably a good time
19   for us to take a break.  It's three full hours for the
20   witness and the court reporter at this point.
21           Madam Court Reporter, how long a break would
22   you like?
23           THE REPORTER:  I'm good with 30 or 45 minutes.
24           MS. DAVIS:  Either is fine with me.  Does
25   anyone have a --
```

1            MR. KELLY:  I have a slight conflict at

2    1 o'clock for about 15 minutes, so I don't know if

3    there's a way to work around that or step aside.  I

4    don't mean to minimize it.  That's a sort of long lunch

5    break if we came back at 1:15.

6            MS. DAVIS:  Should we maybe come back at 12:30

7    and take another break at 1:00?  I agree, I don't want

8    to take that long a break.  Does that work?

9            THE WITNESS:  Yeah.  That works for me.

10            MS. DAVIS:  Does that work for you, Madam Court

11    Reporter?

12            THE REPORTER:  Yes.

13            MS. DAVIS:  Okay.  Thank you.

14            (At 11:59 a.m. a lunch break was taken until

15            12:32 p.m. of the same day.)

16            (Nothing omitted nor deleted.  See next page.)

17

18

19

20

21

22

23

24

25

```
 1                FRIDAY, NOVEMBER 20, 2020; P.M. SESSION
 2
 3                       EXAMINATION RESUMED
 4  BY MS. DAVIS:
 5       Q.  Just a reminder, even after the break you're
 6  still under oath.
 7       A.  Yes.
 8       Q.  I just have a couple quick follow-up questions,
 9  and I'm going to pass it over to Mr. Yen who's going to
10  be asking you questions on behalf of the state
11  defendants.
12            I want to circle back to your time when you
13  stated you were a licensed marijuana distributor or
14  grower?
15       A.  Grower.
16       Q.  Grower.  Okay.  Do you still have that license?
17       A.  I could look in my records.
18       Q.  Yes.  If you could see whether or not you still
19  have that license, and if so, when it expires.
20       A.  Yes.
21       Q.  And just give the information to your attorney.
22       A.  Yes, I will.
23       Q.  Thank you.  And what about your -- I guess the
24  medical marijuana card; do you still have one of those?
25       A.  It was a piece of paper with my name and photo
```

1  and doctor's information.  And I almost -- I should be

2  able to find that.

3      Q.  Okay.  If you have those, particularly the one

4  for the grower, so we could know if that has expired or

5  what the status of that is, that would be great.

6      A.  I believe it's an annual renewal process.

7      Q.  Do you recall having renewed it recently?

8      A.  No.

9          MS. DAVIS:  All right.  I think that that's it

10  from the federal defendants right now.  But I want to

11  thank you for answering my questions and for your

12  participation, and I think I'm going to pass it on to

13  Mr. Yen right now.  We may have some follow-up questions

14  for you, but right now we're done.

15          THE WITNESS:  Okay.

16  EXAMINATION BY MR. YEN:

17      Q.  Good afternoon, Mr. Stokes.  Can you hear me

18  okay?

19      A.  Yes, I can.

20      Q.  So as Ms. Davis mentioned, I represent the

21  state defendants, basically the state of California and

22  attorney general defendant section.  So we covered a lot

23  this morning, so I apologize in advance if we cover some

24  of the same items, but I just wanted to clarify a few

25  things.

```
 1        A.  Certainly.
 2        Q.  So I'd like to just go back to your -- what
 3   happened in March of 2002.  You said that, you know, you
 4   took the drugs on a Friday at a party; is that right?
 5        A.  Yes.
 6        Q.  And then after the party you went home?
 7        A.  I went back to the Barkers.
 8        Q.  And then when did you leave for Bodega Bay?
 9        A.  That would have been evening.  It was dark out.
10   That would have been Saturday evening.  I would guess
11   maybe -- I'm not sure if that was March.  I would guess
12   8 o'clock in the evening is my best guess.
13        Q.  So what did you do between basically that day
14   from when you got home from the party to when you left
15   for Bodega Bay?
16        A.  I stayed -- I was at the Barkers that whole
17   day.  I didn't really leave.  I didn't sleep that much
18   and I didn't -- that was it.
19        Q.  And were you watching TV or playing video
20   games?
21        A.  I can't recall exactly.  I would imagine TV.  I
22   wasn't reading.  I might have -- I really don't recall
23   that day.  I remember being exhausted, trying to sleep,
24   probably watched TV.  But I know I wasn't reading.  I
25   didn't do any exercise.  I was really just tired and out
```

1  of it.

2      Q.  So when did -- did you have a discussion at

3  some point on that Saturday about going to Bodega Bay,

4  or was that a preplanned activity?

5      A.  It just kind of came about.  My friends were

6  going out, and I was invited and I wanted to go with

7  them.

8      Q.  So even though you hadn't been sleeping and you

9  weren't feeling well, you still felt well enough to go

10 on this short trip?

11     A.  I wouldn't say I felt well enough.  I'd say it

12 was something to do that I thought would make me feel

13 more normal to socialize with friends.

14     Q.  And do you recall what -- when did you get back

15 from Bodega Bay?

16     A.  I really don't recall.  My friends ended up

17 carrying me out of there.  Maybe midnight, but I'm not

18 certain.  I was really out of it.  By the time we were

19 done there, I got carried by my friends out of there.

20     Q.  Back to the Barkers' house?

21     A.  Yes.  That was back to the Barkers'.

22     Q.  And then so during that period from when you

23 got back to the Barkers' probably early Sunday morning

24 until Monday, what did you do?

25     A.  I relaxed.  Nothing really eventful that I can

```
 1   remember.  I wasn't riding my bike.  I wasn't running.
 2   I was just kind of milling about.  Really at that point
 3   afterwards, I was really depressed at that time and
 4   concerned.  After that event I was very scared.  I do
 5   remember being scared of what had happened, and I didn't
 6   really understand what had happened, and just an
 7   overwhelming sense of fear.
 8       Q.  And so that kind of was throughout the day on
 9   Sunday into Monday?
10       A.  Sunday, yes.  And then Monday it was
11   Don Barker, he was there present and knew that I was not
12   doing well, and he wanted to take me -- he's like,
13   "Maybe could you go to school?"  And I couldn't go to
14   school.  I couldn't bear the social interaction or the
15   stimulation.  I just wasn't emotionally capable of going
16   to school, and I was scared of it.  And that's when the
17   Barkers really knew that something was wrong.
18           I enjoyed school.  And for me to not be
19   emotionally able to go to school, they were concerned.
20   And that's when it was communication with Kaiser and
21   figuring out, okay, you can't go to school, what can we
22   do now?
23       Q.  So but during that period from when you got
24   back from Bodega Bay to the discussion of what to do,
25   you didn't leave the house or anything?
```

```
 1        A.  I never left the house, no.
 2        Q.  And then as part of that discussion of whether
 3   or not -- what to do on Monday, did you have any
 4   communications with your father regarding --
 5        A.  No.
 6            Sorry, I just interrupted you.  Could you
 7   finish that question?
 8        Q.  Yeah.  As part of that decision-making, did you
 9   involve your father in deciding whether or not to go to
10   the hospital?
11        A.  No.  He wasn't a part of that until after I was
12   there.  Then Nancy informed my father and sister.  I
13   believe it was Nancy that informed her -- informed my
14   parents.  My dad was not a part of that process.
15        Q.  And then once you got there, did you have any
16   communications with your father?
17        A.  As far as at Oakcrest or at Kaiser?
18        Q.  At Kaiser.
19        A.  No, I did not yet.
20        Q.  And then once you got to Oakcrest, did you have
21   any communications with your father?
22        A.  Not until he visited several days later.  I
23   don't believe I had any visitors for the first three
24   days and it might have been the fifth day that I was
25   starting to get visitors.  But I believe it was about
```

1    5 days without any visitors.  And my father and my
2    sister Marie both came to visit.
3        Q.  So going back to your time at Kaiser, I can't
4    remember if you said that -- did you receive any
5    paperwork or documents while you were at Kaiser?
6        A.  I don't recall.  To the best of my memory, I
7    believe that I filled out a form releasing my ability to
8    make decisions to Nancy Barker.  I'm not 100 percent
9    that period.
10       Q.  You had mentioned you received your medical
11   records from Kaiser.  Have you had a chance to look
12   through those?
13       A.  Yes.  It was additional copies.  I looked
14   through them.  I sent that -- I forwarded that e-mail to
15   my lawyer, Tim Kelly, and it's somewhat protected with a
16   passcode, so I don't think he was able to open it
17   because of the password protection.  So I'm going to get
18   together with him this weekend to figure out a way -- I
19   guess I'll turn it into a paper copy is my best bet.
20       Q.  But you did have a chance to look through the
21   records?
22       A.  Yes, I did.
23       Q.  And in looking through those records, did that
24   include any kind of forms or anything that you would
25   have signed while you were at Kaiser?

1        A.  There was nothing from the day of Kaiser --
2   there was no -- I looked for -- I forget what it's
3   called when you release your decision-making ability.
4   Power of attorney perhaps.  I looked for that and
5   couldn't find it for that date, but I could find it
6   either while I was at Oakcrest or after I left Oakcrest.
7   There is power of attorney documentation with Nancy
8   Barker's name on it and Kari Kincheloe's name on it.
9        Q.  And did you see any other documents where you
10  signed something?
11       A.  There was an intake document and I don't -- I'm
12  not sure if there's a signature on it.  I don't recall
13  if there's a signature, but I do have a document from
14  Kaiser as I was in the intake process.  The night right
15  before I was transferred to Oakcrest, I have a document
16  from that part.
17       Q.  And then once you were -- so then when you got
18  to Oakcrest, do you recall receiving any documents or
19  forms that needed to be completed?  I know you said that
20  you were sedated for three days or so.  But once you --
21  from what you remember, do you remember receiving any
22  documents or forms?
23       A.  From my memory, I believe that I signed -- I
24  don't.  I can't recall signing the power of attorney
25  before I got to Oakcrest or when I got to Oakcrest.  I'm

1    not 100 percent sure.  I thought it was when I got to
2    Kaiser.
3             To the best of my memory, that's when I thought
4    I signed my power of attorney over to Nancy as the first
5    person, and later on the forms I was looking at in the
6    records from Kaiser, I can see that it had been shifted
7    as the Number 1 person from Nancy Barker to Kari
8    Kincheloe as my -- the number one power of attorney.
9        Q.  So going back to the records that you saw, did
10   you see any records from Oakcrest at all?  Do you
11   remember seeing any?
12       A.  There was nothing from Oakcrest in there.
13   Nothing.
14       Q.  Sorry to keep jumping around, but I did -- in
15   your declaration, and we're talking about your time
16   at -- your initial intake at Kaiser.  In your
17   declaration it says, "I was told that personnel at
18   Kaiser decided to label me as 5150 in order to transport
19   me to Oakcrest Hospital via ambulance."
20            Do you remember someone at Kaiser telling you
21   that you were going to be labeled 5150?
22       A.  No.  It was while I was in the ambulance
23   talking with the paramedic in the back.  I could hear
24   over the radio that so-and-so ambulance is transferring
25   a patient who's a 5150 to Oakcrest.  So that was the

1  first -- my first memory of that part.

2       Q.  And did you have any discussions with anyone

3  about what 5150 meant?

4       A.  No.

5       Q.  So when did you first realize what a 5150 was?

6       A.  That's a good question.  I'm not sure when I

7  realized.  I believe, to the best of my understanding,

8  that's a danger to yourself and others.  And I don't

9  recall when I realized that that's what that was.

10      Q.  Okay.  So you just remember hearing it over the

11 radio, but none of the personnel at Kaiser or any of the

12 personnel at Oakcrest, none of them conveyed to you that

13 you were going to be -- there was going to be a 5150

14 hold on you?

15      A.  Not -- to the best of my memory, I don't recall

16 that part.

17      Q.  Okay.  So earlier you had discussed with

18 Ms. Davis about a hearing to get out of Oakcrest.  Do

19 you remember that?

20      A.  I remember there was an opportunity to get out

21 of the hospital to avoid for myself -- if you want to

22 leave, this is your opportunity -- and I'm paraphrasing

23 here.  I'm not 100 percent accurate with the wording.

24 But paraphrasing, it was if you want to get out you can

25 talk to these people and you can contest -- you can try

1  to get out.

2      Q.  And who were you talking to about that?

3      A.  That was -- I believe that was an evaluation

4  with a doctor.

5      Q.  When did that occur?

6      A.  I can't recall the exact -- it might have

7  been -- there was several different evaluations with a

8  doctor.  And I believe there was maybe two or three

9  altogether while I was there.  I remember right before I

10 left, when he said -- he signed the documentation for me

11 to leave, and that was with several different

12 evaluations, I believe.

13     Q.  So you said you recall about two or three

14 evaluations at Oakcrest?

15     A.  Yes.

16     Q.  When was the first evaluation?

17     A.  That is fuzzy for me.  I don't recall.  I

18 wasn't sedated multiple times.  I believe I was sedated

19 right when I got there, and that's when I was just out

20 for about three days in a row.

21     Q.  Do you think that you were evaluated during

22 that three days, or do you have any memory of being

23 evaluated?

24     A.  I don't have any memory, but I think I was just

25 sleeping about the entire time.

1        Q.  So when's the first evaluation that you do
2    remember?
3        A.  I would guess -- I would estimate about a week
4    into my stay there.
5        Q.  What was -- how long did that evaluation last?
6        A.  I can't recall the exact time, but there would
7    be questions like -- I don't know exactly how long it
8    would last.  But I remember it was just checking in with
9    me.  How do you feel?  Do you feel depressed, suicidal?
10   Do you hear voices?  Just a lot of questions to check as
11   to my well-being is my best memory of that.
12       Q.  But it was a one-on-one conversation?
13       A.  Yes, that was a one-on-one.  I do recall that
14   clearly.  It was one-on-one.
15       Q.  So it was just basically a check?  It wasn't
16   any kind of therapy or anything like that; correct?
17       A.  No, it wasn't therapy.
18       Q.  So you said -- so the first time that you
19   remember having that evaluation, that was when you first
20   heard about petitioning to get out?
21       A.  It was basically checking in to see if I wanted
22   to try to leave or if I was okay.  And I voluntarily
23   signed -- I asked him, "Do you think I'm okay to leave?"
24   And I voluntarily -- I believe his answer was, "I don't
25   think you're ready to leave.  I think you need more time

1    and treatment before you're able to leave."

2           And I remember making that decision right there

3    where I didn't want to try to get out early without the

4    consent from the doctor's best medical decision.  I was

5    still -- I was medicated and I was sleeping well and I

6    was eating a lot, but I was still confused and scared.

7    And I didn't really know -- I didn't grasp the entirety

8    of the situation.  I would get more as time went on

9    being there.

10          Q.  So in that first evaluation do you remember

11   receiving any forms or documents?

12          A.  I don't recall.  I may have signed something

13   that stayed there, but I don't recall getting a document

14   and keeping that of any kind.  And I'm not 100 percent

15   clear on that.

16          Q.  So you don't remember receiving any kind of

17   documents or any forms that you -- at either Kaiser or

18   Oakcrest where they gave you a document to keep?

19          A.  I don't remember keeping any document.  I

20   believe I signed a document when I was at Kaiser and I

21   believe that I signed a document when I was also at

22   Oakcrest.

23          Q.  But you don't remember keeping any documents

24   from Kaiser or Oakcrest?

25          A.  No.

1    Q.  So after your time at Oakcrest, you said you

2  had counseling sessions at Kaiser for about four months;

3  is that correct?

4    A.  I believe it was about three months.  I

5  remember it got discontinued, I believe early July when

6  I went to Hawaii with the Barkers, a family vacation.

7  And that was a concern, is do I bring medication?  That

8  was a concern, is Nancy wanted to make sure that I had

9  the right medication.  And that was when, before that

10  trip had started, my medication was discontinued by the

11  psychologist at Kaiser.

12    Q.  So for the three to four months that you were

13  seeing the psychologist, was it the same psychologist

14  every time?

15    A.  Yes, it was.

16    Q.  Do you have the name of that psychologist?

17    A.  I don't.  That might be in the documentation

18  from Kaiser, but I'm not certain of the name.

19    Q.  During that time that you were meeting with the

20  psychologist at Kaiser, did they ever reference any

21  documents or do you remember them ever referencing any

22  documents that they received from Oakcrest?

23    A.  I don't remember that part of it.

24    Q.  So --

25    A.  I'm certain that he had -- I'm not certain, but

1 I believe he had some communication with Oakcrest to
2 understand my treatment part there.  Like, he was
3 looking at something while we were -- he wasn't flying
4 blind in that situation.  I believe he must have had
5 communication with Oakcrest to know who I am and how
6 that went.  I'm not sure the field of psychology, but
7 I -- there must have been some sort of communication
8 between them.
9     Q.  Have you tried to reach out to this
10 psychologist to see if they have any records?
11     A.  I've reached out to Kaiser and requested every
12 bit of record that they have, but I haven't reached out
13 to anybody outside of that.
14     Q.  But you do know -- you do have a name of the
15 psychologist; correct?
16     A.  I do not.
17     Q.  Oh, but you're saying that it might be in the
18 records; you just --
19     A.  It may be in records.  I need my lawyer to go
20 over all those records.  I did a scan of this.  I got
21 this about a week ago.
22     Q.  So one of the people that submitted a
23 declaration is -- and forgive me, I don't know how to
24 say this last name -- Kari Kincheloe?
25     A.  Kari Kincheloe.

```
 1        Q.  Who is Kari Kincheloe?
 2        A.  It's Jenny Kincheloe's mother.  She's one of my
 3   best friend's parents.
 4        Q.  And Jenny is Kari Kincheloe's daughter?
 5        A.  Yes.  She was a classmate of mine.
 6        Q.  In high school; right?
 7        A.  In high school, yes.
 8        Q.  So Kari Kincheloe in her declaration said that
 9   she recalls a conversation with Nancy Barker where Nancy
10   had mentioned that you -- and I'm going to quote here --
11   "answered some questions a certain way.  He would have
12   been responsible for all the hospital charges during his
13   stay.  After this was explained to him, he chose to
14   answer in the way that would ensure him not being
15   responsible for any of the charges, not realizing that
16   there may be long-term consequences for that action."
17             Do you recall answering questions at Kaiser in
18   a certain way so that you wouldn't have to pay any
19   charges?
20        A.  No, I don't remember anything about me
21   personally paying for charges of any kind.  I was under
22   the Kaiser insurance through my father's employment.  So
23   I wasn't a part of any financial decision-making
24   process.
25             But Kari was there.  She visited me several
```

1    times in the hospital.  Her husband, Jon Kincheloe,

2    visited me several times in the hospital.  She was very

3    much a part of knowing what was happening with me.  Her

4    husband, Jon Kincheloe, he visited me several times.

5    And he ended up -- when I was released, he took me out

6    of there.  He asked me what I would like to do, and I

7    mentioned that I wanted to go kayaking.  He took us to

8    Doran Beach, and we both went kayaking.

9         Q.  Okay.  So some more people submitted

10   declarations on your behalf.  So I'm just going to go

11   through them one by one.

12        So Nancy Barker submitted a declaration.  Did

13   you have any conversations with her about her submitting

14   a declaration on your behalf in this case?

15        A.  I asked her early on.  I let her know what was

16   happening, and it was all about that incident -- she was

17   there -- and that I had lost my Second Amendment rights,

18   and I asked her if she was willing to be a witness as to

19   what happened.  And then I asked her if my

20   representative, Tim Kelly, could contact her and if I

21   could give her -- if I could give Tim her contact

22   information.  And she said of course.  And that's when I

23   gave her information, contact information to Tim.

24        Q.  Did you have any conversations with Ms. Barker

25   about what she would be writing in this declaration?

```
 1        A.  No.
 2        Q.  And then Kari Kincheloe, did you have any
 3   conversations with her about what she would be writing
 4   in her declaration?
 5        A.  No.  I asked her -- I believe two weeks ago,
 6   maybe three weeks ago, I let her know what was happening
 7   from the very beginning, that I was filing litigation to
 8   get my Second Amendment rights restored, and I sent her
 9   a link to that article from the Mercury Times, and I
10   asked her recently if she was willing to write a
11   recommendation about me.
12        Q.  And you --
13        A.  Because she -- I'm sorry.  I was going to
14   finish that part.
15            She was one of the people, which I do have
16   documentation of, that became my power of attorney.  And
17   I'm not sure exactly when, but it was after the 5150.  I
18   believe it was after my stay at Oakcrest, but it might
19   have been during my stay at Oakcrest.  And I believe we
20   switched my number one power of attorney from
21   Nancy Barker to Kari Kincheloe.  That's my understanding
22   of that sequence.
23            MR. YEN:  Tim, I've got that it's 12:58 right
24   now.  I know you got a cutoff at 1:00.  Do we want to
25   take a break now and come back at 1:15 now?  How do you
```

```
 1   want to handle this?  You're on mute.
 2          MR. KELLY:  We can go 10 or 15 minutes.  The
 3   thing I need to do is about 10 minutes out.
 4          MR. YEN:  Okay.  Let us know when we need to
 5   take a break.
 6          MR. KELLY:  Thank you.  I really appreciate
 7   that.
 8   BY MR. YEN:
 9      Q.   Okay.  Mr. Stokes?
10      A.   Yes.
11      Q.   Okay.  So Luke McGarva.
12      A.   Yes.
13      Q.   Who is Luke McGarva?
14      A.   He's a friend of mine.  He was my boss.  He's
15   how I found out -- he got me a job at Western Water
16   Construction.  After I graduated from the junior
17   college, I got to a point -- I had a business transfer
18   from Sonoma State, and I had built up several thousand
19   dollars in student loans, and I wanted to work that off
20   before going back to Sonoma State -- or going to Sonoma
21   State.
22          So I filed a petition to extend my invitation,
23   however that works, and they gave me -- they said yes.
24   And then I waited -- I wanted to start working right
25   after I graduated the junior college, I believe
```

1   June 2002 -- 2005 right after I got my AA.  And he said
2   I'm first on the list and, as soon as they need help,
3   that he would employ me.
4        And that's when I waited until about August
5   of 2005, and he got me a job working for Western Water
6   Construction.  And the first gig we had was in
7   Marysville -- Olivehurst.  The closest town was
8   Marysville.  We lived in Marysville.  I stayed on the
9   couch five days or four nights a week.  And it was a
10  two-bedroom work house, and I was an employee for
11  Western Water from 2005 through 2008.
12       Q.  So did you have any conversations with him
13  about his declaration?
14       A.  Not about the declaration.  That was more to
15  show my work history.  The Court asked for me to have a
16  complete -- all the information about my work history.
17  And that was -- I just asked him for a reference.  I
18  told him what was happening early on.  I sent him also
19  an article of the Mercury -- about my incident, about me
20  suing to own -- to have my Second Amendment rights
21  restored.
22       So I let him know about that a year ago, right
23  when it first happened, that that's what's happening.
24  And I didn't know that it was going to be relevant to
25  have my work history, but once the judge asked for that,

```
 1    that's when I asked him.  I said, "Hey, would you be
 2    willing to write a reference letter to the Court about
 3    me?"
 4         Q.  I think we've talked about, or at least you've
 5    mentioned Jonathan --
 6         A.  Bassignani.
 7         Q.  Bassignani.  Sorry.
 8         A.  That's okay.
 9         Q.  He was a classmate of yours?
10         A.  Yeah.  I was held back in first grade.  And
11    when I was held back in first grade -- this is in
12    Occidental at Harmony Union School.  He was my classmate
13    from first grade all the way till high school, and I was
14    his best man at his wedding, and it was three days
15    before my surgery to have my large intestine removed.
16         Q.  And did you have any conversations about what
17    he would be writing in his declaration?
18         A.  No.
19         Q.  But you did ask him to write one; is that
20    correct?
21         A.  Yeah.  Just to have an account.  It was just to
22    have an account of the events of my 5150.  And he was
23    also in the process of -- he was one of the people
24    involved, one of my good friends that helped me get to
25    the hospital, as far as I was talking with him on the
```

1  Sunday before I went as to -- he was one of the people I
2  was chatting with that was closely involved.  And
3  it's -- where was I going with that?  He was involved
4  with the whole process.
5       Q.  So when was the last time you talked with him
6  about what had happened in 2002?
7       A.  I don't know if I've talked to him about that.
8  I believe it came up before I went to the hospital,
9  talking about my drug-induced psychotic episode and me
10 needing help, and since then I don't believe it's come
11 up.  He visited me in the hospital as well, but I wasn't
12 talking about issues or events.  It was right there in
13 the moment, just kind of checking in on my well-being.
14      Q.  And then Micah Black, he was also a high school
15 classmate; is that right?
16      A.  Yeah.  Same thing.  He was a transplant.  I
17 believe he came in third grade from Southern California.
18 His family moved to Occidental as well, and we became
19 very good friends over the years.
20      Q.  You haven't had any conversations with him
21 about what he wrote in his declaration?
22      A.  No, I have not.
23      Q.  And then Brad Truline.  Who is Brad Truline?
24      A.  Brad Truline is a friend of mine.  He's a
25 carpenter, and I learned how to build with him.

1          Q.  Did you have any conversations about the
2     declaration he submitted?
3          A.  No.  I told him what was happening.  He was
4     there right -- I was working with him in two thousand --
5     when we first filed, when the newspaper article came
6     out, we were working together.  And I told him what had
7     happened and I asked him if he would be -- he was a part
8     of my work, complete work history.
9               I've been working with him, so I wanted to add
10    him to let the Court know what I've been up to.  I did
11    my best to get every piece of information regarding work
12    history and to answer all of those 13 questions.
13         Q.  And Brian Evans, he's your current boss; is
14    that right?
15         A.  Yes, he is.
16         Q.  And did you have any conversations with him
17    about the letter that he wrote?
18         A.  No.  I just asked him if he would be willing to
19    write me a reference letter.  I told him -- I sent
20    him -- I said, "Hey, I sued the federal government for
21    my Second Amendment rights, and I was hoping to have you
22    as my reference for my current employment."  So this was
23    also in regards to my complete work history.
24              And I also let him know what was going on and I
25    sent him an article, that same article, this is what

1   happened, and that's how -- I didn't want to be -- it

2   was the only way to deal with this court stuff with my

3   employer, is for him to know what's going on.  For me to

4   get today off of work and other days off of work, I felt

5   it was easier for him to know everything as well.

6        Q.  So going back to your time at Kaiser and

7   Oakcrest, do you remember or do you recall, during that

8   time did anyone mention that you were going to be placed

9   on a 5250?

10       A.  No.

11       Q.  So you don't recall ever hearing the term

12  5250 --

13       A.  That was --

14       Q.  -- in your time at Kaiser or Oakcrest?

15       A.  Sorry for interrupting again.

16           No, I found that out when I failed a background

17  check.  It was a preliminary background check to own or

18  possess firearms, and that's when it said you have

19  failed your background check.  I have that

20  documentation.  But it said you have failed your

21  background check and the phone number to figure out

22  why -- I'm paraphrasing here again -- here's a phone

23  number for the Department of Justice to figure out why.

24           And in that conversation I had with them, that

25  was the first time I found out that I had a 5250 charge

1  or however charge.  I don't know if that's the right
2  word, charge, indication, something.
3      Q.  So during that traffic stop when the police
4  found your father's handgun and they informed you that
5  you were prohibited from owning a gun, did they ever
6  mention a 5250?
7      A.  They did not mention a 5250.  And I had -- how
8  did that work?  I already knew that I had -- that I had
9  a five-year ban from firearm possession.  So they didn't
10 inform me of that, and I don't believe that they ever
11 figured that out.
12     Q.  So the only thing that you knew was you had a
13 five-year ban.  You didn't know why or anything like
14 that; is that right?
15     A.  I knew it was related to a 5150 charge.
16 Ken Bireze represented me for this process, and he was
17 familiar -- what he found out was it was a 5150 which
18 causes a five-year ban, but he never knew about a 5250.
19     Q.  When you were at Oakcrest, do you recall
20 speaking to anyone from the County Health Department?
21     A.  I don't.  Just the employees that work there.
22 I don't know if you call them -- I guess they would be
23 nurses that ran the program and that one doctor who was
24 the same doctor who did the evaluation, several
25 evaluations.

```
 1            But I don't remember any county representative.
 2   It is a county-funded facility, or it was, Oakcrest.  So
 3   I believe -- I don't believe it was a private business
 4   at the time.  I believe it was a county-run mental
 5   institution or facility.  I think that was why some of
 6   the people there were waiting to see judges -- some
 7   people were there for different reasons, but it was
 8   where they held people, instead of jail before they went
 9   to see the judge, for something that they had done
10   wrong.  So I believe county-funded or county-supported.
11            It was in direct relationship with the county,
12   but I don't recall ever talking directly with a county
13   person besides the people that were employees that
14   worked there.
15       Q.  And the county that you're referring to is
16   Sonoma County; is that correct?
17       A.  Yes, it is.  Yes.
18       Q.  So other than the medical records that you
19   received from Kaiser, did you look for any other medical
20   records that you might have had from 2002?
21       A.  Yes.  Tim Kelly filed requests with -- I'm not
22   sure how he did it, but we made requests.  Oakcrest no
23   longer exists, and then it was run as a private facility
24   after that, I believe.  But we've done our due
25   diligence, to my understanding, to request information
```

1  from that facility.

2      Q.  And you said that it was -- it might have been

3  a county-run facility or county-funded facility.  Did

4  you reach out to Sonoma County to see if they had any

5  records?

6      A.  I don't know who Tim reached out to to get that

7  information, to get the records.  I signed paperwork

8  with Tim Kelly to get information from -- about this.  I

9  signed -- I don't know how that works exactly, but for

10  him to request information on my behalf, I have to have

11  my signature on that.  So I don't recall who he made the

12  request to, but I do recall signing documentation

13  requesting all of the information from Oakcrest.

14      Q.  Okay.  But you don't remember signing any

15  documentation to Sonoma County requesting information;

16  right?

17      A.  I don't know who it was to.  He explained to me

18  that he was making a request for that information, but I

19  don't recall who that was to.  It was different than

20  Kaiser.  I filed -- I'm not sure if there was a

21  difference between -- both of those were two separate

22  requests of information.

23      Q.  So the first set of requests for Oakcrest, when

24  did that happen?

25      A.  I believe this was -- I believe it was 2016

1  when he had me file a -- I don't know what it's called,
2  but he basically had me file a petition for a background
3  check for my firearm eligibility, and after that was
4  denied, it was shortly after that point is when he tried
5  to get records from Oakcrest.
6      Q.  Okay.  So I noticed that Tim isn't on anymore,
7  so I think we need to take a break here until he gets
8  back on; is that right?
9      A.  I don't see anybody.  I just see you.
10         MS. DAVIS:  I don't see Tim either.  It's
11  probably best to take a break until he can come back to
12  his client.
13         MR. YEN:  Okay.  Let's take a break to
14  1:30-ish, and we can take a break till Tim gets back on.
15         (Break taken at 1:12 p.m.)
16  BY MR. YEN:
17      Q.  All right.  Mr. Stokes, you understand you're
18  still under oath?
19      A.  Yes.
20      Q.  So before we took a break, we were just talking
21  about your search for records from Oakcrest.  And you
22  said you had tried to look for documents back in -- or
23  at least tried to request documents back in 2016; is
24  that right?
25      A.  Yes.

1      Q.  Is there a reason why you didn't request the
2  Kaiser documents at the same time?
3      A.  We did request -- I believe we made a request
4  for Kaiser documents.  I can't recall how all that
5  happened as far as request for documentation.  I would
6  have to refer to Tim Kelly as to when we requested what
7  information.  I'm not sure when we made these requests.
8          MR. KELLY:  Would you like me to chime in now
9  or wait for --
10         MR. YEN:  No, that's okay.  Just wanted to see
11  if Mr. Stokes knew.
12  BY MR. YEN:
13     Q.  Okay.  So, Mr. Stokes, I wanted to just go back
14  to the traffic stop back in -- you said that was
15  in 2006; is that right?
16     A.  I believe that was 2006, yes.
17     Q.  And you said you were stopped for both carrying
18  a firearm as well as for having a small amount of
19  marijuana; is that right?
20     A.  I was already stopped.  I had gone to 7-Eleven
21  to get a Coca-Cola while I was waiting for my
22  girlfriend.  This was on Lakeville Highway in Petaluma.
23  It was a really busy 7-Eleven.  I just didn't feel
24  comfortable waiting there, so I went across the street
25  to an empty business lot.

```
 1              And I was sitting there doing my mail, drinking
 2    Coca-Cola when a police officer drove by on Lakeville
 3    Highway and looped back around and said I looked
 4    suspicious parking on this private property and started
 5    a conversation with me and asked to search my vehicle.
 6    He said he had probable cause to do so.  So I wasn't
 7    stopped.  I was already just stopped doing my mail in my
 8    truck.
 9         Q.  Okay.  But did you receive a citation -- you
10    did receive a citation for the firearm; right?
11         A.  Yes, I did.  I submitted that as well to the
12    Court.
13         Q.  Okay.  Did you get a citation for the marijuana
14    that you had possession of?
15         A.  I believe there was a citation and they -- it
16    seemed -- my representative, Ken Bireze, advised me to
17    go get a license, a medicinal marijuana license, so that
18    there was a reason for that.  And I don't think that the
19    Petaluma Police Department cared about that.  I believe
20    they wanted a gun charge.
21         Q.  Okay.  So you never pled guilty to a marijuana
22    possession charge; correct?
23         A.  I do not believe so.  I think in the
24    negotiation process I don't think they even cared about
25    that.  I think once the judge saw that I had a medicinal
```

 1   marijuana license, that they weren't concerned about
 2   that.
 3        Q.  And so -- and then for the carrying the firearm
 4   charge, did you plead guilty for that?
 5        A.  Yes.  In the negotiation process I pled guilty
 6   to a misdemeanor charge, correct.
 7        Q.  And did you serve any time or you just had to
 8   pay a fine?
 9        A.  I believe there was a small fine.  And I ended
10   up getting I believe 40 -- I believe it was 40 hours of
11   community service, and I volunteered at Doran Beach, and
12   I cleaned up restrooms and barbecue pits and we cut
13   trail within the McLeod.  And towards the end they
14   offered me a job to work at the -- to be a ranger,
15   whatever they offered me, employment after my 40 hours
16   of community service.  But they were making somewhere
17   around $15 an hour, and I kindly rejected.
18        Q.  And then the firearm that you were carrying at
19   the time, you said it was from your father; correct?
20        A.  Yes, it was.  He had passed away.  I put the
21   death certificate in the documentation as well that got
22   submitted.  I believe he passed away less than a year
23   before this had happened.
24        Q.  And so you received the firearm when he passed,
25   not before; correct?

```
 1        A.  Not before, correct.
 2        Q.  Have you ever taken a firearm safety course?
 3        A.  Yes, I have.  In San Rafael.  It was a
 4   two-weekend safety course.  I can't recall exactly when
 5   that was.  But I took that course before I went hunting.
 6        Q.  And you said you went hunting in 2008?
 7        A.  2008/2009.
 8        Q.  So you would have taken the fire safety --
 9   firearm safety course in 2008 or maybe 2007?
10        A.  Yes.
11        Q.  And did you review a certificate --
12        A.  Yes.
13        Q.  -- of completion?
14            Do you still have a copy of that certificate?
15        A.  I can look.  I'm not certain that I do have
16   that documentation.  Once I got my -- once I got the
17   certificate, I presented that to get my hunting license.
18   And once I had a hunting license, then they wanted to
19   see the hunting license, but I didn't have to present my
20   certificate every time I got a hunting license.
21        Q.  Since -- so you said you went hunting in 2008
22   and 2009.  Since -- is that correct?
23        A.  In 2010, I believe it was right before -- I
24   stopped hunting when I got cancer and went through that
25   process.
```

1        Q.  So since the last time you went hunting, have
2    you ever fired a firearm?
3        A.  No, I have not.
4        Q.  Were you ever in possession of a firearm?
5        A.  Since two thousand -- since my hunting?  No, I
6    have not.
7        Q.  So going to the firearms that your grandfather
8    owned, where does your grandfather live right now?
9        A.  He lives in Indian Valley.  It's 61501 Indian
10   Valley Road.
11       Q.  What city?
12       A.  It's 40 miles from the nearest town.  The
13   closest town would be -- the closest big town is
14   Paso Robles.  It's just barely in Monterey County.  Mile
15   Marker 18 in between -- very close to San Luis Obispo
16   County.
17       Q.  So he lives in Monterey County?
18       A.  Yes.
19       Q.  And so he owns the Ithaca 1911 and the
20   Winchester 1894?
21       A.  Yes.
22       Q.  Do you know if those are registered with the
23   Department of Justice?
24       A.  I don't know.  I'm not sure how that works.  My
25   grandfather is a retired colonel in the Air Force.  He's

1    very by the book.  I'm not certain.  I believe he had to

2    file paperwork to keep his service firearm, and then he

3    inherited his father's rifle after his father passed in

4    1980.  So I'm not certain.  I don't know that

5    information.

6        Q.  Okay.  Do you know if -- let's just start with

7    the -- or, actually, for the Winchester 1894 do you know

8    if it uses rimfire ammunition?

9        A.  It's a smokeless powder, but I'm not certain.

10   So I believe it was one of the first rifles to

11   transition from the old style.  I believe that is a

12   rimfire ammunition, yeah.

13       Q.  And the Ithaca and the Winchester are both

14   still in the possession of your grandfather; correct?

15       A.  Yes, they are.

16       Q.  And if they did not go to you, who would they

17   go to?

18       A.  I'm not -- I'm not certain.  I have about 12

19   cousins.  One of them passed away years ago.  But

20   there's 12 different cousins that are all very close.

21   So I would guess one of my cousins would make the most

22   sense.

23       Q.  But you haven't had any conversations with your

24   grandfather about who they would go to if they didn't go

25   to you; correct?

1        A.   No, I haven't.

2        Q.   And then if you weren't able to inherit the

3   firearms, where would they be stored?

4        A.   I would keep them at my grandfather's place.

5        Q.   And who is at your grandfather's home?

6        A.   Right now my three aunts.  All three of his

7   daughters are there taking care of him.  He's 101.  He

8   needs a lot of help for mobility.  He's mentally sound,

9   but he's old.  So all three of my aunts are there

10  helping to take care of him.

11       Q.   Are there any children that visit him?

12       A.   Yes.  Ever since COVID-19 we haven't had any

13  visitors.  March 2nd was his birthday, and that was

14  right as things started to get a little bit more known

15  and a little bit out of control.  I went down at the end

16  of April -- I went down at the end of -- I went down

17  right at the very beginning of March, and I was there

18  when the lockdown order was happening.  And I ended up,

19  the first two months of coronavirus as the state got

20  locked down, I spent that time with my grandfather.

21       Q.   Okay.  I guess my main question:  Are there any

22  minor children that visit your grandfather's household?

23       A.   No.  There's some of my cousins' kids have

24  visited for, like, the hundredth birthday two years ago.

25  There were children present, but no regular children.

1       Q.  And I know this is kind of hard to anticipate
2   sometimes, but do you anticipate having children of your
3   own?
4       A.  It's interesting you bring that up.  Because of
5   my genetic disease, which is one in 26,000 people if
6   your parents don't have it.  If I were to naturally have
7   children, it would be a 50/50 chance of passing on my
8   genetic disease.  And I've put thought into that.  I'm
9   not certain.
10          I like the idea of having children.  So I would
11  have to get in vitro fertilization.  I would have to get
12  in vitro fertilization in order to have children
13  responsibly, and I do think about that.  And I am 37, so
14  I probably need to make that decision in the next 10
15  years.  But I'm not 100 percent sure if I'm going to
16  have children or not.
17      Q.  And I think this might be my last question.
18  Have you ever gotten into a physical fight with anyone?
19      A.  No, I have not.  But at high school there was
20  several different occasions where there's a fight
21  happening and I tried to break it up, and I discovered
22  that's the best way to get punched in the face when
23  you're trying to stop a friend or a stranger and two
24  people from fighting, but the only altercation I've ever
25  been is to stop a fight from continuing.  And I didn't

1    throw any blows after that.  I try to de-escalate that
2    situation and get out of that situation.
3            MR. YEN:  I think that's all the questions that
4    I have for you.  So I thank you for your time.
5            Julie, I'm not sure if you have any follow-up
6    questions.
7            MS. DAVIS:  No, I don't think we have any
8    follow-up questions right now.  As I said, we want to
9    keep the deposition open pursuant to the -- in case
10   there's any questions we want to ask about the medical
11   records.
12           MR. KELLY:  We will try to get those to you as
13   quickly as possible.  I don't expect it to be more than
14   a couple days to get everything that my client has
15   received over to you.
16           MS. DAVIS:  Thank you.
17           MR. KELLY:  And at that point I'll let you know
18   if it seems likely that there's any more out there that
19   we might have a chance to get them.
20           MS. DAVIS:  Okay.  Eric, did you have anything?
21           MR. SOSKIN:  No.  I'm all set.  Thanks.
22           MS. DAVIS:  Thank you, everybody.  Thank you in
23   particular, Mr. Stokes, for appearing for this
24   deposition.
25           And thank you, Madam Court Reporter.

 1          THE REPORTER:  Thank you.  Mr. Yen or
 2  Mr. Kelly, would you like a copy of the transcript?
 3          MR. KELLY:  Yes, please.
 4          MR. YEN:  Yes, please.
 5          MS. DAVIS:  And we would like a copy of the
 6  transcript in all formats, please, for federal
 7  defendants.
 8          (The deposition adjourned at 1:57 p.m.)
 9
10
11          _____
12                    EASTON STOKES
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                REPORTER'S CERTIFICATE
 2          I, ANGELA SINCLAIR, a Shorthand Reporter, State
 3   of California, do hereby certify:
 4          That EASTON STOKES, in the foregoing deposition
 5   named, was present remotely and by me sworn as a
 6   witness, pursuant to FRCP 30(b)(4), in the
 7   above-entitled action at the time therein specified;
 8          That said deposition was taken before me at
 9   said time, and was taken down in shorthand by me, a
10   Certified Shorthand Reporter of the State of California,
11   and was thereafter transcribed into typewriting, and
12   that the foregoing transcript constitutes a full, true
13   and correct report of said deposition and of the
14   proceedings that took place to the best of my ability
15   via remote videoconferencing;
16          That before completion of the proceedings,
17   review of the transcript was NOT requested pursuant to
18   Federal Rule 30(e).
19          IN WITNESS WHEREOF, I have hereunder subscribed
20   my hand this 3rd day of December, 2020.
21
22
23   _____
24          ANGELA SINCLAIR, RMR, RPR, CRR, CCRR,
25          CSR 13902
```