1  ROB BONTA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  JERRY T. YEN
   Deputy Attorney General
4  State Bar No. 247988
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-7836
     Fax: (916) 324-8835
7    E-mail: Jerry.Yen@doj.ca.gov
   *Attorneys for State of California and Rob Bonta, in his*
8  *official capacity as California Attorney General*

9

               IN THE UNITED STATES DISTRICT COURT
10
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12

13  **EASTON STOKES,**                   Case No. 3:19-cv-04613-WHA

14                          Plaintiff,   **DEFENDANT CALIFORNIA**
                                         **ATTORNEY GENERAL ROB BONTA'S**
15            v.                         **NOTICE OF MOTION; MOTION FOR**
                                         **SUMMARY JUDGMENT; POINTS OF**
16                                       **AUTHORITIES IN SUPPORT OF**
    **THE UNITED STATES DEPARTMENT**      **MOTION FOR SUMMARY JUDGMENT**
17  **OF JUSTICE, WILLIAM BARR,**
    **individually and as Attorney General of the**   Date:        June 3, 2021
18  **United States, THE U.S. BUREAU OF**              Time:        2:00 p.m.
    **ALCOHOL, TOBACCO, FIREARMS AND**                 Courtroom:   Remote
19  **EXPLOSIVES (ATF); REGINA**                        Judge:       Hon. William Alsup
    **LOMBARDO individually and as Acting**             Trial Date:  December 7, 2020
20  **Director of ATF; THE FEDERAL**                    Action Filed: August 12, 2019
    **BUREAU OF INVESTIGATION;**
21  **Christopher Wray individually and as**
    **Director of the Federal Bureau of**
22  **Investigation; STATE OF CALIFORNIA,**
    **ROB BONTA[1], individually and acting as**
23  **Attorney General of the State of California,**
    **THE SONOMA COUNTY SHERIFF'S**
24  **OFFICE, MARK ESSICK, individually and**
    **as Sheriff of Sonoma County,**
25
                            Defendants.
26

27  _____

28  [1] Attorney General Rob Bonta is hereby substituted for former Attorney General Xavier
    Becerra. *See* Fed. R. Civ. P. 25(d).

1    TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on June 2, 2021 at 2:00 p.m., or as soon thereafter as the

3    matter may be heard before the Honorable William Alsup, Defendant California Attorney General

4    Rob Bonta will and hereby does move under Rule 56 of the Federal Rules of Civil Procedure for

5    an order granting summary judgment in favor of the California Attorney General.  This motion is

6    based on this Notice of Motion and Motion, the accompanying Memorandum of Points and

7    Authorities, all pleadings and papers on file in this action, and such other matters as may properly

8    come before the Court.

9        Attorney General Bonta's motion is made on the grounds that (1) this suit against the

10   California Attorney General is barred by the Eleventh Amendment, and (2) Plaintiff fails to

11   establish a case or controversy against the California Attorney General as required for Article III

12   jurisdiction.

13

14   Dated:  April 29, 2021                         Respectfully submitted,

15                                                  ROB BONTA
                                                    Attorney General of California
16                                                  ANTHONY R. HAKL
                                                    Supervising Deputy Attorney General

17

18                                                  _____/s/ Jerry T. Yen_____
                                                    JERRY T. YEN
19                                                  Deputy Attorney General
                                                    *Attorneys for State of California and Rob*
20                                                  *Bonta, in his official capacity as California*
                                                    *Attorney General*

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................ 1

Statutory and Procedural Background ............................................................................... 1

    I.    Process for Involuntary Commitment Under California Welfare &
           Institutions Code Section 5250 ......................................................................... 1

    II.   Process for Mental Health Facility Reporting a 5250 Hold to the CA DOJ ........... 3

    III.  Firearms Background Checks in California ......................................................... 3

Factual Background ........................................................................................................... 4

Legal Standard .................................................................................................................. 5

Argument ........................................................................................................................... 5

    I.    Attorney General Bonta Is Immune from Suit Under the Eleventh
           Amendment .................................................................................................... 5

    II.   No Justiciable Controversy Exists Between Plaintiff and Attorney General
           Bonta ............................................................................................................. 7

Conclusion ......................................................................................................................... 9

i

Defendant Attorney General Rob Bonta's Notice of Motion; Mot. for Summary Judgment;
P. & A. in Support of Mot. for Summary Judgment (3:19-cv-04613-WHA)

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*ACLU of Nev. v. Masto*,
  670 F.3d 1046 (9th Cir. 2012)................................................................7

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)................................................................5

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................5

*In Re Azzarella*,
  207 Cal. App. 3d 1240 (Cal. Ct. App. 1989) ................................2

*Carnohan v. United States*,
  296 Fed. Appx. 603 (9th Cir. Oct. 20, 2008) ................................6

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................5

*Foster v. Carson*,
  347 F.3d 742 (9th Cir. 2003)................................................................7

*Julian v. Mission Community Hospital*,
  11 Cal. App. 5th 360 (Cal. Ct. App. 2017) ................................1

*L.A. Branch NAACP v. L.A. Unified Sch. Dist.*,
  714 F.2d 946 (9th Cir. 1983)................................................................7

*L.A. County Bar Ass 'n v. Eu*,
  979 F.2d 697 (9th Cir. 1992)................................................................6

*Long v. Van de Kamp*,
  961 F.2d 151 (9th Cir. 1992)................................................................6

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)................................................................7

*Mai v. United States*,
  952 F.3d 1106 (9th Cir. 2020)................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................5

*Natural Resources Defense Council v. Cal. Dept. of Transp.*
  96 F.3d 420 (9th Cir. 1996)................................................................5

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*Nordyke v. King*,
    681 F.3d 1041 (9th Cir. 2012)....................................................................................8

*Pennhurst State School & Hosp. v. Halderman*,
    465 U.S. 89 (1984) .....................................................................................................5

*Pervez v. Becerra*,
    Case No. 2:18-cv-02793-KJM-KJN, 2019 WL 2715621 (E.D. Cal. June 28,
    2019) ..........................................................................................................................7

*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26 (1976) .....................................................................................................8

*Snoeck v. Brussa*,
    153 F.3d 984 (9th Cir. 1998)...................................................................................6, 7

*T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987)......................................................................................5

*Wilbur v. Locke*,
    423 F.3d 1101 (9th Cir. 2005)....................................................................................6

*Ex parte Young*,
    209 U.S. 123 (1908)............................................................................................5, 6, 7

**Statutes**

18 United States Code
    § 922(g)(4) ...........................................................................................................1, 5, 8
    § 922(t)(1) ...................................................................................................................3
    § 922(t)(3) ...................................................................................................................3

California Penal Code
    § 28220.......................................................................................................................3
    § 28220(b) ...............................................................................................................4, 8

California Welfare & Institutions Code
    § 5001.........................................................................................................................1
    § 5150......................................................................................................................1, 2
    § 5250 ................................................................................................................ *passim*
    § 5251-5253 ...............................................................................................................2
    § 5256......................................................................................................................2, 8
    § 8103(g)(1) ...............................................................................................................4

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

**Other Authorities**

4

28 Code of Federal Regulations

5

§ 25.5.................................................................................................................................3
§ 25.6.................................................................................................................................3

6

Federal Rules of Civil Procedure

7

56(a) ................................................................................................................................5
56(d) ................................................................................................................................5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

Defendant Attorney General Rob Bonta's Notice of Motion; Mot. for Summary Judgment;
P. & A. in Support of Mot. for Summary Judgment (3:19-cv-04613-WHA)

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

A person who has been held and certified for involuntary treatment under California Welfare & Institutions Code § 5250 (a "5250 hold") generally is prohibited under federal law from purchasing or possessing firearms.  More specifically, federal law (18 U.S.C. § 922(g)(4)) prohibits any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from doing so.

Plaintiff Easton Stokes, who has been subject to a 5250 hold, asks this Court to declare that 18 U.S.C. § 922(g)(4) violates his constitutional rights.  However, the Complaint does not request any relief from the California Attorney General.  Although the California Department of Justice (CA DOJ) runs federal background checks for individuals seeking to purchase or possess a firearm in California, it does not have any connection to any prohibition imposed by operation of federal law, including the federal statute at issue in this case, sufficient for Plaintiff to maintain a suit against the California Attorney General.  Moreover, the CA DOJ is not responsible for the content of Plaintiff's mental health records, and is in no position to alter those records so that Plaintiff might be able to possess a firearm under federal law.  Thus, this suit against the California Attorney General is barred by the Eleventh Amendment and Plaintiff lacks Article III standing to bring this suit with respect to the California Attorney General.

**STATUTORY AND PROCEDURAL BACKGROUND**

**I.    PROCESS FOR INVOLUNTARY COMMITMENT UNDER CALIFORNIA WELFARE & INSTITUTIONS CODE SECTION 5250**

The California Legislature enacted the Lanterman-Petris-Short (LPS) Act to, among other things, "safeguard individual rights through judicial review."  Cal. Welf. & Inst. Code § 5001.  Relevant to this case, the LPS Act sets forth a process for the involuntary evaluation and treatment of persons with mental health disorders and limits involuntary commitment to successive periods of increasingly longer duration.  *See id*. § 5150 et seq.; *see also Julian v. Mission Community Hospital*, 11 Cal. App. 5th 360, 375 (Cal. Ct. App. 2017).  In particular, the LPS Act provides for an initial 72-hour detention period ("5150 hold").  Cal. Welf. & Inst. Code

1

§ 5150.  At the end of that period, the person must be released unless the person consents to voluntary treatment or the mental health facility certifies the person for up to 14 days of involuntary treatment.  *Id*. § 5152; *see also In Re Azzarella*, 207 Cal. App. 3d 1240, 1245 (Cal. Ct. App. 1989).

A person may be certified for this additional treatment period if (1) the professional staff at the mental health facility conducts an evaluation and finds that the person is a danger to himself or others, or is gravely disabled, as a result of a mental health disorder, (2) the mental health facility has been designated by the county to provide intensive treatment and agrees to treat the patient, and (3) the person is unwilling or unable to accept treatment after being advised of the need for treatment.   Cal. Welf. & Inst. Code § 5250; *see also In Re Azzarella*, 207 Cal. App. 3d at 1245.  If the criteria are met, two mental health professionals must sign a notice of certification and serve it on the person certified.  Cal. Welf. & Inst. Code §§ 5251-5253.  As soon as practicable after certification, the patient must meet with an attorney or patient advocate, who will explain the commitment process, answer questions, and help prepare for the certification review hearing.  *Id.* § 5255.  The patient must also be informed of the right to counsel and the right to challenge the commitment at the certification review hearing or through a judicial review by habeas corpus.  *Id*. §§ 5254, 5254.1, 5275, and 5276.

Unless the patient requests judicial review, the certification review hearing must be held within four days after certification.  *Id*. § 5256.  A certification review hearing officer[2] conducts the hearing where the patient has the right to counsel as well as the right call and cross-examine witnesses.  *Id*. §§ 5256.1 and 5256.4.  The patient must be released immediately if the hearing officer does not find probable cause that the patient is a danger to himself or others, or is gravely disabled, as a result of a mental health disorder.  *Id*. §§ 5256.5 and 5256.6.

---

[2] The certification review hearing officer is "selected from a list of eligible persons unanimously approved by a panel composed of the local mental health director, the county public defender, and the county counsel or district attorney designated by the county board of supervisors."  *Id*. § 5256.1.

2

## II. PROCESS FOR MENTAL HEALTH FACILITY REPORTING A 5250 HOLD TO THE CA DOJ

Within 24 hours of certifying a person for treatment under California Welfare & Institutions Code § 5250, the mental health facility must notify the CA DOJ.  *Id*. § 8103(g)(2).  Mental health facilities currently submit this notification through the CA DOJ's online Mental Health Firearms Prohibition System.[3]  Gilbert Mac Decl. ¶ 11.  The facility must submit its name and telephone number as well as identifying information about the person subject to the 5250 hold, including the person's name, date of birth, gender, ethnicity, medical number, and date of admission or certification.  *Id*. ¶ 12.  The facility may also include other information about the patient, such as height, weight, eye color, hair color, social security number, and California driver license number. *Id*.  The information received from the mental health facility is then transferred to a federal database, the National Instant Criminal Background System (NICS).  *Id*. ¶ 5.

The CA DOJ does not participate in the certification or treatment of a person subject to a 5250 hold.  *Id*. ¶ 8.  As a result, the CA DOJ does not evaluate records submitted by mental health facilities for errors.  *Id*. ¶ 14.  Anyone who believes that a mental health facility has entered erroneous information into the Mental Health Firearms Prohibition System may address their concern with the facility.  *Id*. ¶ 15.  If a mental health facility has submitted incorrect or erroneous information, the facility can notify the CA DOJ and have the information corrected.  *Id*.

## III. FIREARMS BACKGROUND CHECKS IN CALIFORNIA

A person who wants to purchase or otherwise take possession of a firearm in California must pass a background check that relies on several state databases as well as NICS.  Cal. Penal Code § 28220.  The CA DOJ is responsible for running these background checks.  *Id*.  Federal and state law rely on these background checks to prevent prohibited persons from obtaining firearms. 18 U.S.C. § 922(t)(1); Cal. Penal Code § 28220.  Federal law authorizes states to administer the federal background check process, in lieu of the Federal Bureau of Investigation, if they do so concurrently with their own background check process.  *See* 18 U.S.C. § 922(t)(3); 28 C.F.R. § 25.6.  States that elect this procedure are called "point of contact" states.  28 C.F.R.

---

[3] Any paper records received prior to July 2012 were entered into the system and the hardcopies were not retained.  Mac Decl. ¶ 11.

3

1  § 25.5.  California has long served as a point of contact state, and, since the enactment of

2  Proposition 16 in 2016, the CA DOJ has been required to serve as one.  Cal. Penal Code

3  § 28220(b).

4  ## FACTUAL BACKGROUND

5       In March 2002, Plaintiff was brought to the emergency room at Kaiser by his foster parents

6  for "abnormal behavior," as well as "depressed and dangerous behavior."  Exhibit A (ECF No.

7  79-1 at 10).  The emergency room doctor also noted that Plaintiff's foster parents felt that he was

8  a "danger to self them and his friends" and was "not cooperative with [his] history."  *Id*.  Another

9  doctor's handwritten notes from Plaintiff's Psychiatric Diagnostic Intake Evaluation stated that

10 Plaintiff had "hit a close friend" and "refused to discuss [the] details."  Exhibit B (ECF No. 79 at

11 1).  The notes from his Chemical Dependency Services Intake Summary say that he "put his

12 hands in a fire" and "punched his [] friend."  *Id*. at 7.  Those notes also state that Plaintiff was

13 "suspicious" of his treatment plan.  *Id*. at 10.  He was then placed on a 5150 hold and transported

14 to a local mental health treatment facility, Oakcrest.  *See* Complaint, August 12, 2019, ECF No. 1,

15 ¶ 25 and Exhibit 3 (Declaration of Easton Stokes), at ¶ 3; Exhibit C (Nov. 20, 2020 Deposition of

16 Easton Stokes ("Stokes Depo") at 106.  At some point, he was placed on a 5250 hold and

17 received treatment at Oakcrest for a total of 16 days.  *See* Compl., ¶¶ 25-26.  During his

18 treatment, Plaintiff knew of his right to request a court hearing in order to be released from the

19 mental health facility, but chose not to exercise that right.  *See* Compl., ¶ 25; Exhibit C (Stokes

20 Depo.) at 121-122.

21      Almost fourteen years later, in 2016, Mr. Stokes submitted a Personal Firearms Eligibility

22 Check to the CA DOJ.  Compl., ¶ 30 and Exhibit 3 (Declaration of Easton Stokes), at ¶ 7.  After

23 running a background check, the CA DOJ informed Mr. Stokes that he was ineligible to possess

24 or purchase a firearm.  *Id*.; *see also id*. at Exhibit 1 (Firearms Eligibility Notification).  Although

25 Mr. Stokes is eligible to possess a firearm under California law,[4] he is ineligible under federal law

26 ─────────────
        [4] Under California law, Plaintiff is permitted to possess a firearm because it has been more
27 than five years since he was subject to the 5250 hold.  Cal. Welf. & Inst. Code § 8103(g)(1) ("No
   person who has been certified for intensive treatment under Section 5250 . . .  shall own, possess,
   control, receive, or purchase, or attempt to own, possess, control, receive, or purchase, any
28 firearm for a period of five years").

4

1    because of the 5250 hold in his NICS record.  Exhibit D (Easton Stokes NICS Record); 18 U.S.C.

2    § 922(g)(4).

3    **LEGAL STANDARD**

4         A court must grant summary judgment in favor of a moving party that shows there is no

5    genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed.

6    R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970).  The moving party is

7    entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

8    showing on an essential element of a claim in the case on which the nonmoving party has the

9    burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue

10   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

11   the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

12   (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

13   metaphysical doubt"); *see also* Fed. R. Civ. P. 56(d).  Conversely, a genuine dispute over a

14   material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring

15   a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

16   U.S. 242, 253, (1986); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

17   (9th Cir. 1987).

18   **ARGUMENT**

19   **I.    ATTORNEY GENERAL BONTA IS IMMUNE FROM SUIT UNDER THE ELEVENTH
         AMENDMENT**

20        This suit against Attorney General Bonta is barred by the Eleventh Amendment of the

21   United States Constitution as a matter of law.  The Eleventh Amendment prohibits federal courts

22   from hearing suits brought by private citizens "against state agencies regardless of the nature of

23   the relief sought."  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see

24   also Natural Resources Defense Council v. Cal. Dept. of Transp.* 96 F.3d 420, 421 (9th Cir.

25   1996).

26        The Supreme Court recognized a limited exception to Eleventh Amendment immunity in

27   *Ex parte Young*, 209 U.S. 123 (1908).  The *Ex parte Young* exception allows "suits for

28

5

1     prospective declaratory and injunctive relief against state officers, sued in their official capacities,

2     to enjoin an alleged ongoing violation of federal law." *Wilbur v. Locke*, 423 F.3d 1101,1111 (9th

3     Cir. 2005) (quoting *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th

4     Cir. 2000)).  However, for the *Ex parte Young* exception to apply the state officer "must have

5     some connection with the enforcement of the act, or else it is merely making him a party as a

6     representative of the State, and thereby attempting to make the State a party." *Snoeck v. Brussa*,

7     153 F.3d 984, 986 (9th Cir. 1998) (quoting *Ex parte Young*, 209 U.S. at 157).  "This connection

8     must be fairly direct; a generalized duty to enforce state law or general supervisory power over

9     the persons responsible for enforcing the challenged provision will not subject an official to suit."

10     *L.A. County Bar Ass 'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (citing *Long v. Van de Kamp*, 961

11     F.2d 151, 152 (9th Cir. 1992); *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 714 F.2d 946, 953

12     (9th Cir. 1983)).

13        Here, the California Attorney General is named as a defendant simply because Plaintiff

14     generally alleges that he "is presently enforcing the laws, customs, practices, and policies

15     complained of in this action."  Compl., ¶ 15.  Nothing more than this generalized allegation is set

16     forth in the complaint.  Such an allegation is insufficient to overcome Eleventh Amendment

17     immunity.

18        In directing the district court to dismiss the California Attorney General on Eleventh

19     Amendment grounds, the Ninth Circuit has stated that "there must be a connection between the

20     official sued and enforcement of the allegedly unconstitutional statute, and there must be a threat

21     of enforcement."  *Long*, 961 F.2d at 152.  No such connection exists in this case.  Attorney

22     General Bonta simply lacks the requisite enforcement connection to the allegedly unconstitutional

23     federal statute nor does he have any authority over whether a mental health facility imposes a

24     5250 hold.  *See Carnohan v. United States*, 296 Fed. Appx. 603 (9th Cir. Oct. 20, 2008)

25     (affirming the dismissal of the State of California under the Eleventh Amendment where the

26     plaintiff sued the State under the Federal Tort Claims Act for denial of permission to purchase a

27     handgun due to his commitment to a mental health facility).  Thus, Plaintiff cannot show that the

28

6

Defendant Attorney General Rob Bonta's Notice of Motion; Mot. for Summary Judgment;
P. & A. in Support of Mot. for Summary Judgment (3:19-cv-04613-WHA)

1   *Ex parte Young* exception applies, and the Eleventh Amendment bars Plaintiff from suing the

2   California Attorney General.

3        In a case with almost identical facts to this one, the Eastern District of California granted

4   the California Attorney General's motion to dismiss because the Eleventh Amendment barred the

5   plaintiff's claims against the California Attorney General. *Pervez v. Becerra*, Case No. 2:18-cv-

6   02793-KJM-KJN, 2019 WL 2715621 (E.D. Cal. June 28, 2019). Like Plaintiff in this case, the

7   plaintiff in *Pervez* was subject to a 5250 hold and was thus prohibited from owning a firearm

8   under federal law. *Id*. at *1. She filed a complaint requesting an order that the CA DOJ erase,

9   amend, or remove all records of her 5250 hold. *Id*. at *2. The court, however, found that the *Ex*

10  *parte Young* exception did not apply because the CA DOJ does not direct or control the mental

11  health facilities responsible for the imposition of a 5250 hold, and that the role of the CA DOJ is

12  purely administrative. *Id*. at *5. Without a direct connection to the 5250 determination, the court

13  concluded that the Eleventh Amendment barred the plaintiff's claims against the California

14  Attorney General. *Id*. at *6. This Court should reach the same conclusion here, and grant

15  summary judgment in favor of Attorney General Bonta.

16  **II.    NO JUSTICIABLE CONTROVERSY EXISTS BETWEEN PLAINTIFF AND ATTORNEY**
17  **GENERAL BONTA**

18       Attorney General Bonta also moves for summary judgment because Plaintiff lacks Article

19  III standing. As an initial matter, any standing analysis is unnecessary in the event the Court were

20  to find this suit barred by the Eleventh Amendment. *See Snoeck*, 153 F.3d at 988 ("Because the

21  Eleventh Amendment bar conclusively ends this dispute we need not address the related issue of

22  standing which the district court found plaintiffs lacked."); *L.A. Branch NAACP*, 714 F.2d at 949

23  n.3 ("We need not ask the district court on remand to find whether these powers and duties are

24  sufficient to raise a justiciable case or controversy against the Governor in this case, however,

25  since we hold below that he is immune from suit here under the Eleventh Amendment.")

26       Assuming the court reaches the Article III standing issue, Plaintiff must establish the

27  existence of a "case or controversy" between him and the California Attorney General. *See*

28  *ACLU of Nev. v. Masto*, 670 F.3d 1046, 1061–62 (9th Cir. 2012); *Foster v. Carson*, 347 F.3d 742,

1    745 (9th Cir. 2003).  Among other things, this requires a causal connection between plaintiff's

2    injury and the defendant's actions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

3          Here, Plaintiff cannot show that the CA DOJ affirmatively, or by improper omission, took

4    any unlawful action to harm him.  In other words, there is no causal connection between

5    Plaintiff's injury (inability to possess a firearm) and any unlawful conduct by the CA DOJ.  *See*

6    *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38 (1976) (Plaintiffs

7    lacked standing to challenge the IRS ruling because they could not show that their alleged injury,

8    a denial of medical services, was traceable to the IRS ruling, rather than to the hospitals'

9    independent action).  It is the federal government applying a federal statute that is preventing

10   Plaintiff from acquiring a firearm.[5]

11         The CA DOJ's role merely involves receiving information from medical facilities about

12   someone being placed under a 5250 hold, and then providing that information to the federal

13   government.  *See* Mac Decl. ¶¶ 5, 11- 12; *see also* Cal. Penal Code § 28220(b) ("The Department

14   of Justice shall participate in the National Instant Criminal Background Check System (NICS), as

15   described in subsection (t) of Section 922 of Title 18 of the United States Code").  As discussed

16   earlier, the CA DOJ does not create such information (it was created by the mental health

17   facility), and is not authorized to modify or disregard it.  Even though Plaintiff may disagree with

18   the propriety of his section 5250 hold, that disagreement has no connection to the CA DOJ and

---

19         [5] The Court expressed interest in whether a 5250 hold qualifies as a "commitment" for
20   purposes of 18 U.S.C. § 922(g)(4), and whether Plaintiff has been denied equal protection of the
     laws because he does not have an opportunity to demonstrate his current fitness to possess
21   firearms.  April 14, 2021 Order, ECF No. 87.  The California Attorney General defers to the
     Federal Defendants on these issues because they involve a question of federal law, and thus the
22   Federal Defendants are in the best position to address the issues.  However, the California
     Attorney General notes that, as described above, when a person is certified for a 5250 hold, a
23   certification review hearing must be held.  Cal. Welf. & Inst. Code § 5256.  Further, Plaintiff had
     an opportunity to request a hearing in order to challenge his 5250 hold and chose not to do so.
24   *See* Compl., ¶ 25; Exhibit C (Stokes Depo.) at 121-122.  As for any alleged denial of equal
     protection, the California Attorney General notes that this case does not involve a suspect
25   classification and thus rational basis review applies.  *See Nordyke v. King*, 681 F.3d 1041, 1043
     n.2 (9th Cir. 2012) (en banc) (stating that rational basis scrutiny applies to the plaintiffs' equal
26   protection claim when the challenged law is found not to violate the First or Second Amendment
     and the law does not involve a suspect classification).  Here, the rational basis standard would be
27   met because the purpose of 18 U.S.C. § 922(g)(4) is related to a legitimate government interest.
     *See Mai v. United States*, 952 F.3d 1106, 1116 (9th Cir. 2020) (agreeing that preventing crime
28   and suicide are legitimate interests supporting 18 U.S.C. § 922(g)(4)).

1    instead should be directed to the mental health facility.[6]  *See* Mac Decl. ¶¶ 14-15.  Moreover, if

2    Plaintiff were to prevail in his constitutional challenge to federal law, he would receive full relief

3    through the issuance of an injunction against the federal government.  In sum, Plaintiff lacks

4    standing to bring suit against Attorney General Bonta because no case or controversy exists with

5    respect to the California Attorney General.

6                                        **CONCLUSION**

7           The Eleventh Amendment bars Plaintiff from bringing this suit against the California

8    Attorney General.  Moreover, Plaintiff lacks Article III standing because there is no controversy

9    between Plaintiff and the California Attorney General.  Accordingly, Attorney General Bonta

10   respectfully requests that the Court grant this motion for summary judgment.

11

12   Dated:  April 29, 2021                    Respectfully Submitted,

13                                             ROB BONTA
                                               Attorney General of California
14                                             ANTHONY R. HAKL
                                               Supervising Deputy Attorney General
15

16

17                                                   */s/ Jerry T. Yen*
                                               _____
18                                             JERRY T. YEN
                                               Deputy Attorney General
19                                             *Attorneys for State of California and Rob*
                                               *Bonta, in his official capacity as California*
20                                             *Attorney General*

21   SA2019104336/35053592

22

23

24

25   _____
26      [6] Plaintiff filed a petition on November 4, 2020, in Sonoma County Superior Court
     challenging his 5250 hold.  *See* Plaintiff's Response to October 22nd Order, ECF No. 73 (Nov. 5,
27   2020) at 40-60.  Pursuant to the Court's order (ECF No. 68), the California Attorney General
     advised Plaintiff that he did not wish to participate in the state court action.  Although it appears
28   that the California Attorney General has been named as a defendant in that action (ECF No. 73 at
     40), the California Attorney General has not been served yet with the complaint and summons.

                                               9

**EXHIBIT A**

Encounter Record

## CIPS Notes Historical - NCAL

**8 of 16**

| | Provider | Department | Encounter # |
|---|---|---|---|
| | Duchynski, Robert Michael (M.D.) | EMERGENCY ROOM | 5532789 |

**Encounter Messages**

No messages in this encounter

**Patient Secure Message**

No messages in this encounter

---

### Progress Notes

Version 1 of 1

| Author: — | Service: — | Author Type: — |
|---|---|---|
| Filed: | Creation Time: 3/11/2002 9:19 PM | Status: **Signed** |

DATE/TIME: 03/11/2002 21:19
PROVIDER: DUCHYNSKI, ROBERT (M.D.)
Time seen: 8:30pm
CC: depressed
HPI: patient is a 18yo male who  is brought in by foster
parents today twice to psychiatry for abnormal behavior x last
week,  depressed and dangerous behavior,  sent home with rx for
risperidol and lorazapam yet to pick them up but foster parents
found out more information from pts friends and feel pt is
danger to self them and his friends.  Pt denies drug use since
yesterday but does admit to hallucination, auditory telling him
to slow down.   pt is not cooperative with history.
ROS:  all other systems negative

ALL: nkda see cips and triage
Meds: see cips and triage
PMH:  cips reviewed
SH:   no etoh today but + in past

PE: see MSE for vitals
Const:  WDWN  NAD alert and oriented but reserved affect
Eyes:  PERRL  EOMI
Neck: supple no JVD
Resp: respiratory effort normal  CTA B chest NTTP chest
symmetry and expansion normal
CV: RRR no M/R/G
GI: +BS NTTP no R/G Soft ND no HSM
Musc: atraumatic
skin: inspection normal dry and well perfused
Neuro: A+Ox3 CN II-XII grossly intact  motor/sensory intact

labs: udap
etoh

ED course:psych consulted

A: abnormal behavior--?drug induced psychosis
depression
Plan:per psych

Condition on D/c:  stable

---

**Vitals**

Generated on 11/9/20  4:44 PM

**EXHIBIT B**

10473776

# PSYCHIATRY:
# DIAGNOSTIC INTAKE EVALUATION (MEDICATION)

Date: 3/11/02

[Please imprint Kaiser Card here]

Provider Debb. M

Clinic: Psychiatry (Adult Team), Santa Rosa

Personal Data Sheet dated 3/11/02 is found in the front section of the chart.

## Identifying Data & Chief Complaint [Age, Marital/Relationship Status, Ethnicity, Gender, Sexual Orientation, Occupation, Referral Source]

18 y.o. single male seen c "surrogate father" Don Barker & late his surrogate mother Nancy Barker, UC student referred f. eval by Jim Baldini 2° ? hypo reaction. Pt has recent hx of Δ in MS 2° drug & alcohol use - erratic behavior 3 days ago.

## History of Present Illness [Symptoms, Onset, Duration, Precipitating Factors, Treatment]

Pt seen c Don Barker first 45' & then also c Nancy Barker. Pt gave verbal consent for exchange of info c the Barkers & their understood participation. P interview I discovered no written consent had been signed. I conveyed this info to J. Baldini & D. Barker, MD re all Ro's interview. The history was reported primarily by pt c some additions by Mr. Barker. Pt's history was spotty & he chose to withhold certain details of his behaviors over the past week. Apparently, after binging on psychedelic mushrooms ~1 week ago he has been having difficulty sleeping, has been skipping school, has been disorganized & "not myself," culminating in a night of ETOH & heavy MJ use last Friday night in which he "freaked out," hit a close friend, and other impulsive acts (see J. Baldini report). Pt refused to discuss details of this stating either "It's in the past, I don't want to dwell on it, I don't want to talk about it." Pt specifically denied every psychiatric sxs, delusions or hallucinations. He adamantly denied S/HI, plan or intent and requested help with sleep & stopping drug use. When Mrs. Barker arrived she brought pts journal which pt received (It hadn't been read) & some writing by another friend which pt didn't want to read or discuss in session. Mrs. Barker asked to stay p session ended & then stated concerns about pt's safety based on report of friends who were @ the party & his erratic behavior. I gave her specific instructions regarding patient & pt and/or others if now seemed to escalate (clinic, ED, police) & encouraged her to share her concerns in session when pt is present.

[Please imprint Kaiser Card here]

## Alcohol & Drugs Also see Personal Data Sheet [Use Patterns, Treatments, DUIs, IV drugs, Prescription drugs, Tobacco, Caffeine] Personal Data Sheet Information reviewed and noted ☐

*use of MJ – daily, past month or longer. Stuff quantity unknown + Psychedelic mushrooms last use ~7 days ago multiple previous trips? Denies oth drug use.*

If smoker, patient was advised to quit ☐

## Psychiatric Review of Systems [Mark only those areas addressed]: PDS reviewed and noted ☐

| | Current | Past | | Current | Past | | Current | Past |
|---|---|---|---|---|---|---|---|---|
| Depressed Mood | ☐ | ☐ | Anxiety | ☐ | ☐ | Mania/Hypomania | ☐ | ☐ |
| Anhedonia | ☐ | ☐ | Panic | ☐ | ☐ | Racing thoughts | ☐ | ☐ |
| Crying | ☐ | ☐ | Phobias | ☐ | ☐ | Initial Insomnia | ☐ | ☐ |
| Fatigue/Low Energy | ☐ | ☐ | Obsessions | ☐ | ☐ | Grandiosity | ☐ | ☐ |
| Middle/Term. Insomnia | ☐ | ☐ | Compulsions | ☐ | ☐ | Irritability | ☐ | ☐ |
| Hypersomnia | ☐ | ☐ | Hallucinations | ☐ | ☐ | Reduced need for sleep | ☐ | ☐ |
| Poor Appetite | ☐ | ☐ | Paranoia/Vigilance | ☐ | ☐ | Binging/purging | ☐ | ☐ |
| Decreased Libido | ☐ | ☐ | Disorganized Thoughts | ☐ | ☐ | Compulsive Overeating | ☐ | ☐ |
| Poor Concentration | ☐ | ☐ | Work Performance Problems | ☐ | ☐ | History of Physical Abuse | ☐ | ☐ |
| Easy Distractibility | ☐ | ☐ | Pain | ☐ | ☐ | History of Sexual Abuse | ☐ | ☐ |

## Comments:

## Significant Current & Past Medical History also see Personal Data Sheet

| Current Medications (include dosage) | Medical Problems/Issues | Active | Inactive |
|---|---|---|---|
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | Yes | No |
| | Head Injury | ☐ | ☑ |
| | Seizures | ☐ | ☑ |
| | Allergies | ☐ | ☑ |

## Comments:

## Prior Psychiatric History Also see Personal Data Sheet [Hospitalizations, Therapy, Medications, Suicide Attempts, Who Provided Care?] Personal Data Sheet Information reviewed and noted ☐

|  | No | Yes | Comments/Results: |
|---|---|---|---|
| **Old Records Requested** | ☐ | ☐ | Requested from: _____ |
| Prior labs, consults | ☐ | ☐ | Kaiser: see CIPS; Non-Kaiser: Requested from: _____ |
| Hospitalizations | ☐ | ☐ | Narrative: |
| Outpatient therapy | ☐ | ☐ | |
| Suicide Attempts | ☐ | ☐ | |
| Psychiatric Medications | ☐ | ☐ | |

## Comments:

## Psychosocial History

Unclear on details. Pt attends El Molino high, senior. Plans to attend JC next year. Used to wrestle. Stopped sophomore yr. Lives in the Barkers, parents of his friend Danny for the past 2 yrs. Father lives somewhere in Budapest, mom in England, abandoned family 10 yrs ago. Pt apparently has been somewhat depressed on past month since totaling his car for the 2nd time. Unclear however why these wrecks took place.

## Family Psychiatric History [Psychiatric, Substance Abuse, Suicides, Medication Responses]

|  | No | Who (Mat./Pat.) | Comments/Results: |
|---|---|---|---|
| Psychiatric Illness, including Psychiatric Medications and Hospitalizations | ☐ | Dad — Sister | "manic" — unclear his dx |
| Suicide Attempts | ☐ | uncle | — suicide. |
| Alcohol/Drugs | ☐ | Dad | by hx? |

## Medical ROS [Mark only those areas addressed]

| | WNL | Abnormalities/Comments |
|---|---|---|
| HEENT | ☐ | |
| GI | ☐ | |
| CV | ☐ | |
| Resp. | ☐ | |
| Skin | ☐ | |
| Musculoskeletal | ☐ | |
| GU | ☐ | |
| Endocrine | ☐ | |
| Heme/Lymph | ☐ | |
| Neurological | ☐ | |

### Vital Signs & Musculoskeletal Exam
(As indicated) [Mark only those areas examined]

| BP / | Pulse | Respiration |
|---|---|---|
| Height | Weight | |
| Muscle Strength & Tone | WNL ☐ | Abnormal: |
| Gait & Stance | WNL ☐ | Abnormal: |

## Mental Status Exam [Mark only those areas examined]

| | WNL | Impaired/Comments: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Appearance & Behavior | ☑ | neatly dressed + groomed | | | | | | |
| Speech | ☐ | Pressured clipped | | ☑ Slow | | ☐ Mute symbolic | | ☐ |
| Mood/Affect | ☐ | Anxious | ☐ | Restricted | ☑ | Expansive | | ☐ |
| | | Depressed | ☐ | Flat | ☐ | Angry mildly | | ☑ |
| | | Euphoric | ☐ | Blunted | ☐ | @ first | | |
| Thought Process | ☐ | Disorganized moderate | ☐ | Loose Assoc. | ☐ | | | ☐ |
| Thought Content | ☑ | Delusions | ☐ | Hallucinations | ☐ | | | ☐ |
| Orientation | ☑ | Narrative mental status exam: | | | | | | |
| Attention | ☑ | | | | | | | |
| Concentration | ☐ | impaired | | | | | | |
| Memory | ☐ | grossly intact | | | | | | |
| Fund of Knowledge | ☑ | | | | | | | |
| Impulse Control | ☐ | poor - drug use, self distructive when high | | | | | | |
| Insight | ☐ | poor | | | | | | |
| Judgment | ☑ | | | | | | | |

## Comments:
Pt is a poor historian somewhat withholding + somewhat disorganized. He speaks in symbolic riddles abt problems at the post office but responds to structured inquiry.

## Risk Assessment

| | No | Yes | N/A | Comments |
|---|---|---|---|---|
| Suicidal Ideation | ☑ | ☐ | ▓ | |
| Suicidal Plan | ☑ | ☐ | ☐ | |
| Suicidal Intent | ☑ | ☐ | ☐ | |
| No Self Harm Contract | ☐ | ☑ | ☐ | |
| Homicidal Ideation | ☑ | ☐ | ▓ | |
| Homicidal Plan | ☑ | ☐ | ☐ | |
| Homicidal Intent | ☑ | ☐ | ☐ | |
| No Other Harm Contract | ☐ | ☐ | ☑ | |
| Threatening/Assaultive | ☑ | ☐ | ▓ | |
| Impulse Control Problem | ☐ | ☑ | ▓ | see above |
| Weapons/Firearms | ☑ | ☐ | ☐ | |
| Tarasoff | ☑ | ☐ | ☐ | Person/Date/Time notified: |
| Involuntary Hold (5150) | ☑ | ☐ | ☐ | ☐ DS  ☐ DO  ☐ GD Facility: _____ |

MR # _____

[Please imprint Kaiser Card here]

**Strengths:** Circle, if applicable: [(Social Support, Intelligence) Motivation for Treatment, Solves Problems]

Other: _____

**Weaknesses:** Circle, if applicable: [Isolated, Lacks Insight, Severe Impairment, Lacks Motivation, Nonadherence]

Other: _____ drug use , immaturity _____

**Assessment (Brief narrative case summary):**

Pt in the aftermath of hallucinogenic drug binge, who has not fully recovered. He may have been suffering from depression prior to events of past week, but unclear from current data. Although vague and somewhat disorganized he denied violent or self destructive urges now. Agrees to stop drug use, agrees to enter treatment.

**Diagnoses:**

AXIS I:   Drug induced psychosis    AXIS III: _____
          Depression NOS  (R/O)

                                    AXIS IV: _____
AXIS II:   deferred                 AXIS V: _____

**Goals**                           **Time Frame to Completion**

↓ insomnia                          1 day
↑ clarity of thought                2 - 4 weeks
enter appropriate treatment         1 day

**Treatment Plan:**

**Medication Management:** [List medications ordered, renewed, and/or changed]

Trial Ativan 1 mg QHS for sleep GXP
"   Risperdal 1 mg QHS for thought disorder
No drugs or ETOH
Pt advised not to attend school tomorrow - reassess       **Informed Consent given** ✓
p eval c Dr. Parker                                        **Side Effects explained** ✓

<u>Non-Pharmacologic Management</u>: [Individual, Group, Couples, Family, CD, IOP]

_Per Jim Below + Dan Picker, I will f/u the meds once Rx plan established. P.E. for J Below, D. Picker rqsted, MH consents, f/u plan + crisis plan._

Time spent in session _____ 75' _____

Follow-Up Appointment on ____~~FBA~~ to-m'row__ at ___2 Pm___ (or case closed ☐)

Primary MD: _____ Phone #: _____ Contacted: _____
Referred By: _____ Phone #: _____ Contacted: _____

Practitioner's Printed Name & Degree _____ L. DEBBOLD, M.D. _____

Signature: _____ Date: _3/11/02_

**KAISER PERMANENTE**

Northern California

Facility: _SRO_

☑ Chemical Dependency
☐ Co-Dependency

## CHEMICAL DEPENDENCY SERVICES
### ADULT INTAKE/DIAGNOSTIC SUMMARY

Date: 3/11/02

IMPRINT AREA

REFERRAL SOURCE
☐ Self   FAMILY FRIEND ~~████~~

| DATE OF BIRTH | AGE | GENDER |
|---|---|---|
| 7/26/83 | 18 | M |

**Chief Complaint/Presenting Problem:** Anger at self, guilt feelings, Pt also wants to deal with "chemical probls" + "solor problems." ~~████~~ Pt. has been decompensating for past month. Pt ~~████~~ doesn't answer + often answers in weird ways —

**History of Presenting Problem: (symptoms, onset, duration, precipitating factors, treatment)**
Pt. has not been attending school (12th grade E<medina>) - Says it brings out the best + worst of him — "it mirrors me." Pt. hasn't slept well for 2-3 days - reports sleeping Thurs PM & some last night (Sunday). Pt. could not accurately report how much sleep or food ~~████████████████~~ Pt. reports he was drinking + smoking pot but he "freaked out" b/c of his anger and guilt "it was a boiling point." Pt. put his hands in a fire (to get out his guilt), punched his biggest friend & apparently kissed a male. Pt. reports "lashing out" (cont.)

**Psychosocial History: (childhood development, education, relationships, employment, legal, living situation)**
Mother moved to England approx 10 yrs ago. Father lives in en bc the woods in Bodega, Pt. has lived with Barker family 2 yrs. Friend with 17 y.o. son of Mr. Barker, 3 other children 15, 13 + ? yr. Pt. has 2 sisters.
Pt. says he began drinking + smoking pot elementary school. Reports he doesn't like drinking. Daily pot smoking until 1/02. Hx of mushrooms (psychedela).

**Prior Psychiatric History: (include previous suicide attempts and means)**
0 now reported
Pt says he is not suicidal or homicidal —

PRIOR PSYCHIATRIC LABS, CONSULTATIONS
☐ Yes ☐ No   ☐ Kaiser: See CIPS   ☐ Other: ☐ Yes ☐ No ☐ REQUESTED

01996-5 (8-99)                PAGE 1 OF 4

**Symptoms: (see Personal Data Sheet for symptoms checklist)** _____

Additional Symptoms: _Pt. says he's not depressed. Says Manic runs_
_in family - 2cy.: sister + father._

**Past History of Abuse: (physical, sexual, emotional, cultural; child, adolescent, adult)** _____
_non reported_

**Past or Current Domestic Violence Issues:** _non reported —_

**Significant Medical History: (illnesses, surgery/accidents/head injury/seizures)**

| Illness/Injury | Year | Complications/Comments |
|---|---|---|
| non - reported. | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Current Medications:** _ø_

**Allergies:** ☐ None Known   If yes, what kind? _____

**Family History: (psychiatric, substance abuse, suicide, medication, responses)**

| Who | Maternal/Paternal | Psychiatric Illness | Alcohol & Drugs | Suicide Attempts | Psychiatric Medications |
|---|---|---|---|---|---|
| Fa | | | Drugs | | Manic |
| Mo | ? | | | | |
| Sis | | | Drugs | | Manic |
| Br | | | | | |
| | | | | | |
| | | | | | |

**Alcohol and Other Drug Use: (See attached Alcohol/Drug History. Also refer to the Personal Data Sheet for additional information, including caffeine and tobacco use.)**

**KAISER PERMANENTE**

Northern California

Facility: _____

☐ Chemical Dependency
☐ Co-Dependency

## CHEMICAL DEPENDENCY SERVICES
## ADULT INTAKE/DIAGNOSTIC SUMMARY

IMPRINT AREA

Date: _____

### Mental Status Exam:

| | WNL | Impaired/Comments |
|---|---|---|
| Appearance/Behavior | | |
| Cognition | | Difficult |
| Insight | | Poor |
| Judgment | | impulsive beh |
| Attention/Concentration | | Difficult concentrating |
| Memory | | Poor historian |
| Orientation x 4 | | Poor sense of history, Didn't know address — |
| Fund of Knowledge | | Impaired |

| | | | | | | |
|---|---|---|---|---|---|---|
| Speech | Pressured | ☐ | Slow | ☐ | Mute | ☐ |
| Mood/Affect | Anxious | ☐ | Restricted | ☑ | Expansive | ☐ |
| | Depressed | ☑ | Flat | ☐ | Angry | ☐ |
| | Euphoric | ☐ | Blunted | ☐ | Tearful | ☐ |
| Thought Process | Disorganized | ☐ | Loose Associations | ☐ | | |
| Thought Content | Delusions | ☐ | Hallucinations | ☐ | | |

Comments: Reports ⊘ auditory or visual hallucinations

### Risk Assessment:

| | Yes | No | Prior History | Comments |
|---|---|---|---|---|
| Suicidal Ideation | | ✓ | | |
| Suicidal Plan | | | | |
| Suicidal Intent | | | | |
| Homicidal | | ✓ | | |
| No Harm Contract ☐ N/A | | | | |
| Threatening/Assaultive | | | | |
| Impulse Control Problem | ✓ | | | Over weekend – impulsive beh. |
| Weapons/Firearms | | | | |
| Tarasoff Warning | | | | |
| 5150 | | | | |

Risk Statement (if yes to any of the above): _____

### Assessment and Diagnosis:

R/O Schizophrenia

AXIS I. R/O Manic Depressive.
R/O Substance Induced Psychotic As
ETOH & Marijuana depend

AXIS II. R/O Schizotypal Dis —

AXIS III. None Reported

AXIS IV. *(optional) _____

AXIS V. *(optional) _____

01996-6 (8-99)

**Strengths: (family support, intelligence, motivation for treatment, other)** _____

_Friends of family Supportive_

**Weaknesses: (severity of impairment, noncompliance, other)** _____

**Motivation for Treatment:** ☐ Poor ☐ Fair ☐ Good _____

**Formulation/Treatment Plan: (individual/marital/family/CD/medication/IOP/groups)**
**Include goals and estimated timeframe, requests for previous treatment information/labs)** _____

1. MED EVAL - 2:30 Los Debbild  3/1/02
2. 2:00 Dan Pizler - for IOP Screening 3/2/02

**Primary Care Provider Contacted?** ☐ Yes ☐ No
**If no, reason:** _____

**Patients Response to Treatment Plan:** _Superior_

**Follow-up Appointment:** _____

**PRACTITIONER'S NAME, SIGNATURE AND DEGREE**
_James L. Baldwin, LCSW_

**DATE** 3/11/02

1996-8 (8-99) REVERSE                    PAGE 4 OF 4

**EXHIBIT C**

# In The Matter Of:

*Easton Stokes v.*
*United States Department of Justice, et al.*

---

*Easton Stokes*
*November 20, 2020*

---

*Behmke Reporting and Video Services, Inc.*
*455 Market Street, Suite 970*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 37537Stokes.txt
**Min-U-Script® with Word Index**

Case 3:19-cv-04613-WHA   Document 89   Filed 04/29/21   Page 31 of 44

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5     - - - - - - - - - - - - - -
 6     EASTON STOKES,          )
 7              Plaintiff,     )  CASE NO.
 8     vs.                     )  3:19-CV-04613 WHA
 9     UNITED STATES DEPARTMENT )
10     OF JUSTICE, et al.,     )
11          Defendants.        )
12     - - - - - - - - - - - - - -
13
14
15
16        REMOTE DEPOSITION OF EASTON STOKES
17          FRIDAY, NOVEMBER 20, 2020
18
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22     BY: ANGELA SINCLAIR, RMR, RPR, CRR, CCRR, CSR NO. 13902
23              455 MARKET STREET, SUITE 970
24            SAN FRANCISCO, CALIFORNIA 94105
25                    (415) 597-5600
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8        Remote Deposition of EASTON STOKES located in
 9     Santa Rosa, California, taken on behalf of Federal
10     Defendants via Zoom videoconference, with the
11     witness in Santa Rosa, California, commencing at
12     9:02 A.M., FRIDAY, NOVEMBER 20, 2020, before Angela
13     Sinclair, Certified Shorthand Reporter No. 13902,
14     pursuant to Notice of Deposition.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1     APPEARANCES OF COUNSEL:
 2     FOR THE PLAINTIFF EASTON STOKES:
 3         LAW OFFICES OF TIMOTHY KELLY
 4         BY:  TIMOTHY KELLY, ATTORNEY AT LAW
 5             (VIA VIDEOCONFERENCE)
 6         1403 Spyglass Parkway
 7         Vallejo, California 94591
 8         Telephone:  (707) 570-7507
 9         Email:  tskelliot@gmail.com
10
11     FOR THE FEDERAL DEFENDANTS:
12         UNITED STATES ATTORNEY'S OFFICE
13         BY:  JULIE DAVIS, ASSISTANT U.S. ATTORNEY
14              ERIC SOSKIN, ASSISTANT U.S. ATTORNEY
15             (VIA VIDEOCONFERENCE)
16         1301 Clay Street, Suite 340-S
17         Oakland, California 94612
18         Telephone:  (510) 637-3701
19         Email:  julie.davis@usdoj.gov
20                 eric.soskin@usdoj.gov
21
22
23
24
25
```

Page 4

```
 1     APPEARANCES OF COUNSEL - (CONTINUED):
 2     FOR THE STATE DEFENDANTS:
 3         DEPARTMENT OF JUSTICE
 4         OFFICE OF THE ATTORNEY GENERAL
 5         BY:  JERRY YEN, DEPUTY ATTORNEY GENERAL
 6         1300 I Street
 7         Sacramento, California 95814
 8         Telephone:  (916) 210-7836
 9         Email:  jerry.yen@doj.ca.gov
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

---

Page 5

```
                    INDEX
 1
 2   FRIDAY, NOVEMBER 20, 2020
 3   EASTON STOKES                              PAGE
 4     Examination by MS. DAVIS                    7
 5   P.M. SESSION                                125
 6     Examination resumed by MS. DAVIS          125
 7     Examination by MR. YEN                    126
 8
 9
10
11
12
13                      -oOo-
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
                    EXHIBITS
 1
 2              EASTON STOKES
 3   Number        Description           Page
 4            (No exhibits marked.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1       FRIDAY, NOVEMBER 20, 2020; 9:02 A.M.
 2
 3           EASTON STOKES,
 4       affirmed as a witness,
 5       testified as follows:
 6       MS. DAVIS: Thank you, Madam Court Reporter.
 7   And thank you for appearing here today.
 8       There's one housekeeping matter I want to get
 9   on the record before we get started.  I just want to
10   make sure that all the attorneys agree that this
11   deposition is a remote deposition and can be used for
12   all purposes for in-person deposition under the federal
13   rules.  Do you stipulate?
14       MR. KELLY: Yes, so stipulated.
15       MS. DAVIS: Jerry?
16       MR. YEN: Yes, I do.
17       MS. DAVIS: Okay.  Thank you.
18   EXAMINATION BY MS. DAVIS:
19       Q.  All right.  Mr. Stokes, I represent the federal
20       defendants in this action, so I represent the
21       United States.  And we're going to be asking you some
22       questions about the case that you filed.
23           Have you ever been deposed before?
24       A.  No.  This is my first time.
25       Q.  Okay.  So I'm going to give you some
```

Page 8

```
 1   information about a deposition to start out with.  Let
 2   me know if you have any questions.
 3       First, and most importantly, we need verbal
 4   answers because the court reporter is recording this.
 5   That means no nods or head shakes because they can't be
 6   recorded.
 7       A.  Okay.
 8       Q.  Do you understand?
 9       A.  I do.
10       Q.  In addition, please say "yes" or "no" as
11   opposed to "uh-huh" or "huh-uh," again, so that the
12   court reporter can record it.
13       A.  Yes, I understand.
14       Q.  Okay.  Also, we can't speak at the same time,
15   so please wait until you're sure I've completed the
16   question before you respond.  It's okay if you ask for
17   clarification or if you pause before answering.
18       A.  Okay.
19       Q.  Also, it's okay to say "I don't know" or "I
20   don't have an opinion," but I am entitled to your best
21   recollection of the events.
22       A.  Okay.
23       Q.  Do you understand?
24       A.  I do understand, yeah.
25       Q.  Thank you.  While we're not in a courtroom and
```

---

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 9

1    this situation seems informal, the deposition is under
2    oath; therefore, it's the same testimony in a courtroom
3    and you are required to tell the truth.
4         Do you understand?
5    A. I do understand, yes.
6    Q. Okay. Your attorney or the other attorneys in
7    this deposition may object to a question. Even if
8    there's an objection, you may still answer the question.
9    The objection will just be recorded in the transcript.
10   A. Okay.
11   Q. Do you understand?
12   A. I do understand, yes.
13   Q. Okay. Also, if you don't ask me to clarify, I
14   will assume that you've understood the question and that
15   your answer is based on a full understanding of my
16   question.
17        Does that make sense?
18   A. That does, yes.
19   Q. Okay. We can take breaks during the day. If
20   you need to take a break, just let us know. However, we
21   can't take a break when a question is pending.
22   Therefore, if I or one of the other attorneys ask you a
23   question, you need to answer it before requesting a
24   break.
25        Does that make sense?

Page 10

1    A. That does, yes.
2    Q. Okay. Do you feel as if you're able to
3    understand questions and respond to them today?
4    A. Yes, I am.
5    Q. Okay. And this next question, this is a
6    standard question that we ask. This is not specific to
7    you or your circumstances and meant to imply anything.
8    It's just to make sure the deposition is a good one.
9         Have you taken any drugs or alcohol within the
10   last 24 hours, including prescription drugs?
11   A. No, I have not.
12   Q. Okay. Anything else that might impair your
13   ability to answer questions truthfully and fully today?
14   A. No.
15   Q. Okay. Thank you.
16        Did you speak with anybody to prepare for
17   today's deposition?
18   A. Very little, but yes. I talked to my attorney,
19   Tim Kelly.
20   Q. Okay. So you don't have to give me any of the
21   content of the communications between you and your
22   attorney. Did you review -- but did you review any
23   documents with your attorney?
24   A. I did not. I was told that they would be on
25   the record, and if I didn't understand the exact

Page 11

1    timeline, I could ask for information as far as
2    clarification of the question and what's already on the
3    record, I believe was available.
4    Q. Okay. I'm just going to say you don't have
5    to -- please don't have any communication between you
6    and your attorney. You're not required to answer that.
7         MS. DAVIS: And, Tim, we will not construe that
8    as any waiver of the privilege, okay?
9         MR. KELLY: Absolutely.
10   BY MS. DAVIS:
11   Q. Have you spoken to anyone else about your
12   deposition who wasn't your attorney?
13   A. No.
14   Q. Okay. Have you spoken to anybody else about
15   this lawsuit?
16   A. Yes, I have.
17   Q. Who? Who did you speak to?
18   A. Friends and family. I haven't kept this a
19   secret.
20   Q. Okay. What sort of things have you discussed
21   with your friends and family about this lawsuit?
22   A. Just that it was happening. And there was a
23   newspaper article in the Mercury News, and I shared that
24   with my friends and family. Not everybody but privately
25   with certain family members and friends.

Page 12

1    Q. There was an article in Mercury News about this
2    particular lawsuit?
3    A. Yes, there is.
4         MR. KELLY: Ms. Davis --
5    BY MS. DAVIS:
6    Q. Do you remember when that article was?
7    A. I believe August of 2019.
8    Q. Thank you. Did you ever discuss this lawsuit
9    on social media?
10   A. Never. No.
11   Q. Never? Okay.
12        And can you tell me -- outside of
13   communications with your attorney, which is privileged,
14   can you please let me know anything else you've done to
15   prepare for this deposition?
16   A. I Googled it just to see what the rules are,
17   and that was about it.
18   Q. You mean Googled the rules for a deposition?
19   A. Yes.
20   Q. And do you have any questions about those rules
21   before we proceed?
22   A. I do not, no.
23   Q. Okay. And just so we have this, can you please
24   state your full name for the record and spell it?
25   A. Easton Atwood Stokes, E-a-s-t-o-n A-t-w-o-o-d

Easton Stokes v.

United States Department of Justice, et al.

Easton Stokes

November 20, 2020

Page 101

1  friend's mom and my friend's dad as to I'm not doing
2  well and I need help.
3      And could you repeat the question?  I'm not
4  sure if I'm getting off topic.
5      Q.  No, it was fine.  And we'll come back to that,
6  but let me just confirm one thing.
7      Why did you take the mushrooms on Friday night?
8  Do you recall that?
9      A.  Yes.  It seemed like it would be fun.  I didn't
10  realize how serious and how scary those are.  And it
11  just seemed like a fun thing to do.
12      Q.  Were you -- were your friends, did they
13  regularly ingest mushrooms?
14      A.  This was -- it was more like a house party.
15  And this wasn't my close friends.  I didn't do this with
16  my close friends.  This would have been a house party,
17  and it was a big party and it just was going around, and
18  it was like, oh, cool, I can handle that, I'll try that.
19  And that was really scary.  It was a really bad decision
20  and quite terrifying, to be honest.
21      Q.  Did any --
22      A.  Go ahead.
23      Q.  Did your friends take the mushrooms as well?
24      A.  No, they did not.  Not my close group of
25  friends.  It was a bigger house party.  And some people

Page 102

1  were doing it and I'd say most people were not.
2      Q.  What about any of the friends who went to
3  Bodega Bay?
4      A.  They -- none of them had mushrooms that night.
5  I don't recall who was even there at that house party
6  that night.
7      Q.  Had the people that you were with when you
8  drove to Bodega Bay, had any of them ingested alcohol?
9      A.  We -- not before, but I believe some of them
10  were drinking beer when we got there.  The driver was
11  sober.  I hadn't drank anything that day and I didn't
12  drink while we were there, but I believe some of my
13  friends were drinking when we got there.
14      Q.  You said you had gotten into a minor accident
15  on the way there.  What happened with that?
16      A.  Yes.  One second.
17      It was on Highway 1 right through the town of
18  Bodega Bay and there's a hairpin left-hand turn.  And
19  the driver took it too fast.  I was in the passenger
20  seat closest to the impact, and we -- he applied the
21  brakes when he shouldn't have and slid into the
22  guardrail and lifted the car up a little bit.  I was
23  right there in the driver's seat or the passenger -- I
24  was a front passenger in the car and everybody else was,
25  like, pretty concerned and scared and getting through

Page 103

1  the adrenaline rush of just getting into a car accident.
2      I remember that I didn't even react, and that's
3  when it seemed like something was wrong.  I was
4  completely just unresponsive to that level of danger.
5      Q.  So you were unresponsive, but it seems like you
6  have a very clear memory of exactly what happened?
7      A.  I remember the car accident, yes, but I
8  wouldn't describe -- I did not have a very clear memory
9  of after Friday when I stopped sleeping and not feeling
10  myself.  I would describe my -- I wouldn't describe my
11  memory as very clear.  I have good memories of certain
12  pieces, but when I stopped sleeping, my memory -- a lot
13  of my -- I became -- things became much more unclear.
14      Q.  But you remember this incident on Saturday
15  night?
16      A.  Yes, I do.  Yes.
17      Q.  And had Donny Barker, is that the -- is that
18  your friend?
19      A.  Yes.
20      Q.  Had he used alcohol or any drugs during this
21  incident at Bodega Bay?
22      A.  Donny Barker, I don't -- he was not in the car
23  when we went out to the beach.  It was James Cardwell
24  was driving.  Micah Black was in the car, me, Jonathan.
25  I believe there were five of us that went to that --

Page 104

1  were there in that minor car accident.
2      Q.  Okay.  Is there a reason that Donny Barker
3  wasn't there?
4      A.  He was doing something else.
5      Q.  Okay.  All right.  So now let's go to Monday.
6  It was Nancy Barker who drove you to Kaiser?
7      A.  Yes.  It was Nancy that drove.  There was
8  also -- that would have been Mike O'Brien.  Mike
9  O'Brien's also -- we have the same half-sister.  My
10  oldest sister Christine is my half-sister.  We share the
11  same mother.  And then that -- and we've been friends
12  for a long time.  Christine's father, Brendan O'Brien,
13  is the father of Mike O'Brien.  So he's not my family
14  relative, but he is a good friend of mine.
15      So Nancy was driving, Micah Black was there,
16  Mike O'Brien was there, me.  I think I have that all.
17  And Donny drove with us then as well.
18      Q.  Donny drove with you where?
19      A.  To Kaiser Hospital.
20      Q.  Why did they all come with you to Kaiser?
21      A.  It was to be supportive, to be comforting, and
22  to be around me.  I was scared and didn't really have a
23  good perspective of reality.  I was in really a bad, a
24  very challenging emotional state.  I didn't really
25  understand what was going on.  I just knew that I wasn't

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 105

1  well, I wasn't sleeping, and I was scared.  So my
2  friends were very supportive and they all helped me
3  through this process.
4      Q.  So who did you meet with at Kaiser?
5      A.  I don't recall exactly who I met.  I remember
6  filling out some questionnaire in the very beginning,
7  but I don't have a very clear memory of my -- of the
8  transfer of this.  I remember some sort of inpatient
9  that questioned, but I don't -- I was really exhausted
10  and out of it.
11      I felt safe -- I felt more safe just by being
12  in that environment where there was professional care,
13  but I -- could you rephrase that question or repeat the
14  question?
15      Q.  Who did you meet with at Kaiser?
16      A.  I'm not 100 percent sure.  I don't know how the
17  inpatient process went.
18      Q.  Was this a hospital?
19      A.  Yes.
20      Q.  And what happened after you arrived at Kaiser?
21      A.  I was there for a while.  My friends were there
22  with me.  And I ended up getting transported from
23  Kaiser, voluntarily transported with consent.  They
24  wasn't -- there wasn't a service where I could get --
25  I'm guessing on that part as far as why I didn't just

Page 106

1  stay there.  I don't think they have a psychiatric ward,
2  and it was clear --
3      Q.  I don't --
4      A.  -- to everybody --
5      Q.  I don't need you to speculate as to their
6  decision.  I just want to know what happened from your
7  perspective.
8      A.  From there I gave up my rights to make
9  decisions, and I believe it was Nancy Barker who was
10  talking with the nurses as to what's the best course of
11  action.  I needed help.  I needed professional care.
12  And it wasn't an option -- it wasn't a good decision for
13  me just to go home.  There was nowhere else for me to
14  go.  I needed medical treatment.  And I voluntarily went
15  to Kaiser in an ambulance, and that's when I was
16  declared a 5150.
17      Q.  But you also said you gave up your rights to
18  make decisions?
19      A.  Yes.  I wasn't -- I was very consenting to this
20  process.  I didn't know what was real, what wasn't real.
21  I was scared and I trusted everybody that was around me
22  to make decisions for me.
23      Q.  Okay.  So if you trusted other people to make
24  your decisions and you gave up your rights to make
25  decisions, it seems that other people were making the

Page 107

1  decisions for you?
2      A.  I was -- it was more of a process I believe
3  where it was, hey, this is what happened, are you okay
4  with this?  Yes.  There's nowhere for you to stay here
5  and get help and get treatment.  Where there is help and
6  treatment is at Oakcrest.  Are you willing to go to
7  Oakcrest?  Yes.
8      And the hospital provided an ambulance for me
9  to get there.  We had just driven from Occidental to
10  Santa Rosa which is probably 16 miles, I'm guessing.
11  But we made it a pretty good distance with private
12  driving getting there voluntarily.  And once I was
13  there, it was -- the professional way to get from Kaiser
14  to get treatment at Oakcrest was in an ambulance.
15      Q.  Okay.  I just want to clarify.  So agreeing to
16  something is very different from giving up your rights
17  to make decisions, and I think the two are getting
18  conflated.  So I want to clarify with you your
19  testimony.
20      You stated you gave up your rights to make
21  decisions; is that correct?
22      A.  I did.  I believe it was either here at Kaiser
23  or it was at Oakcrest, but I believe it was at Kaiser.
24  That's when I gave up my decision to make -- my consent
25  to make decisions for me.  I believe that's when I gave

Page 108

1  it to Nancy Barker.
2      Q.  And do you recall signing a document to that
3  effect?
4      A.  I do.  Everything's a little bit spotty.  I'm
5  not sure if this was at Kaiser or at Oakcrest, but I do
6  recall signing documents to have Nancy Barker make
7  decisions for me.
8      Q.  Do you recall signing documents at both places?
9      A.  I do not.  I'm not certain if it was at Kaiser
10  or if it was at Oakcrest.
11      Q.  Could it have been both?
12      A.  I don't know how that works.  So I would say it
13  could have, but I'm not -- I don't know.
14      Q.  And as of today do you have records from either
15  place?
16      A.  I do have records from Kaiser, yes.  I
17  requested my complete -- all of the medical records that
18  exist.  And I have -- I did get that and I'd be willing
19  to share that.  It's a file.  I'd be willing to show it,
20  share that.
21      MR. KELLY:  Yeah.
22  BY MS. DAVIS:
23      Q.  When did you get those?
24      A.  That was maybe a week ago.
25      Q.  Okay.

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 109

1    MS. DAVIS: Yeah, we can talk about this time,
2  Tim, but these should probably be produced pursuant to
3  the judge's order.
4    MR. KELLY: Absolutely. I haven't even had a
5  chance to review them, but I will certainly turn over
6  what I have.
7    THE WITNESS: What happened is I sent you the
8  link but it wasn't able to because it was
9  password-protected.
10    MS. DAVIS: I'm sorry. This is attorney-client
11  privilege, and it's really risky for us to have you talk
12  about stuff.
13    MR. KELLY: Just so I won't interrupt, I will
14  certainly provide them to you. I haven't even seen them
15  myself, but we are in the process of trying to get
16  medical records.
17    MS. DAVIS: Okay. Given that, I just want to
18  put this on the record for at least the federal
19  defendants. Jerry, you can chime on if you want, but I
20  think that we should probably reserve some time from
21  this deposition to go over any issues that might be --
22    MR. KELLY: Absolutely.
23    MS. DAVIS: Because these issues go directly to
24  the issues in this lawsuit that Judge Alsup has asked us
25  to explore, we may need to question your client further.

Page 110

1  So we may need to reserve some time.
2    MR. KELLY: Absolutely. I think that's a very
3  good idea.
4  BY MS. DAVIS:
5    Q. So you've gotten your medical records from
6  Kaiser, which is great. Have you gotten other paperwork
7  or medical records from Oakcrest?
8    A. I have not, no.
9    Q. Okay. In her declaration Nancy Barker spoke --
10  states that you went into the evaluation interview
11  yourself. Do you recall what was discussed in that
12  evaluation interview at Kaiser?
13    A. I cannot recall this part.
14    Q. Okay. Do you --
15    A. I don't remember. Everything is really blurry.
16  I'm on three days of maybe a couple hours of sleep. I'm
17  somewhat -- I remember being relieved to be in a place
18  where I felt like I was going to get care. But I don't
19  recall that process, no.
20    Q. All right. So who took you to Oakcrest?
21    A. From Kaiser to Oakcrest I was transported in an
22  ambulance. I remember sitting in the back and having a
23  conversation with the EMT. I was sitting in their
24  little jump seat. I was not like gurneyed down and out
25  of it. I was sitting in the back part of the ambulance,

Page 111

1  and I remember just having a casual conversation with
2  the EMT.
3    Q. Okay. What was -- do you recall what you
4  discussed?
5    A. It was basic -- I think he was just keeping me
6  engaged with the weather and the day and just -- I think
7  he was just being professional as to keeping me engaged
8  with the situation as far as -- I don't recall anything
9  specific. I don't think it was an in-depth
10  conversation. It was more just like, hey, how are you?
11  I'm guessing at this point, but I remember it was a very
12  casual basic conversation just to get me there.
13    Q. And do you recall what treatment you received
14  while you were at Oakcrest?
15    A. What do you mean by "treatment"?
16    Q. You were there 16 days; is that right?
17    A. Yes.
18    Q. So how about -- we'll be more general.
19    What happened while you were there?
20    A. Okay. So I remember getting there and being in
21  a room and being very confused and disoriented. And
22  they gave me some sort of sedative, and I just fell
23  asleep for about -- I don't recall, 72 hours of just
24  being asleep. And when I woke up I was confused as to
25  how -- I asked what day it was. Like, what day is it?

Page 112

1  What time is it? What's happening? I was surprised
2  that it had been three days.
3    Q. Okay. What happened --
4    A. Sorry, someone was in the background from your
5  TV.
6    Q. Sorry.
7    A. That's all right.
8    Q. There are multiple people teleworking at our
9  house. So sorry about that.
10    A. No worries.
11    So I recall -- once I came to, I recall it was
12  having a bunkmate, a roommate in a small room. There
13  were no doors. I remember eating and having meals. I
14  remember being on Zyprexa. There's no more sedative
15  after that initial period. I remember, maybe five or
16  six days into it, just feeling restless and needing to
17  move around.
18    So I went for -- every time they let me outside
19  I would go for a run on the perimeter of Oakcrest's
20  facilities. It was a really beautiful outdoor setting,
21  the oak trees and nice grass that time of the year, and
22  I remember just running as much as I could while I was
23  outside or sitting in the sun.
24    But I remember whatever medication -- it was
25  Zyprexa. Basically I went in at probably 145 pounds and

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 113

1    I left at about 170 pounds.  And when I was running I
2    wasn't really able to sweat, and I remember that was
3    weird, go for a run even with the jacket on and I wasn't
4    able to sweat.
5        I recall earlier on having a lot of friends
6    coming to visit me.  They actually -- and there's a
7    weird -- it's a little bit of what I would perceive as a
8    little bit jealousy from other people.  It was so much
9    commotion.  I had a lot of school friends come and visit
10   me, parents' friends, and they started to have to make
11   rules as to how to have guests.
12       And they would have a group of friends come in.
13   There was a line of really close people.  My
14   ex-girlfriend Heather Bowen came in to see me there.  I
15   remember Jon Kincheloe, who's one of my best friend's
16   father, he came and visited and we chatted outside.
17       I remember doing little projects to keep people
18   engaged, little groups, and this is not with the guests
19   but with the -- not with my friends but with the people
20   that were inpatient -- of doing group activities, having
21   circle conversations or drawing or doing a music thing.
22       I remember this was also a facility that
23   would -- people that were mentally -- I don't even know
24   how you'd say that, but people that were waiting to go
25   to court but not capable of staying in a jail also

Page 114

1    stayed here.  And my bunk -- my roommate was waiting to
2    go to see the judge, and he was a Sonoma County -- going
3    to see the Sonoma County judge.  Very friendly.
4        I remember one time there was -- there was a
5    few scary incidents.  There's no doors.  I remember at
6    one point waking up for just no reason, and there was an
7    older woman with toothpaste dripping down her face and I
8    was just, like, confused.  And she was saying weird
9    stuff to me while I was sleeping.  And that's when I
10   went and got help from staff, and that was really a
11   frightening part.
12       I remember about maybe -- it might have been a
13   week or a week and a half.  I remember the last week
14   that I was in there, it was the student -- my student
15   counselor at El Molino High School -- would bring me
16   homework assignments or send homework assignments with
17   my friends, so I was able to somewhat stay on focus.
18   And they're really basic simple, like, worksheets and
19   read this and answer these questions with history and a
20   little bit of math and a little bit of science.  It was
21   basically to keep me in the school program.
22       And I was -- when I did get out, I was able to
23   transition right back to El Molino High School.  And
24   that was a really challenging time, to have people know
25   that I had been in the hospital and been gone for so

Page 115

1    long.  And I had really good friends that would visit
2    me, but that was a real -- that was a big challenge, to
3    kind of face the herd and be a part of school.  And I
4    didn't get bullied or made fun of, but it was really --
5    I was on guard.  It wasn't as friend -- I wasn't having
6    as much as a good time.  It was really a lot of work,
7    and I had really good friends that would help me through
8    that process as far as just being emotionally supportive
9    to get back to school and finish school.
10       Q.  Was there a time during those 16 days where you
11   thought that you didn't belong there?
12       A.  No.  It was hard, but it wasn't -- I wanted to
13   graduate, and I really wanted to graduate and just
14   continue.  I thought that giving up and quitting would
15   have really been have a negative impact for the rest of
16   my life.  If I wasn't able to rise to that challenge
17   then, then it seemed like an obstacle that I really had
18   to do.
19       Q.  So when you say graduate, did the therapist
20   that you worked with talk about this in terms of
21   graduating from a program while you were there?
22       A.  No.  I didn't have any therapy.  It was
23   graduating from high school to get my diploma.
24       Q.  Oh, okay.  That's not what I'm asking about.
25           Was there any time when you were at Oakcrest

Page 116

1    where you thought you didn't belong there?
2        A.  Oh, that I didn't belong at Oakcrest?
3        Q.  Yeah.
4        A.  No.  I knew that something was wrong.  I didn't
5    know what it was and this was the place to get help.  So
6    I trusted the professionals to -- no, I felt like I was
7    really out of it, and I was still scared of that
8    incident where I didn't -- no, I felt like I needed
9    help.
10       Q.  Okay.
11       A.  I didn't fit in with your average -- I
12   definitely stood out like a sore thumb compared to the
13   other people that were getting medical treatment.  There
14   was one other person that was about my age, but other
15   than that, almost everybody else was much older.
16           Did I answer that well enough?
17       Q.  No, you answered that fine.
18           Did you ever ask if you could leave the
19   facility?
20       A.  No.  I do remember -- I don't remember how far
21   into it.  It might have been seven days, it might have
22   been ten days.  I'm not sure how long, but I do remember
23   an evaluation with a doctor and he let me know that I
24   could petition to get out.  And I asked him, I said, "I
25   don't really feel comfortable making this choice myself.

Easton Stokes v.                                                    Easton Stokes
United States Department of Justice, et al.                  November 20, 2020

Page 117

1  What are your thoughts?  Am I better?"
2        And he said, "No.  I think you need to stay
3  additional to get more treatment."
4        So I never once questioned getting out or
5  leaving.  I felt like I needed help.  And the only way
6  to get it was to follow the advice of the doctors.
7     **Q. So the doctor said that you would have to**
8  **petition to get out?**
9     A. He said -- I don't recall -- I don't know how
10  that works, but he said there was an opportunity to try
11  to get out if I wanted to.  And I left that decision --
12  basically he didn't make the decision for me, but I
13  asked him, like, "Am I better?  What -- am I better?"
14        And he said, "No, I think you need more
15  treatment before getting out of here."  So I opted to go
16  with the doctor's recommendation.
17     **Q. But the doctor didn't indicate that you were**
18  **free to leave at any time?**
19     A. There was at least that one time that I could,
20  I did have the option to -- it seemed like there was an
21  option to leave, yeah.
22     **Q. But the option -- you specifically said that**
23  **you would have to petition to leave?**
24     A. I don't remember 100 percent.  I don't remember
25  exactly how this works, but there was -- I do recall an

Page 118

1  opportunity to either leave or get out, and I remember
2  talking -- basically going with what the doctor
3  recommended.  And I don't know if it would have been --
4  I didn't have anywhere to go.
5     **Q. You couldn't go back --**
6     A. Sorry.  I'm stalling out a little bit.
7        I don't -- there was an opportunity to try and
8  leave.  I don't know if it would have been walk out or
9  don't walk out.  But there was an opportunity to either
10  leave or to try to get out, but in my mind I didn't have
11  anywhere that was ready to go.  And I didn't -- I wanted
12  to leave that up to the doctor's advice as far as -- I
13  didn't know if I was better or not better.
14     **Q. Were you unable to stay with the Barkers any**
15  **longer?**
16     A. After it was decided -- I did not go move in
17  with the Barkers afterwards, no.
18     **Q. Why not?**
19     A. It was a very -- it was decided that it
20  wasn't -- I guess to break routine and not just jump
21  back into whatever my life was.  It was almost the end
22  of high school, and we had talked about if I could move
23  in with my father or what the best option was.
24        And I ended up moving in with Gabe Chestly, who
25  was my older sister's boyfriend, and he had an extra

Page 119

1  room right by the junior college that was kind of
2  setting me up for college.  I rented a room from him.
3  And that was, like, okay, what are we going to do right
4  now and what are we going to do next.  And it seemed
5  like that was the best option for me, was to have my own
6  space and finish high school and go to college from
7  there.
8     **Q. So when you say "it was decided," who decided**
9  **this?**
10     A. I was talking with Nancy Barker, my father, my
11  sister, and Gabe.  All these people would come and visit
12  me.  In the beginning there was no -- it was more get
13  help and get treatment.  But towards the end I believe
14  it was like, what is he going to do?  Where is he going
15  to go?  So it was brought up to me what are my best
16  options, and I went with what I thought was the best
17  option for my future.
18     **Q. Were any of the doctors involved in this**
19  **decision-making process?**
20     A. No, I don't believe so.  I do believe, though,
21  when you leave this hospital I don't think they want
22  someone to just go out on the street and leave.  I
23  believe the hospital wanted to know where I was going.
24     **Q. Okay.**
25     A. I believe.  I could be wrong on that.  That's

Page 120

1  just to the best of my memory.
2     **Q. So before you were discharged, the best of your**
3  **memory is the hospital wanted to know where you were**
4  **going?**
5     A. Yes.
6     **Q. And you were 18 years old at this time; right?**
7     A. Yes, I was.
8     **Q. Did you receive any sort of therapy while you**
9  **were at Oakcrest?**
10     A. There was like group -- there's no one-on-one.
11  To the best of my knowledge, I don't believe there was
12  like individual therapy there.  It was more of like
13  group sessions and doing different art or music or
14  talking in a circle.  I remember talking in a circle
15  with a pretty large group of maybe ten people.  To the
16  best of my memory, I don't recall any individual
17  one-on-one therapy.  But I could be wrong about that.
18  I'm not 100 percent certain.
19     **Q. So group therapy; is that right?**
20     A. Yes.  That was the main -- that was their main
21  method.
22     **Q. Did you have any individual therapy that you**
23  **recall?**
24     A. No.  I had -- upon leaving, I was connected
25  with a psychologist at Kaiser.

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 121

1   Q. Okay. And did you -- you said that you
2   received Zyprexa while you were there?
3   A. Yes.
4   Q. Did you receive any other drugs?
5   A. I believe when I first got in there, I was
6   given a sedative. But after that I believe it was just
7   Zyprexa as the follow-up to that. And like I said,
8   whatever the sedative was, it put me out for nearly
9   three days. I'm guessing that I woke up and I had water
10  or food, but I really don't recall my first three days
11  there. I just slept, yeah. So that's my memory, I
12  slept for about three days straight.
13  Q. Okay. Did you ever request a court hearing
14  while you were there?
15  A. I did not.
16  Q. Why not?
17  A. I believe that to request a court hearing would
18  be to get out, but I didn't have any interest in just
19  getting out. I wanted to get better. So it just didn't
20  seem -- it didn't make sense to try to get out. I knew
21  that I needed help.
22  Q. So but was it your understanding that to get
23  out, you would have to have a court hearing or something
24  like that to get out as opposed to just walking out the
25  door, you're 18, you're an adult, you can leave?

Page 122

1   A. Yeah. I believe there was a process. My
2   memory to knowing it then, I believe it was explained to
3   me that there would be a process to make an appeal of
4   some sort, but to get out wasn't just walking out the
5   front door.
6   Q. So you did understand that you would have to
7   make some sort of appeal to get out of Oakcrest?
8   A. Something would have to happen that was --
9   yeah. I'm a little bit -- at that time I didn't know
10  exactly how that all worked. But I knew that walking
11  out the front door was not really an option.
12  Q. That wasn't an option. Okay.
13  And when you left Oakcrest, did you request
14  your medical records?
15  A. I did not, no.
16  Q. Why not?
17  A. I don't -- I went -- I was working directly
18  with Kaiser. And I don't know -- I don't know how that
19  could have -- at the time I don't know how that could
20  have helped me deal with it. My focus was to graduate
21  high school, to get into the junior college. But I
22  guess just with hindsight, I guess that would make
23  sense. I didn't know the place was going to close down,
24  I didn't know the records would be helpful in the
25  future, and I was trying to do the best I could moving

Page 123

1   forward.
2   Q. Do you happen to know -- and don't discuss this
3   with your attorney on the record, but do you happen to
4   know if these Kaiser records include your Oakcrest
5   records?
6   A. I believe that they would be different. I
7   think that they were two separate entities. And when
8   Kaiser sent me to Oakcrest, it was them passing off the
9   treatment to a facility that would treat me. And then
10  they were -- they must have been in communication
11  because I was directly linked up with a psychologist
12  from Kaiser.
13  MS. DAVIS: Okay. It's noon now, and we've
14  been going pretty straight since 9:00. So I think we
15  should break for lunch right now, and then we'll come
16  back and we may have some more questions. And Mr. Yen's
17  going to have some questions for you as well. But if
18  everybody agrees, I think this is probably a good time
19  for us to take a break. It's three full hours for the
20  witness and the court reporter at this point.
21  Madam Court Reporter, how long a break would
22  you like?
23  THE REPORTER: I'm good with 30 or 45 minutes.
24  MS. DAVIS: Either is fine with me. Does
25  anyone have a --

Page 124

1   MR. KELLY: I have a slight conflict at
2   1 o'clock for about 15 minutes, so I don't know if
3   there's a way to work around that or step aside. I
4   don't mean to minimize it. That's a sort of long lunch
5   break if we came back at 1:15.
6   MS. DAVIS: Should we maybe come back at 12:30
7   and take another break at 1:00? I agree, I don't want
8   to take that long a break. Does that work?
9   THE WITNESS: Yeah. That works for me.
10  MS. DAVIS: Does that work for you, Madam Court
11  Reporter?
12  THE REPORTER: Yes.
13  MS. DAVIS: Okay. Thank you.
14  (At 11:59 a.m. a lunch break was taken until
15  12:32 p.m. of the same day.)
16  (Nothing omitted nor deleted. See next page.)
17
18
19
20
21
22
23
24
25

**EXHIBIT D**



CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS

# CERTIFICATION OF FIREARMS PROHIBITION

I, Angel Tuyen, do certify and attest under penalty of perjury that I am the legal custodian of records in the Mental Health Firearm Prohibition System maintained by the California Department of Justice (the Department), Bureau of Firearms. This file contains records of individuals lawfully prohibited from possessing, receiving, owning, or purchasing a firearm.

**On July 31, 2020, a diligent search of the Mental Health Firearms Prohibition System was conducted for STOKES, EASTON (DOB: ███████).**

The search revealed the following records:

| <u>Report Number</u> | <u>Date Prohibited</u> |
|---|---|
| 702063818 | 03/12/2002 |

I certify that the attached records are complete, true and exact copies. This certification was prepared by personnel of the Department in the ordinary course of business on the date stated above.

_____
ANGEL TUYEN
Custodian of Records
Bureau of Firearms

CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS
COMPLETE TRUE AND CORRECT COPY

JUL 31 2020

CUSTODIAN OF FIREARMS RECORDS

```
4W1WGH9JQ4C.IQ

RE: QP.FCN/1860208400205              DATE: 2020-07-31 TIME: 14:36:17

******************* FIREARMS PROHIBITION SUMMARY *********************
FCN/1860208400205
PHN/702063818          TYP/M
ENT/2                              NRI/1519750671
NAM/STOKES,EASTON                  DOB/███████████
SEX/M   RAC/W   HGT/      WGT/      HAI/      EYE/      POB/
***********************PROHIBITION REPORT**************************
ORI/49P001 - SUTTER PSYCHIATRIC UNIT   OCA/1029422
DATE RECEIVED/03-25-2002
DATE PROCESSED/03-25-2002
DATE PROHIBITED/03-12-2002
PROHIBITION/5250 - 5250 WIC - DTSO OR GRAVELY DISABLED
COM/707 5654980 NEW FORM
               PROHIBITION EXPIRATION/LIFETIME

         *   *   *   END OF MESSAGE   *   *   *
```

```
4W1WGTAR66O.IQ
RE: R.QDP.CA0349425.NRI/1519750671


CHECKING NCIC


             *   *   *   END OF MESSAGE   *   *   *


4W1WGTAR66O.IJ
CA0349459
ACCEPT MKE/QDP
DATE: 07/31/20  TIME:17:43
A G E N C Y   N I C S   I N D E X   D I S P L A Y   R E S P O N S E
==========================================================
NRI: 1519750671   STATUS: ACTIVE    EXPIRATION DATE: N/A
PCA: D - ADJUDICATED OR COMMITTED MENTAL DEFECTIVE
NAM: STOKES, EASTON
SEX: M RAC: W
HGT: 000 WGT: 0 EYE: XXX HAI: XXX
POB: UNKNOWN PLACE OF BIRTH SOR: N/A
RTV: 0 SST: N/A
SOC: N/A
SMT: N/A
AKA: N/A
MNU: N/A
DOB: ███████

MIS: N/A
     SST: N/A
     RTV: N/A
     UCN: N/A
     SID: N/A


ORI: CA0349418   OCA: 1029422
DNY: N/A
DATA-SRC: CA
ARI: ███████
CREATED-BY: CA0349418       CREATED-DATE: 10/02/2007
UPDATED-BY: CA0349418       UPDATED-DATE: 10/02/2007
```

CONFIDENTIAL          AG_Stokes-000003

# CERTIFICATE OF SERVICE

Case Name:   **Easton Stokes v. US DOJ, et al**        No.   **3:19-cv-04613-WHA**

I hereby certify that on <u>April 29, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT CALIFORNIA ATTORNEY GENERAL ROB BONTA'S NOTICE OF MOTION; MOTION FOR SUMMARY JUDGMENT; POINTS OF AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**DECLARATION OF GILBERT MAC IN SUPPORT OF DEFENDANT CALIFORNIA ATTORNEY GENERAL ROB BONTA'S MOTION FOR SUMMARY JUDGMENT**

**[PROPOSED] ORDER GRANTING DEFENDANT CALIFORNIA ATTORNEY GENERAL ROB BONTA'S MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 29, 2021</u>, at Sacramento, California.

| Lindsey Cannan | /s/ *Lindsey Cannan* |
|:---:|:---:|
| Declarant | Signature |

SA2019104336
35045097.docx