Rob Bonta
Attorney General of California
Anthony R. Hakl
Supervising Deputy Attorney General
Jerry T. Yen
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7836
  Fax:  (916) 324-8835
  E-mail:  Jerry.Yen@doj.ca.gov
*Attorneys for State of California and Rob Bonta, in
his official capacity as California Attorney General*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EASTON STOKES,**<br><br>                                        Plaintiff,<br><br>          **v.**<br><br>**THE UNITED STATES DEPARTMENT OF JUSTICE, WILLIAM BARR, individually and as Attorney General of the United States, THE U.S. BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (ATF); REGINA LOMBARDO individually and as Acting Director of ATF; THE FEDERAL BUREAU OF INVESTIGATION; Christopher Wray individually and as Director of the Federal Bureau of Investigation; STATE OF CALIFORNIA, ROB BONTA, individually and acting as Attorney General of the State of California, THE SONOMA COUNTY SHERIFF'S OFFICE, MARK ESSICK, individually and as Sheriff of Sonoma County,**<br><br>                                        Defendants. | 3:19-cv-04613-WHA<br><br>**DEFENDANT CALIFORNIA ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:            June 17, 2021<br>Time:           8:00 a.m.<br>Courtroom:   Remote<br>Judge:          Hon. William Alsup<br>Trial Date:    None Set<br>Action Filed:  August 12, 2019 |

# TABLE OF CONTENTS

Page

Introduction ...................................................................................................................... 1

Argument .......................................................................................................................... 1

    I.     The Mental Health Facility Is Presumed to Comply with the Law ........................ 1

    II.    The 5250 Hold Process Permits Judicial Review and Meets the Definition of "Committed to a Mental Health Institution".......................................................... 2

    III.   Plaintiff was "Adjudicated as a Mental Defective" ................................................ 4

    IV.   Plaintiff's Due Process Claims Are Derivative of His Second Amendment Claim ...................................................................................................................... 4

    V.    Plaintiff's Equal Protection Challenge is Subsumed by His Second Amendment Claim ................................................................................................. 5

Conclusion ....................................................................................................................... 6

# TABLE OF AUTHORITIES

**Page**

CASES

*Albright v. Oliver*
510 U.S. 266 (1994) ............................................................................................................... 4

*Flanagan v. Harris*
No. LA CV16-06164 JAK (ASx), 2017 WL 729788, at *5 (C.D. Cal. Feb. 23,
2017) ...................................................................................................................................... 5

*Harris v. County of Riverside*
904 F.2d 497 (9th Cir. 1990)................................................................................................. 5

*Jefferies v. Sessions*
278 F. Supp. 3d 831 (E.D. Pa. 2017) .................................................................................... 5

*Keyes v. Lynch*
195 F. Supp. 3d 702 (M.D. Pa. 2016) ................................................................................... 5

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013).................................................................................................. 6

*Mai v. United States*
952 F.3d 1106 (9th Cir. 2020)........................................................................................... 3, 6

*Misischia v. Pirie*
60 F.3d 626 (9th Cir. 1995)................................................................................................... 2

*Nordyke v. King*
681 F.3d 1041 (9th Cir. 2012)............................................................................................... 6

*Peruta v. County of San Diego*
824 F.3d 919 (9th Cir. 2016)................................................................................................. 5

*Teixeira v. County of Alameda*
822 F.3d 1047 (9th Cir. 2016)............................................................................................... 5

*United States v. Norton*
97 U.S. 164 (1877)................................................................................................................ 2

*United States v. Rehlander*
666 F.3d 45 (1st Cir. 2012)................................................................................................... 3

STATUTES

18 United States Code
§ 922(g)(4) ...................................................................................................................*passim*

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3  California Civil Code
   § 3548 ......................................................................................................... 2

4

5  California Welfare & Institutions Code
   § 5250 ......................................................................................................... 1

6  § 5254.1 ...................................................................................................... 2
   § 5256 ......................................................................................................... 4

7  §§ 5256 - 5256.4 ........................................................................................ 4
   §§ 5256 - 5256.7 ........................................................................................ 3

8  § 5256.1 ...................................................................................................... 3
   § 5256.6 ................................................................................................... 3, 4

9  § 5256.7 ................................................................................................... 2, 3
   § 5275 ......................................................................................................... 2

10 § 8103(g)(2) ............................................................................................... 2

11

12 **OTHER AUTHORITIES**

   27 Code of Federal Regulations

13 § 478.11 ................................................................................................... 3, 4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Attorney General Rob Bonta's Opposition to Plaintiff's MSJ (3:19-cv-04613-WHA)

**INTRODUCTION**

Plaintiff's Cross-Motion for Summary Judgment (ECF No. 90) is not directed at California law or the actions of the California Attorney General.  Instead, Plaintiff's motion, and his entire case, is focused on the constitutionality of a federal statute – 18 U.S.C. § 922(g)(4) – and the application of that statute by the federal government to prohibit Plaintiff from possessing a firearm.  As such, the California Attorney General defers to the Federal Defendants in opposing Plaintiff's motion.  Nevertheless, the California Attorney General provides the following response to some of the arguments made in Plaintiff's motion.

**ARGUMENT**

**I.    THE MENTAL HEALTH FACILITY IS PRESUMED TO COMPLY WITH THE LAW**

The California Attorney General's Motion for Summary Judgment provides an overview of the process that a mental health facility must follow in order to certify a patient for involuntary treatment under California Welfare & Institutions Code § 5250 (a "5250 hold").  ECF No. 89 at 1-2.  Plaintiff claims that the mental health facility did not follow this process because he does not recall having a certification hearing or receiving a notice of certification.  *See* Plaintiff's Cross-Motion for Summary Judgment (ECF No. 90) at 5-6, 11.  However, Plaintiff testified that he only had vague memories from that time.  For example, when asked whether he had a clear memory of what happened after taking drugs, Plaintiff testified:

> I did not have a very clear memory of after Friday when I stopped sleeping and not feeling myself.  I would describe my -- ***I wouldn't describe my memory as very clear***.  I have good memories of certain pieces, but when I stopped sleeping, ***my memory -- a lot of my -- I became -- things became much more unclear***.

Exhibit 1 (Stokes Nov. 20, 2020 Deposition) at 103:8-13 (emphasis added).  When asked about his evaluation at Kaiser, Plaintiff stated:

> ***I don't remember.  Everything is really blurry.***  I'm on three days of maybe a couple of hours of sleep.  I'm somewhat -- I remember being relieved to be in a place where I felt like I was going to get care.  ***But I don't recall that process, no.***

*Id*. at 110:15-19 (emphasis added).  And when asked about his time at Oakcrest (the mental health facility), Plaintiff testified:

> So I remember getting there and being in a room and ***being very confused***
> ***and disoriented***.  And they gave me sort of sedative, and I just fell asleep
> for about -- ***I don't recall, 72 hours of just being asleep***.

*Id*. at 111:20-24 (emphasis added).  At bottom, Plaintiff simply cannot recall certain events

almost 20 years ago and during a time of confusion and disorientation and of which his memory

is admittedly unclear.  This does not mean that the mental health facility failed to follow the

requirements for certifying his 5250 hold.

To the contrary, the presumption is that the law has been obeyed.  *See* Cal. Civ. Code

§ 3548 ("The law has been obeyed"); *see also United States v. Norton*, 97 U.S. 164, 168 (1877)

("It is a presumption of law that officials and citizens obey the law and do their duty").  Here,

there are no records or any other evidence to suggest that the mental health facility did not

comply with the law or failed to provide Plaintiff with a certification review hearing.  In fact, the

mental health facility followed the law when it reported Plaintiff's 5250 hold to the California

Department of Justice.  *See* Cal. Welf. & Inst. Code § 8103(g)(2).  Plaintiff fails to meet his

burden of showing that he did not actually receive a certification review hearing or that the

mental health facility erred in reporting his 5250 hold.[1]

## II.   THE 5250 HOLD PROCESS PERMITS JUDICIAL REVIEW AND MEETS THE DEFINITION OF "COMMITTED TO A MENTAL HEALTH INSTITUTION"

Any person subject to a 5250 hold has the right to request judicial review by habeas corpus

before or after a certification review hearing.  *See* Cal. Welf. & Inst. Code §§ 5254.1, 5256.7, and

5275.  Here, Plaintiff never requested judicial review.  The failure to request judicial review does

not mean that a 5250 hold lacked judicial involvement.  Indeed, courts generally consider that a

party has an adequate opportunity to litigate when a party has an opportunity to ask for judicial

review, even if he chooses not to take it.  *See Misischia v. Pirie*, 60 F.3d 626, 630 (9th Cir. 1995).

Thus, a person subject to a 5250 hold should not be able to avoid the firearms prohibition under

18 U.S.C. § 922(g)(4) simply by choosing not to request judicial review.

---

[1] Even if there were some evidence that the mental health facility did not comply with the procedures for placing Plaintiff on a 5250 hold or otherwise erred in reporting a 5250 hold, it is the mental health facility, not the California Attorney General, that must correct that information. *See* Gilbert Mac Declaration (ECF No. 89-1), at ¶ 15.

2

Moreover, federal regulations define "committed to a mental institution" to mean a "formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority.  The term includes a commitment to a mental institution involuntarily."  27 C.F.R. § 478.11.  A 5250 hold meets this definition.  In particular, a patient "may be detained for involuntary care . . . pursuant to Section[] 5250" after a certification review hearing and "the person conducting the hearing finds that there is probable cause that the person certified is, as a result of a mental disorder or impairment by chronic alcoholism, a danger to others, or to himself or herself, or gravely disabled . . . ."  Cal. Welf. & Inst. Code § 5256.6.  The hearing is conducted by "either a court-appointed commissioner or a referee, or a certification review hearing officer [who is] . . . selected from a list of eligible persons unanimously approved by a panel composed of the local mental health director, the county public defender, and the county counsel or district attorney designated by the county board of supervisors."  *Id*. § 5256.1.

The 5250 certification review hearing also meets the requirements for a "commitment" under the First Circuit's decision in *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012).[2]  In that case, the First Circuit concluded that an involuntary hospitalization without adversary proceedings and with no findings by an administrative officer did not qualify as a "commitment."  *Id*. at 47-48.  On the other hand, a commitment after an adversary hearing and a determination that the patient is mentally ill and poses a likelihood of serious harm would create "a presumptively valid section 922 ban."  *Id*. at 48, 50.  Here, in the certification review hearing, the patient may receive assistance from an attorney or patient advocate, present evidence, and question witnesses.  *See* Cal. Welf. & Inst. Code §§ 5256–5256.7.  After the hearing, a certification review hearing officer must determine whether a person, as a result of a mental disorder, is a danger to himself or others.  *Id*. §§ 5256.1 and 5256.6.  If so, then the patient is detained for involuntary treatment.  *Id*. § 5256.6.  Even after the certification review hearing, the patient still has the right to request another hearing in California superior court.  *Id*. § 5256.7.  In

---

[2] As the Federal Defendants noted in their cross-motion for summary judgment, the Ninth Circuit in *Mai v. United States* cited *Rehlander* for the proposition that "state-law procedures that lack robust judicial involvement do not qualify as commitments for purposes of § 922(g)(4)."  952 F.3d 1106, 1110 (9th Cir. 2020).

3

sum, the 5250 hold process includes several due process safeguards, including the right to request judicial review, and thus qualifies as a "commitment" under 18 U.S.C. § 922(g)(4).

### III.   PLAINTIFF WAS "ADJUDICATED AS A MENTAL DEFECTIVE"

Even if the process for a 5250 hold under California law is not considered a "commitment," 18 U.S.C. § 922(g)(4) also applies to anyone who has been "adjudicated as a mental defective." Federal regulations define "adjudicated as a mental defective" to mean "a determination by a court, board, commission, or other lawful authority that a person, as a result of . . . mental illness . . . is a danger to himself or to others . . . ." 27 C.F.R. § 478.11.  In the case of a 5250 hold, as discussed above, there is an adversarial type hearing where the patient may receive assistance from an attorney and present evidence.  *See* Cal. Welf. & Inst. Code §§ 5256–5256.4. After the hearing, a certification review hearing officer (i.e., a "lawful authority") determines whether there is probable cause that a person, as a result of a mental disorder, is a danger to himself or others and detained for involuntary treatment.  *Id*. § 5256.6.  So, Plaintiff's 5250 certification review hearing is an "adjudication"[3] and prohibits him from possessing a firearm under 18 U.S.C. § 922(g)(4).

### IV.   PLAINTIFF'S DUE PROCESS CLAIMS ARE DERIVATIVE OF HIS SECOND AMENDMENT CLAIM

Resolution of Plaintiff's Second Amendment claim would resolve his due process claims. With respect to his substantive due process claims, the United States Supreme Court has stated that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  The Ninth Circuit has also held that when equal protection and due process claims are "derivative" of the Second Amendment claims, then resolution of the Second Amendment

---

[3] As also discussed above, the law requires that a certification review hearing be held for all patients subject to a 5250 hold, *id*. § 5256, and there is no evidence that Plaintiff's mental health facility failed to follow the law.

4

1    question "necessarily resolves" those "derivative claims." *Peruta v. County of San Diego*, 824

2    F.3d 919, 942 (9th Cir. 2016) (en banc).

3    As for Plaintiff's procedural due process claim, courts must first determine whether the

4    government action is even "the type . . . to which due process applies." *Harris v. County of*

5    *Riverside*, 904 F.2d 497, 501 (9th Cir. 1990).  In the context of 18 U.S.C. § 922(g)(4), courts have

6    concluded that procedural due process principles do not apply.  *Keyes v. Lynch*, 195 F. Supp. 3d

7    702, 723 (M.D. Pa. 2016) (rejecting the plaintiff's "contention that he deserved some kind of

8    hearing before or after being subjected to the disability under § 922(g)(4)" because "the statute

9    subsection is clear that anyone who has been committed for mental health is subject to it; thus a

10   hearing on whether the plaintiff is still dangerous is not in fact relevant"); *Jefferies v. Sessions*,

11   278 F. Supp. 3d 831, 846 (E.D. Pa. 2017) (agreeing with the district court's rationale in *Keyes*

12   that there is no procedural due process right before applying § 922(g)(4) to the plaintiff.  Thus,

13   an individual does not have a right to a hearing prior to deprivation or post-deprivation of his

14   Second Amendment right under 18 U.S.C. § 922(g)(4).  *See id.*  So it is here.  If the Court

15   determines that application of § 922(g)(4) to Plaintiff does not violate the Second Amendment,

16   then any hearing on whether Plaintiff still suffers from mental health issues is unnecessary.

17   **V.    PLAINTIFF'S EQUAL PROTECTION CHALLENGE IS SUBSUMED BY HIS SECOND
         AMENDMENT CLAIM**

18

19   The Ninth Circuit has stated that where an "equal protection challenge is no more than a

20   Second Amendment claim dressed in equal protection clothing, it is subsumed by, and

21   coextensive with the former, and therefore not cognizable under the Equal Protection Clause."

22   *Teixeira v. County of Alameda*, 822 F.3d 1047, 1052 (9th Cir. 2016) (quotations marks, brackets,

23   and internal citation omitted), *vacated by*, 854 F.3d 1046 (9th Cir. 2016), and *reh'g en banc*, 873

24   F.3d 670 (9th Cir. 2017), *cert. denied*, No. 17-982 (U.S. May 14, 2018); *see also Flanagan v.*

25   *Harris*, No. LA CV16-06164 JAK (ASx), 2017 WL 729788, at *5 (C.D. Cal. Feb. 23, 2017) ("An

26   Equal Protection claim brought under the Fourteenth Amendment that is the same as one brought

27   simultaneously under a different constitutional provision cannot provide an independent basis for

28   relief.").

1    Other courts have reached the same conclusion. *See, e.g., Kwong v. Bloomberg*, 723 F.3d

2    160, 170 n.19 (2d Cir. 2013) ("Like *every* Circuit to have addressed this issue, we simply

3    conclude that plaintiffs should not be allowed to use the Equal Protection Clause to obtain review

4    under a more stringent standard than the standard applicable to their Second Amendment claim."

5    (quotation marks omitted)).  Thus, Plaintiff's claim that his equal protection rights have been

6    violated because his fundamental rights under the Second Amendment have been violated, *see*

7    Plaintiff's Cross-Motion for Summary Judgment (ECF No. 90) at 14, cannot provide an

8    independent basis for relief.

9    Further, as noted in the California Attorney General's Motion for Summary Judgment, this

10   case does not involve a suspect classification and thus rational basis review applies.  *See Nordyke*

11   *v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc) (stating that rational basis scrutiny

12   applies to the plaintiffs' equal protection claim when the challenged law is found not to violate

13   the First or Second Amendment and the law does not involve a suspect classification).  And the

14   rational basis standard would be met because the purpose of 18 U.S.C. § 922(g)(4) is related to a

15   legitimate government interest.  *See Mai*, 952 F.3d at 1116 (agreeing that preventing crime and

16   suicide are legitimate interests supporting 18 U.S.C. § 922(g)(4)).

17                                   **CONCLUSION**

18   In response to Plaintiff's Cross-Motion for Summary Judgment, the California Attorney

19   General notes that California law requires mental health facilities to follow a specific procedure,

20   which includes a certification review hearing, when placing a patient on a 5250 hold for

21   involuntary treatment.  In this case, Plaintiff does not provide any evidence that the mental health

22   facility failed to follow this robust process.  So, Plaintiff's 5250 hold qualifies as both a

23   "commitment" and "adjudication" under 18 U.S.C. § 922(g)(4).  Further, the Ninth Circuit has

24   held that 18 U.S.C. § 922(g)(4) does not violate the Second Amendment.  And because Plaintiff's

25   Second Amendment claim subsumes both his equal protection and due process claims, those

26   claims fail as a matter of law.

27

28

1   Dated:  May 27, 2021                    Respectfully Submitted,

2                                            ROB BONTA
                                             Attorney General of California
3                                            ANTHONY R. HAKL
                                             Supervising Deputy Attorney General
4

5

6                                                  _/s/ Jerry T. Yen_
                                             _____
7                                            JERRY T. YEN
                                             Deputy Attorney General
8                                            *Attorneys for State of California and Rob
                                             Bonta, in his official capacity as California
9                                            Attorney General*

    SA2019104336
10  35145613

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Attorney General Rob Bonta's Opposition to Plaintiff's MSJ (3:19-cv-04613-WHA)

**EXHIBIT 1**

# In The Matter Of:

*Easton Stokes v.*
*United States Department of Justice, et al.*

---

*Easton Stokes*
*November 20, 2020*

---

*Behmke Reporting and Video Services, Inc.*
*455 Market Street, Suite 970*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 37537Stokes.txt

**Min-U-Script® with Word Index**

Case 3:19-cv-04613-WHA  Document 94  Filed 05/27/21  Page 14 of 22

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4
 5   - - - - - - - - - - - - - -
 6   EASTON STOKES,            )
 7            Plaintiff,       )  CASE NO.
 8   vs.                       )  3:19-CV-04613 WHA
 9   UNITED STATES DEPARTMENT  )
10   OF JUSTICE, et al.,       )
11            Defendants.      )
12   - - - - - - - - - - - - - -
13
14
15
16         REMOTE DEPOSITION OF EASTON STOKES
17           FRIDAY, NOVEMBER 20, 2020
18
19
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22   BY: ANGELA SINCLAIR, RMR, RPR, CRR, CCRR, CSR NO. 13902
23                   455 MARKET STREET, SUITE 970
24                 SAN FRANCISCO, CALIFORNIA 94105
25                           (415) 597-5600
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8       Remote Deposition of EASTON STOKES located in
 9   Santa Rosa, California, taken on behalf of Federal
10   Defendants via Zoom videoconference, with the
11   witness in Santa Rosa, California, commencing at
12   9:02 A.M., FRIDAY, NOVEMBER 20, 2020, before Angela
13   Sinclair, Certified Shorthand Reporter No. 13902,
14   pursuant to Notice of Deposition.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFF EASTON STOKES:
 3       LAW OFFICES OF TIMOTHY KELLY
 4       BY:  TIMOTHY KELLY, ATTORNEY AT LAW
 5            (VIA VIDEOCONFERENCE)
 6       1403 Spyglass Parkway
 7       Vallejo, California 94591
 8       Telephone:  (707) 570-7507
 9       Email:  tskelliot@gmail.com
10
11   FOR THE FEDERAL DEFENDANTS:
12       UNITED STATES ATTORNEY'S OFFICE
13       BY:  JULIE DAVIS, ASSISTANT U.S. ATTORNEY
14            ERIC SOSKIN, ASSISTANT U.S. ATTORNEY
15            (VIA VIDEOCONFERENCE)
16       1301 Clay Street, Suite 340-S
17       Oakland, California 94612
18       Telephone:  (510) 637-3701
19       Email:  julie.davis@usdoj.gov
20            eric.soskin@usdoj.gov
21
22
23
24
25
```

Page 4

```
 1   APPEARANCES OF COUNSEL - (CONTINUED):
 2   FOR THE STATE DEFENDANTS:
 3       DEPARTMENT OF JUSTICE
 4       OFFICE OF THE ATTORNEY GENERAL
 5       BY:  JERRY YEN, DEPUTY ATTORNEY GENERAL
 6       1300 I Street
 7       Sacramento, California 95814
 8       Telephone:  (916) 210-7836
 9       Email:  jerry.yen@doj.ca.gov
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

---

Page 5

```
1                          INDEX
2    FRIDAY, NOVEMBER 20, 2020
3    EASTON STOKES                            PAGE
4      Examination by MS. DAVIS                  7
5    P.M. SESSION                              125
6      Examination resumed by MS. DAVIS       125
7      Examination by MR. YEN                 126
8
9
10
11
12
13                         -oOo-
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1                        EXHIBITS
2                      EASTON STOKES
3    Number            Description            Page
4                 (No exhibits marked.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 7

```
1        FRIDAY, NOVEMBER 20, 2020; 9:02 A.M.
2
3              EASTON STOKES,
4       affirmed as a witness,
5       testified as follows:
6       MS. DAVIS: Thank you, Madam Court Reporter.
7  And thank you for appearing here today.
8       There's one housekeeping matter I want to get
9  on the record before we get started.  I just want to
10 make sure that all the attorneys agree that this
11 deposition is a remote deposition and can be used for
12 all purposes for in-person deposition under the federal
13 rules.  Do you stipulate?
14      MR. KELLY: Yes, so stipulated.
15      MS. DAVIS: Jerry?
16      MR. YEN: Yes, I do.
17      MS. DAVIS: Okay.  Thank you.
18 EXAMINATION BY MS. DAVIS:
19      Q.  All right.  Mr. Stokes, I represent the federal
20   defendants in this action, so I represent the
21   United States.  And we're going to be asking you some
22   questions about the case that you filed.
23          Have you ever been deposed before?
24      A.  No.  This is my first time.
25      Q.  Okay.  So I'm going to give you some
```

Page 8

```
1  information about a deposition to start out with.  Let
2  me know if you have any questions.
3          First, and most importantly, we need verbal
4  answers because the court reporter is recording this.
5  That means no nods or head shakes because they can't be
6  recorded.
7      A.  Okay.
8      Q.  Do you understand?
9      A.  I do.
10      Q.  In addition, please say "yes" or "no" as
11  opposed to "uh-huh" or "huh-uh," again, so that the
12  court reporter can record it.
13      A.  Yes, I understand.
14      Q.  Okay.  Also, we can't speak at the same time,
15  so please wait until you're sure I've completed the
16  question before you respond.  It's okay if you ask for
17  clarification or if you pause before answering.
18      A.  Okay.
19      Q.  Also, it's okay to say "I don't know" or "I
20  don't have an opinion," but I am entitled to your best
21  recollection of the events.
22      A.  Okay.
23      Q.  Do you understand?
24      A.  I do understand, yeah.
25      Q.  Thank you.  While we're not in a courtroom and
```

---

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 9

1  this situation seems informal, the deposition is under
2  oath; therefore, it's the same testimony in a courtroom
3  and you are required to tell the truth.
4       Do you understand?
5  A.  I do understand, yes.
6  Q.  Okay.  Your attorney or the other attorneys in
7  this deposition may object to a question.  Even if
8  there's an objection, you may still answer the question.
9  The objection will just be recorded in the transcript.
10  A.  Okay.
11  Q.  Do you understand?
12  A.  I do understand, yes.
13  Q.  Okay.  Also, if you don't ask me to clarify, I
14  will assume that you've understood the question and that
15  your answer is based on a full understanding of my
16  question.
17       Does that make sense?
18  A.  That does, yes.
19  Q.  Okay.  We can take breaks during the day.  If
20  you need to take a break, just let us know.  However, we
21  can't take a break when a question is pending.
22  Therefore, if I or one of the other attorneys ask you a
23  question, you need to answer it before requesting a
24  break.
25       Does that make sense?

Page 10

1  A.  That does, yes.
2  Q.  Okay.  Do you feel as if you're able to
3  understand questions and respond to them today?
4  A.  Yes, I am.
5  Q.  Okay.  And this next question, this is a
6  standard question that we ask.  This is not specific to
7  you or your circumstances and meant to imply anything.
8  It's just to make sure the deposition is a good one.
9       Have you taken any drugs or alcohol within the
10  last 24 hours, including prescription drugs?
11  A.  No, I have not.
12  Q.  Okay.  Anything else that might impair your
13  ability to answer questions truthfully and fully today?
14  A.  No.
15  Q.  Okay.  Thank you.
16       Did you speak with anybody to prepare for
17  today's deposition?
18  A.  Very little, but yes.  I talked to my attorney,
19  Tim Kelly.
20  Q.  Okay.  So you don't have to give me any of the
21  content of the communications between you and your
22  attorney.  Did you review -- but did you review any
23  documents with your attorney?
24  A.  I did not.  I was told that they would be on
25  the record, and if I didn't understand the exact

Page 11

1  timeline, I could ask for information as far as
2  clarification of the question and what's already on the
3  record, I believe was available.
4  Q.  Okay.  I'm just going to say you don't have
5  to -- please don't have any communication between you
6  and your attorney.  You're not required to answer that.
7       MS. DAVIS:  And, Tim, we will not construe that
8  as any waiver of the privilege, okay?
9       MR. KELLY:  Absolutely.
10  BY MS. DAVIS:
11  Q.  Have you spoken to anyone else about your
12  deposition who wasn't your attorney?
13  A.  No.
14  Q.  Okay.  Have you spoken to anybody else about
15  this lawsuit?
16  A.  Yes, I have.
17  Q.  Who?  Who did you speak to?
18  A.  Friends and family.  I haven't kept this a
19  secret.
20  Q.  Okay.  What sort of things have you discussed
21  with your friends and family about this lawsuit?
22  A.  Just that it was happening.  And there was a
23  newspaper article in the Mercury News, and I shared that
24  with my friends and family.  Not everybody but privately
25  with certain family members and friends.

Page 12

1  Q.  There was an article in Mercury News about this
2  particular lawsuit?
3  A.  Yes, there is.
4       MR. KELLY:  Ms. Davis --
5  BY MS. DAVIS:
6  Q.  Do you remember when that article was?
7  A.  I believe August of 2019.
8  Q.  Thank you.  Did you ever discuss this lawsuit
9  on social media?
10  A.  Never.  No.
11  Q.  Never?  Okay.
12       And can you tell me -- outside of
13  communications with your attorney, which is privileged,
14  can you please let me know anything else you've done to
15  prepare for this deposition?
16  A.  I Googled it just to see what the rules are,
17  and that was about it.
18  Q.  You mean Googled the rules for a deposition?
19  A.  Yes.
20  Q.  And do you have any questions about those rules
21  before we proceed?
22  A.  I do not, no.
23  Q.  Okay.  And just so we have this, can you please
24  state your full name for the record and spell it?
25  A.  Easton Atwood Stokes, E-a-s-t-o-n A-t-w-o-o-d

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 97

1    Q. She says that you had actually gone several
2  days without sleep. So I'm trying to nail down the
3  timeline here.
4         When -- did this not sleeping occur before you
5  had taken the mushrooms?
6    A. That was Friday after. So Friday night I
7  didn't sleep. Saturday night I might have gotten an
8  hour. And then Sunday night, those three days in a row
9  was very minimal. Maybe an hour here, hour there. And
10  then Monday, that first Monday is when I went in to
11  Oakcrest or I went to Kaiser, directly to Kaiser and
12  they transferred me to Oakcrest.
13    Q. Okay. So the not sleeping that she refers to,
14  your testimony is that that occurred after you took the
15  mushrooms; you were unable to sleep for several days?
16    A. Yes. That was between the Friday and the
17  Monday and -- Friday and Monday, yes.
18    Q. So --
19    A. We haven't -- sorry. Go ahead.
20    Q. I'm just -- so your recollection is you took
21  the drugs on a Friday, and it was Monday you were
22  transported to the hospital?
23    A. I drove my -- I drove with Nancy Barker. It
24  would have been Nancy Barker, Donny Barker, and
25  Mike O'Brien and Micah Black. We drove -- we had all

Page 98

1  talked together and I needed help and I voluntarily went
2  with -- Nancy was the driver, and she took all of my
3  friends. We went to Kaiser. And from there I was
4  transported from Kaiser to Oakcrest.
5    Q. Okay. We'll get into that. I'm trying to get
6  the previous timeline correct now, but thank you for the
7  other information.
8         So the Friday night was you took the mushrooms.
9  The Saturday night was the trip to Bodega Bay?
10    A. Yes.
11    Q. And during this entire time you did not sleep.
12  That's what you think that Mrs. Barker's referring to?
13    A. Yes. And that Sunday was also -- I might have
14  had a couple hours here and there, but my sleeping
15  rhythm was off.
16    Q. Okay. Another declarant, Joseph Bassignani --
17  I may be pronouncing the name wrong.
18    A. Jonathan.
19    Q. I'm sorry. For the court reporter that last
20  name is B-a-s-s-i-g-n-a-n-i.
21         He stated that you were having some problems
22  with a girl that you were dating?
23    A. I don't believe that he said there was
24  problems. At that time I wasn't dating anybody at that
25  time.

Page 99

1    Q. I'm going to quote from -- and you're right, it
2  doesn't say problems, but I'm going to quote from his
3  declaration. It says, in reference to you, "He was
4  talking about our relationships with current girlfriends
5  and about one girlfriend he had been dating."
6         That was on your mind during
7  Mr. Bassignani's --
8    A. I believe it might have been a classmate Lola,
9  and we weren't even dating. I just had a crush on Lola,
10  but we were not dating.
11    Q. So you're saying that you didn't have concerns
12  about this young woman?
13    A. Oh, I may have had concerns. I don't -- this
14  is in the middle of what was described to me as a
15  drug-induced psychotic episode, and I don't believe
16  that -- I was not being rational or having clear
17  thoughts at all. This would have been right in the
18  middle of that.
19         So if I'm talking about -- it wasn't my
20  girlfriend, but I would refer to my friend Jon who
21  brought that up.
22    Q. Okay. So you don't recall that you had a
23  girlfriend you had been dating at that time?
24    A. I -- yeah, I had -- the girlfriend who I was
25  dating before this happened would have been Heather

Page 100

1  Bowen, and we had dated and that was a really -- how
2  would I describe that? Like a high school, kind of a
3  kids relationship. But I hadn't -- I didn't have a
4  girlfriend at that particular time, no.
5    Q. So would your relationship with these girls
6  have caused you some mental stress or anguish prior to
7  taking the mushrooms?
8    A. I don't believe so, no.
9    Q. So you have no recollection of having concerns
10  or worry about your relationships with girls prior to
11  the mushroom ingestion?
12    A. No.
13    Q. Okay. So let's keep moving forward. You said
14  that after this sort of three-day drug-induced psychosis
15  where you weren't sleeping, you were taken to Kaiser.
16  Do you recall how that came about?
17    A. As far as the thought process or the chain of
18  events that led to me going there?
19    Q. Yeah. The chain of events going there.
20    A. I didn't feel -- it was Monday morning and I
21  wasn't -- I was emotionally un-capable of attending
22  school, and I wasn't able to just pretend like nothing
23  happened. I was not well. And that's when -- once I
24  wasn't able to attend school, it was -- I needed help
25  and I wasn't sleeping. I was very vocal with my

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

---

Page 101

1  friend's mom and my friend's dad as to I'm not doing
2  well and I need help.
3       And could you repeat the question?  I'm not
4  sure if I'm getting off topic.
5    Q.  No, it was fine.  And we'll come back to that,
6  but let me just confirm one thing.
7       Why did you take the mushrooms on Friday night?
8  Do you recall that?
9    A.  Yes.  It seemed like it would be fun.  I didn't
10 realize how serious and how scary those are.  And it
11 just seemed like a fun thing to do.
12   Q.  Were you -- were your friends, did they
13 regularly ingest mushrooms?
14   A.  This was -- it was more of like a house party.
15 And this wasn't my close friends.  I didn't do this with
16 my close friends.  This would have been a house party,
17 and it was a big party and it just was going around, and
18 it was like, oh, cool, I can handle that, I'll try that.
19 And that was really scary.  It was a really bad decision
20 and quite terrifying, to be honest.
21   Q.  Did any --
22   A.  Go ahead.
23   Q.  Did your friends take the mushrooms as well?
24   A.  No, they did not.  Not my close group of
25 friends.  It was a bigger house party.  And some people

---

Page 102

1  were doing it and I'd say most people were not.
2    Q.  What about any of the friends who went to
3  Bodega Bay?
4    A.  They -- none of them had mushrooms that night.
5  I don't recall who was even there at that house party
6  that night.
7    Q.  Had the people that you were with when you
8  drove to Bodega Bay, had any of them ingested alcohol?
9    A.  We -- not before, but I believe some of them
10 were drinking beer when we got there.  The driver was
11 sober.  I hadn't drank anything that day and I didn't
12 drink while we were there, but I believe some of my
13 friends were drinking when we got there.
14   Q.  You said you had gotten into a minor accident
15 on the way there.  What happened with that?
16   A.  Yes.  One second.
17       It was on Highway 1 right through the town of
18 Bodega Bay and there's a hairpin left-hand turn.  And
19 the driver took it too fast.  I was in the passenger
20 seat closest to the impact, and we -- he applied the
21 brakes when he shouldn't have and slid into the
22 guardrail and lifted the car up a little bit.  I was
23 right there in the driver's seat or the passenger -- I
24 was a front passenger in the car and everybody else was,
25 like, pretty concerned and scared and getting through

---

Page 103

1  the adrenaline rush of just getting into a car accident.
2       I remember that I didn't even react, and that's
3  when it seemed like something was wrong.  I was
4  completely just unresponsive to that level of danger.
5    Q.  So you were unresponsive, but it seems like you
6  have a very clear memory of exactly what happened?
7    A.  I remember the car accident, yes, but I
8  wouldn't describe -- I did not have a very clear memory
9  of after Friday when I stopped sleeping and not feeling
10 myself.  I would describe my -- I wouldn't describe my
11 memory as very clear.  I have good memories of certain
12 pieces, but when I stopped sleeping, my memory -- a lot
13 of my -- I became -- things became much more unclear.
14   Q.  But you remember this incident on Saturday
15 night?
16   A.  Yes, I do.  Yes.
17   Q.  And had Donny Barker, is that the -- is that
18 your friend?
19   A.  Yes.
20   Q.  Had he used alcohol or any drugs during this
21 incident at Bodega Bay?
22   A.  Donny Barker, I don't -- he was not in the car
23 when we went out to the beach.  It was James Cardwell
24 was driving.  Micah Black was in the car, me, Jonathan.
25 I believe there were five of us that went to that --

---

Page 104

1  were there in that minor car accident.
2    Q.  Okay.  Is there a reason that Donny Barker
3  wasn't there?
4    A.  He was doing something else.
5    Q.  Okay.  All right.  So now let's go to Monday.
6  It was Nancy Barker who drove you to Kaiser?
7    A.  Yes.  It was Nancy that drove.  There was
8  also -- that would have been Mike O'Brien.  Mike
9  O'Brien's also -- we have the same half-sister.  My
10 oldest sister Christine is my half-sister.  We share the
11 same mother.  And then that -- and we've been friends
12 for a long time.  Christine's father, Brendan O'Brien,
13 is the father of Mike O'Brien.  So he's not my family
14 relative, but he is a good friend of mine.
15       So Nancy was driving, Micah Black was there,
16 Mike O'Brien was there, me.  I think I have that all.
17 And Donny drove with us then as well.
18   Q.  Donny drove with you where?
19   A.  To Kaiser Hospital.
20   Q.  Why did they all come with you to Kaiser?
21   A.  It was to be supportive, to be comforting, and
22 to be around me.  I was scared and didn't really have a
23 good perspective of reality.  I was in a really bad, a
24 very challenging emotional state.  I didn't really
25 understand what was going on.  I just knew that I wasn't

---

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 105

1  well, I wasn't sleeping, and I was scared.  So my
2  friends were very supportive and they all helped me
3  through this process.
4      Q. So who did you meet with at Kaiser?
5      A. I don't recall exactly who I met.  I remember
6  filling out some questionnaire in the very beginning,
7  but I don't have a very clear memory of my -- of the
8  transfer of this.  I remember some sort of inpatient
9  that questioned, but I don't -- I was really exhausted
10 and out of it.
11      I felt safe -- I felt more safe just by being
12 in that environment where there was professional care,
13 but I -- could you rephrase that question or repeat the
14 question?
15      Q. Who did you meet with at Kaiser?
16      A. I'm not 100 percent sure.  I don't know how the
17 inpatient process went.
18      Q. Was this a hospital?
19      A. Yes.
20      Q. And what happened after you arrived at Kaiser?
21      A. I was there for a while.  My friends were there
22 with me.  And I ended up getting transported from
23 Kaiser, voluntarily transported with consent.  They
24 wasn't -- there wasn't a service where I could get --
25 I'm guessing on that part as far as why I didn't just

Page 106

1  stay there.  I don't think they have a psychiatric ward,
2  and it was clear --
3      Q. I don't --
4      A. -- to everybody --
5      Q. I don't need you to speculate as to their
6  decision.  I just want to know what happened from your
7  perspective.
8      A. From there I gave up my rights to make
9  decisions, and I believe it was Nancy Barker who was
10 talking with the nurses as to what's the best course of
11 action.  I needed help.  I needed professional care.
12 And it wasn't an option -- it wasn't a good decision for
13 me just to go home.  There was nowhere else for me to
14 go.  I needed medical treatment.  And I voluntarily went
15 to Kaiser in an ambulance, and that's when I was
16 declared a 5150.
17      Q. But you also said you gave up your rights to
18 make decisions?
19      A. Yes.  I wasn't -- I was very consenting to this
20 process.  I didn't know what was real, what wasn't real.
21 I was scared and I trusted everybody that was around me
22 to make decisions for me.
23      Q. Okay.  So if you trusted other people to make
24 your decisions and you gave up your rights to make
25 decisions, it seems that other people were making the

Page 107

1  decisions for you?
2      A. I was -- it was more of a process I believe
3  where it was, hey, this is what happened, are you okay
4  with this?  Yes.  There's nowhere for you to stay here
5  and get help and get treatment.  Where there is help and
6  treatment is at Oakcrest.  Are you willing to go to
7  Oakcrest?  Yes.
8      And the hospital provided an ambulance for me
9  to get there.  We had just driven from Occidental to
10 Santa Rosa which is probably 16 miles, I'm guessing.
11 But we made it a pretty good distance with private
12 driving getting there voluntarily.  And once I was
13 there, it was -- the professional way to get from Kaiser
14 to get treatment at Oakcrest was in an ambulance.
15      Q. Okay.  I just want to clarify.  So agreeing to
16 something is very different from giving up your rights
17 to make decisions, and I think the two are getting
18 conflated.  So I want to clarify with you your
19 testimony.
20      You stated you gave up your rights to make
21 decisions; is that correct?
22      A. I did.  I believe it was either here at Kaiser
23 or it was at Oakcrest, but I believe it was at Kaiser.
24 That's when I gave up my decision to make -- my consent
25 to make decisions for me.  I believe that's when I gave

Page 108

1  it to Nancy Barker.
2      Q. And do you recall signing a document to that
3  effect?
4      A. I do.  Everything's a little bit spotty.  I'm
5  not sure if this was at Kaiser or at Oakcrest, but I do
6  recall signing documents to have Nancy Barker make
7  decisions for me.
8      Q. Do you recall signing documents at both places?
9      A. I do not.  I'm not certain if it was at Kaiser
10 or if it was at Oakcrest.
11      Q. Could it have been both?
12      A. I don't know how that works.  So I would say it
13 could have, but I'm not -- I don't know.
14      Q. And as of today do you have records from either
15 place?
16      A. I do have records from Kaiser, yes.  I
17 requested my complete -- all of the medical records that
18 exist.  And I have -- I did get that and I'd be willing
19 to share that.  It's a file.  I'd be willing to show it,
20 share that.
21      MR. KELLY: Yeah.
22 BY MS. DAVIS:
23      Q. When did you get those?
24      A. That was maybe a week ago.
25      Q. Okay.

Case 3:19-cv-04613-WHA   Document 94   Filed 05/27/21   Page 20 of 22

Easton Stokes v.                                          Easton Stokes
United States Department of Justice, et al.           November 20, 2020

Page 109

1    MS. DAVIS: Yeah, we can talk about this time,
2  Tim, but these should probably be produced pursuant to
3  the judge's order.
4    MR. KELLY: Absolutely. I haven't even had a
5  chance to review them, but I will certainly turn over
6  what I have.
7    THE WITNESS: What happened is I sent you the
8  link but it wasn't able to because it was
9  password-protected.
10   MS. DAVIS: I'm sorry. This is attorney-client
11  privilege, and it's really risky for us to have you talk
12  about stuff.
13   MR. KELLY: Just so I won't interrupt, I will
14  certainly provide them to you. I haven't even seen them
15  myself, but we are in the process of trying to get
16  medical records.
17   MS. DAVIS: Okay. Given that, I just want to
18  put this on the record for at least the federal
19  defendants. Jerry, you can chime in if you want, but I
20  think that we should probably reserve some time from
21  this deposition to go over any issues that might be --
22   MR. KELLY: Absolutely.
23   MS. DAVIS: Because these issues go directly to
24  the issues in this lawsuit that Judge Alsup has asked us
25  to explore, we may need to question your client further.

Page 110

1  So we may need to reserve some time.
2    MR. KELLY: Absolutely. I think that's a very
3  good idea.
4  BY MS. DAVIS:
5    Q. So you've gotten your medical records from
6  Kaiser, which is great. Have you gotten other paperwork
7  or medical records from Oakcrest?
8    A. I have not, no.
9    Q. Okay. In her declaration Nancy Barker spoke --
10  states that you went into the evaluation interview
11  yourself. Do you recall what was discussed in that
12  evaluation interview at Kaiser?
13   A. I cannot recall this part.
14   Q. Okay. Do you --
15   A. I don't remember. Everything is really blurry.
16  I'm on three days of maybe a couple hours of sleep. I'm
17  somewhat -- I remember being relieved to be in a place
18  where I felt like I was going to get care. But I don't
19  recall that process, no.
20   Q. All right. So who took you to Oakcrest?
21   A. From Kaiser to Oakcrest I was transported in an
22  ambulance. I remember sitting in the back and having a
23  conversation with the EMT. I was sitting in their
24  little jump seat. I was not like gurneyed down and out
25  of it. I was sitting in the back part of the ambulance,

Page 111

1  and I remember just having a casual conversation with
2  the EMT.
3    Q. Okay. What was -- do you recall what you
4  discussed?
5    A. It was basic -- I think he was just keeping me
6  engaged with the weather and the day and just -- I think
7  he was just being professional as to keeping me engaged
8  with the situation as far as -- I don't recall anything
9  specific. I don't think it was an in-depth
10  conversation. It was more just like, hey, how are you?
11  I'm guessing at this point, but I remember it was a very
12  casual basic conversation just to get me there.
13   Q. And do you recall what treatment you received
14  while you were at Oakcrest?
15   A. What do you mean by "treatment"?
16   Q. You were there 16 days; is that right?
17   A. Yes.
18   Q. So how about -- we'll be more general.
19   What happened while you were there?
20   A. Okay. So I remember getting there and being in
21  a room and being very confused and disoriented. And
22  they gave me some sort of sedative, and I just fell
23  asleep for about -- I don't recall, 72 hours of just
24  being asleep. And when I woke up I was confused as to
25  how -- I asked what day it was. Like, what day is it?

Page 112

1  What time is it? What's happening? I was surprised
2  that it had been three days.
3    Q. Okay. What happened --
4    A. Sorry, someone was in the background from your
5  TV.
6    Q. Sorry.
7    A. That's all right.
8    Q. There are multiple people teleworking at our
9  house. So sorry about that.
10   A. No worries.
11   So I recall -- once I came to, I recall it was
12  having a bunkmate, a roommate in a small room. There
13  were no doors. I remember eating and having meals. I
14  remember being on Zyprexa. There's no more sedative
15  after that initial period. I remember, maybe five or
16  six days into it, just feeling restless and needing to
17  move around.
18   So I went for -- every time they let me outside
19  I would go for a run on the perimeter of Oakcrest's
20  facilities. It was a really beautiful outdoor setting,
21  the oak trees and nice grass that time of the year, and
22  I remember just running as much as I could while I was
23  outside or sitting in the sun.
24   But I remember whatever medication -- it was
25  Zyprexa. Basically I went in at probably 145 pounds and

Easton Stokes v.
United States Department of Justice, et al.

Easton Stokes
November 20, 2020

Page 113

1  I left at about 170 pounds.  And when I was running I
2  wasn't really able to sweat, and I remember that was
3  weird, go for a run even with the jacket on and I wasn't
4  able to sweat.
5       I recall earlier on having a lot of friends
6  coming to visit me.  They actually -- and there's a
7  weird -- it's a little bit of what I would perceive as a
8  little bit jealousy from other people.  It was so much
9  commotion.  I had a lot of school friends come and visit
10 me, parents' friends, and they started to have to make
11 rules as to how to have guests.
12      And they would have a group of friends come in.
13 There was a line of really close people.  My
14 ex-girlfriend Heather Bowen came in to see me there.  I
15 remember Jon Kincheloe, who's one of my best friend's
16 father, he came and visited and we chatted outside.
17      I remember doing little projects to keep people
18 engaged, little groups, and this is not with the guests
19 but with the -- not with my friends but with the people
20 that were inpatient -- of doing group activities, having
21 circle conversations or drawing or doing a music thing.
22      I remember this was also a facility that
23 would -- people that were mentally -- I don't even know
24 how you'd say that, but people that were waiting to go
25 to court but not capable of staying in a jail also

Page 114

1  stayed here.  And my bunk -- my roommate was waiting to
2  go to see the judge, and he was a Sonoma County -- going
3  to see the Sonoma County judge.  Very friendly.
4       I remember one time there was -- there was a
5  few scary incidents.  There's no doors.  I remember at
6  one point waking up for just no reason, and there was an
7  older woman with toothpaste dripping down her face and I
8  was just, like, confused.  And she was saying weird
9  stuff to me while I was sleeping.  And that's when I
10 went and got help from staff, and that was really a
11 frightening part.
12      I remember about maybe -- it might have been a
13 week or a week and a half.  I remember the last week
14 that I was in there, it was the student -- my student
15 counselor at El Molino High School -- would bring me
16 homework assignments or send homework assignments with
17 my friends, so I was able to somewhat stay on focus.
18 And they're really basic simple, like, worksheets and
19 read this and answer these questions with history and a
20 little bit of math and a little bit of science.  It was
21 basically to keep me in the school program.
22      And I was -- when I did get out, I was able to
23 transition right back to El Molino High School.  And
24 that was a really challenging time, to have people know
25 that I had been in the hospital and been gone for so

Page 115

1  long.  And I had really good friends that would visit
2  me, but that was a real -- that was a big challenge, to
3  kind of face the herd and be a part of school.  And I
4  didn't get bullied or made fun of, but it was really --
5  I was on guard.  It wasn't as friend -- I wasn't having
6  as much as a good time.  It was really a lot of work,
7  and I had really good friends that would help me through
8  that process as far as just being emotionally supportive
9  to get back to school and finish school.
10      Q.  Was there a time during those 16 days where you
11 thought that you didn't belong there?
12      A.  No.  It was hard, but it wasn't -- I wanted to
13 graduate, and I really wanted to graduate and just
14 continue.  I thought that giving up and quitting would
15 have really been have a negative impact for the rest of
16 my life.  If I wasn't able to rise to that challenge
17 then, then it seemed like an obstacle that I really had
18 to do.
19      Q.  So when you say graduate, did the therapist
20 that you worked with talk about this in terms of
21 graduating from a program while you were there?
22      A.  No.  I didn't have any therapy.  It was
23 graduating from high school to get my diploma.
24      Q.  Oh, okay.  That's not what I'm asking about.
25      Was there any time when you were at Oakcrest

Page 116

1  where you thought you didn't belong there?
2       A.  Oh, that I didn't belong at Oakcrest?
3       Q.  Yeah.
4       A.  No.  I knew that something was wrong.  I didn't
5  know what it was and this was the place to get help.  So
6  I trusted the professionals to -- no, I felt like I was
7  really out of it, and I was still scared of that
8  incident where I didn't -- no, I felt like I needed
9  help.
10      Q.  Okay.
11      A.  I didn't fit in with your average -- I
12 definitely stood out like a sore thumb compared to the
13 other people that were getting medical treatment.  There
14 was one other person that was about my age, but other
15 than that, almost everybody else was much older.
16      Did I answer that well enough?
17      Q.  No, you answered that fine.
18      Did you ever ask if you could leave the
19 facility?
20      A.  No.  I do remember -- I don't remember how far
21 into it.  It might have been seven days, it might have
22 been ten days.  I'm not sure how long, but I do remember
23 an evaluation with a doctor and he let me know that I
24 could petition to get out.  And I asked him, I said, "I
25 don't really feel comfortable making this choice myself.

# CERTIFICATE OF SERVICE

Case Name:   **Easton Stokes v. US DOJ, et al**        No.   **3:19-cv-04613-WHA**

I hereby certify that on <u>May 27, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANT CALIFORNIA ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>May 27, 2021</u>, at Sacramento, California.

<table>
<tr><td>Lindsey Cannan</td><td>/s/ <i>Lindsey Cannan</i></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2019104336
35145884